IN THE UNITED STATES DISTRICT COURT IN AND FOR THE SOUTHERN
DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.03-21216-CIV- LENARD/  SIMONTON

BAPTIST HEALTH SOUTH FLORIDA, INC.
f/k/a BAPTIST HEALTH SYSTEMS OF
SOUTH FLORIDA, INC., a Florida non
profit corporation,

       Plaintiff,

vs.

SCPIE MANAGEMENT SERVICES, INC.,
a foreign profit corporation; SCPIE
INDEMNITY COMPANY, a foreign
corporation; SCPIE INSURANCE
SERVICES, INC., a foreign for profit
corporation; SCPIE MANAGEMENT
COMPANY, a foreign for profit
corporation; and AMERICAN HEALTHCARE
INDEMNITY COMPANY, a foreign profit corporation,

       Defendants.

_____/



**AFFIDAVIT OF PLAINTIFF IN SUPPORT OF MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

       Comes now the Deponent, who being first duly sworn, deposes and says under
penalties of perjury that:

(1)     Affiant is Paige P. Stone, Insurance Manager for Baptist Health Systems of South
Florida, 6855 Red Road, Suite 500, Coral Gables, FL. 33143, and personally
familiar with the insurance program sold to Baptist Health Systems by Southern
California Physician's Insurance Exchange (SCPIE).

(2)     Baptist Health Systems of South Florida purchased liability insurance from
defendant SCPIE Insurance Company in 1996 insuring Baptist Health Systems of
South Florida facilities. [Exhibit #1 is an overview of the Program]




CASE NO.: 03-21216-CIV- LENARD/SIMONTON

(3)     Historical documentary references between Baptist and SCPIE verify Baptist's understanding that SCPIE was Baptist's primary insurance carrier. [Exhibit #2 - "SCPIE/Reliance Insurance Company of Illinois replaced the primary carrier] [Exhibit #2 (A) - September 26, 1996 letter stating "SCPIE would like very much to become your hospital professional liability insurer."; September 25 and 29, 1998 letters from SCPIE referring to Baptist as "our insured"; July 15, 1999, August 15, 1999, and August 17, 1999 letters from or to SCPIE referring to Baptist as "insured"].

(4)     In support of Baptist understanding that SCPIE was Baptist's direct insurer, Baptist relies upon the following:

        a)      Reliance had little involvement in Baptist's insurance program and Reliance did not function as Baptist's "true insurer." [Exhibit #3] - [SCPIE November 14, 2001 correspondence stating "Reliance (had) minimal involvement in the SCPIE program;" "policyholders look to SCPIE;" "SCPIE would continue to administer and resolve claims as if it were the insurer"].

        b)      Reliance acted only as a "pass through" and not as Baptist's "true insurer." Rather, SCPIE functioned as Baptist's direct insurer and Baptist reasonably expected direct payment of its claims from SCPIE. [Exhibit #4 - SCPIE correspondence and direct payment of Baptist's defense fees; Exhibit #5 - SCPIE counsel's references to the "Expectations of the involved Reliance policyholders" (e.g., Baptist) and the "nature of American Healthcare's reinsurance of Reliance"].

        c)      SCPIE assumed 100% of Baptist's risk from Reliance as a "fronting insurer." [Exhibit #6]

        d)      From October 1, 1996 until October of 2001 SCPIE adjusted Baptist claims, authorized the employment of defense counsel by Baptist, collected premiums paid directly by Baptist to SCPIE, paid defense attorneys to represent Baptist and its hospitals, and communicated with defense counsel employed by SCPIE to defend Baptist. [Exhibits #4, #12 and #15]

        e)      SCPIE collected insurance premiums directly from Baptist, stated in correspondence that it was functioning as the direct insurer of Baptist, tendered settlement drafts, authorized the hiring of experts, corresponded with and hired defense attorneys to defend Baptist's claims. [Exhibits #12 and #15]

-2-

CASE NO.: 03-21216-CIV- LENARD/SIMONTON

f)     A July 21, 1997 joint press release form SCPIE and Sullivan Kelly Insurance
       Brokerage states that "SCPIE (was) selected as the insurer" (for Baptist).
       [Exhibit #7]

g)     An August 27, 1996 letter written by Sullivan Kelly to Baptist describes
       SCPIE's coverage of Baptist, including 24-hour claims handling and access
       to a legal panel of defense lawyers [never mentioning "reinsurance"].
       [Exhibit #8].

h)     A diagram of the SCPIE - Baptist relationship.  [Exhibit #9]

i)     A description of the biographies of the SCPIE team that would assist Baptist.
       [Exhibit #10]

j)     A January 10, 1997 letter from SCPIE to Baptist describing the on-line claims
       access system in which all Baptist facilities were directly linked to SCPIE.
       [Exhibit #11]

k)     Baptist's premium payments were made directly to SCPIE [Exhibit #12].

l)     The establishment of a toll-free SCPIE telephone number dedicated
       exclusively to Baptist.  [Exhibit #13]

m)     A bulletin from SCPIE indicating "all claims are reported directly to SCPIE"
       with 24-hour service.  [Exhibit #14]

n)     A January 7, 1997 letter from SCPIE settling a Baptist claim as a direct
       insurer.  [Exhibit #15]

o)     An October 30, 2001 letter from SCPIE regarding a Baptist claim indicating
       ". . . the insured . . . should continue to report any new claims to the Los
       Angeles claims office," noting the insured was South Miami Hospital. [Exhibit
       #16]

p)     A SCPIE / Sullivan Kelly PowerPoint marketing presentation made to Baptist
       prior to SCPIE's assumption of Baptist's direct insurer responsibilities in
       which the following representations were made:

       1)     The Baptist account team included the President and Chief Executive
              Officer of SCPIE.

       2)     SCPIE would become Baptist's "underwriting partner."

-3-

CASE NO.: 03-21216-CIV- LENARD/SIMONTON

    3)     SCPIE would "control (Baptist's) professional liability litigation."

    4)     SCPIE would provide Baptist "local claims management" and would "vigorously defend non-meritorious claims."

    5)     SCPIE would provide Baptist early investigation, evaluation, and resolution of liability claims; approve hospital attorney firms; coordinate defense and provide Baptist an expert referral program.

    6)     SCPIE would be Baptist's "ideal partner."

    7)     The presentation makes no reference to SCPIE as a reinsurer, nor is Reliance mentioned.  [Exhibit #17].

q.    A November 1998 Settlement Agreement and Release indicates SCPIE is "insurer" for defendant Baptist Hospital of Miami, Inc. and Baptist Health Systems South Florida. [Exhibit #18]

**FURTHER AFFIANT SAYETH NAUGHT.**

AFFIANT

## VERIFICATION / ATTESTATION

STATE OF FLORIDA    )
                      ) SS:
COUNTY OF DADE    )

    Before me, a person authorized to administer oaths, personally appeared Paige P. Stone, who swore to me her affirmations are made under penalty of perjury, and that this Affidavit is supported by documents declared to be true and correct under penalty of perjury.

SIGNATURE

My Commission Expires:

Hilda R Portal
My Commission CC950778
Expires June 28, 2004

L:\2130-0055-00\P\affidavit.wpd

**EXHIBIT #1**

JUN-24-2003 17:23
06/24/2003 14:22 FAX          MENDES & MOUNT                          1 212 261 8750      P.05/07
                                                                                          005/007

### The SCPIE Companies Hospital Professional Liability Program

1. The purpose of the SCPIE Companies Hospital Professional Liability Program (SCPIE Program) with Reliance National was to provide a fronting arrangement allowing The SCPIE Companies (SCPIE) to write business in states in which its Hospital Professional Liability program was not available. This arrangement was accomplished through an automatic facultative quota share reinsurance agreement between Reliance Insurance Company (RIC) and American Healthcare Indemnity Company (AHIC), effective August 1, 1996. Under this agreement, RIC would write the risk on a non-admitted basis and AHIC would reinsure RIC 100%.

2. The major terms and conditions of the fronting agreement are as follows:

   a. Effective date: August 1, 1996
   b. Cancellation date: October 1, 1999
   c. Healthcare Liability business written through the Health Care Division of Reliance National in which SCPIE Management Services, Inc. (SMS), is acting as program manager.
   d. Ceding Commission of five percent (5%) plus applicable brokerage commission plus 100% of assessments from guarantee funds, insolvency funds and any related assessment.
   e. SCPIE Management Services, Inc. (SMS) entered into a Claims service agreement with Reliance Insurance Company of Illinois to handle all claims services on the facultative business.
   f. SMS entered into a Program Manager's Agreement to provide solicitation, binding, policy issuance, billing and accounting services to Reliance National for this program.

3. SMS was authorized to administer the program and assumed responsibility for the program management and claims administration.

4. SCPIE is seeking novation of the policies to mitigate the adverse reaction of these policyholders to the downgrade of Reliance and the regulatory actions the Departments of Insurance have taken. With the novation, we would also expect the return of our letter of credit to the extent that we can obtain reductions in liabilities.

5. The advantage to Reliance is that they will no longer bear the "credit" risk on these policies. Reliance would be removed as the insurance company and The SCPIE Companies would move into their place as the primary insurer.

**EXHIBIT #2**



**SULLIVAN KELLY**
INSURANCE EXPERTS TO THE HEALTHCARE INDUSTRY

July 1, 1997

Ms. Kathryn Eblen Townsend
Corporate Director, Risk Mgmt.
Affiliated Pysicians of
Baptist Health Systems of South Florida, Inc.
6200 Southwest 73rd Street
Miami, Florida 33143

Re:     **Affiliated Physicians Program of Baptist Health Systems of South Florida, Inc.**
        **SCPIE/Reliance Insurance Company of Illinois**
        **Primary Policy No. NPD1412189/7077**

Dear Ms. Townsend:

We are pleased to enclose a copy of the *new master policy* for the Affiliated Physicians
Program. As of October 1, 1996, SCPIE/Reliance Insurance Company of Illinois replaced
the primary carrier and now provides the first $500,000 of coverage along with Claims
and Risk Management Services.   The annual anniversary date of the program remains
January 1, 1998.

A current list of covered physicians, with their respective retroactive dates, is included.
Please advise if there are any questions or corrections. Individual *Coverage Certificates* for
each participating physician were mailed to you last January. If you need additional
copies of any of these certificates we will be happy to provide them upon request.

The program coverage limit has not changed. Primary and excess coverage limits apply
as follows:

> *When ONE insured physician is determined by the Primary Insured to be solely involved
> in any claim or suits, the maximum limit of liability available to the insured physician shall be
> limited to $500,000 excess of $500,000 underlying each and every loss (or $1,000,000).*

> *When TWO insured physicians are determined by the Primary Insurer to be jointly
> involved in any claim or suits, they shall share a maximum limit of liability of $1,500,000 excess
> of $500,000 underlying each and every loss (or $2,000,000).*

> *When MORE THAN TWO insured physicians are determined by the Primary Insurer to
> be jointly involved in any claim or suits, they shall share a maximum limit of liability of
> $3,000,000 excess of $2,000,000 underlying each and every loss (or $5,000,000).*

• • •

RECEIVED
JUL 0 3 1997

| ITEM 1: | THE NAMED          ED<br>AFFILIATED PHYSICIAN PROGRAM<br>OF BAPTIST HEALTH SYSTEMS OF<br>SOUTH FLORIDA, INC | POLICY NUM.  R | : NPD1412189/7077 |
|---------|----------------------------------------------------------|----------------|-------------------|

DATE ISSUED          : 04/23/97

COUNTY - DISTRICT      : DAD - 00

ITEM 2: MAILING ADDRESS
        8900 NORTH KENDALL DRIVE
        MIAMI FL 33176

ITEM 3: RETROACTIVE DATE:  REFER TO ATTACHED SCHEDULE OF PHYSICIANS FOR VARIOUS RETROACTIVE DATES

ITEM 4: POLICY PERIOD    FROM:   10/01/96 (12:01 A.M. STANDARD TIME)
                     TO:      01/01/97 (12:01 A.M. STANDARD TIME)

SUBJECT TO ALL OF THE TERMS OF THE POLICY, THE INSURANCE  AFFORDED IS ONLY WITH RESPECT TO THOSE
COVERAGES AND LIMITS OF LIABILITY THAT ARE LISTED BELOW. THE PREMIUM FOR THE POLICY PERIOD IS SET FORTH
ON AN INVOICE(S), WHICH IS PART OF THE POLICY, AND INCORPORATED INTO THE DECLARATIONS.

ITEM 5: COVERAGES

| COVERAGE | * * * LIMIT OF LIABILITY * * *<br>(Section 6, Item 5 of Policy) |
|----------|----------------------------------------------------------------|
| **A.**   Personal Injury Liability<br>     Claims Made and Reported Coverage<br>     (Section 1 of Policy)<br><br>     Professional Liability<br>     Claims Made and Reported Coverage<br>     (Section 1 of Policy) | $500,000 Each Occurrence<br>(Shared Limits Among All Insureds) |
| **B.**   Property Damage Liability<br>     Claims Made and Reported Coverage<br>     (Section 1 of Policy) | $200 Property Damage Deductible |

ITEM 6: ENDORSEMENTS

| CODE | DESCRIPTION | Effective Date: |
|------|-------------|-----------------|
| HCP-01-BP | Insured's Portion of Loss | 10/01/96 |
| HCP-02-BP | Definition of Insured (Employee) | 10/01/96 |
| HCP-03-BP | DPR Investigation Defense (Separate Individual Limits) | 10/01/96 |
| HCP-04-BP | Addt'l Reporting Period (as of 09/30/96) | 10/01/96 |
| HCP-05-BP | Premium Determination | 10/01/96 |
| HCP-06-BP | Prior Accts Coverage | 10/01/96 |
| HCP-07-BP | Defense and Arbitration | 10/01/96 |
| HCP-08-BP | Definition of Insured (Locum Tenens) | 10/01/96 |
| HCP-09-BP | Addt'l Reporting Period (after 09/30/96) | 10/01/96 |
| HCP-435A-BP | Claims Made Provisions | 10/01/96 |

This supersedes all prior Declarations/Certificate Inserts
THIS IS NOT A BILL - DO NOT PAY

HCP-89D-BP (9/96)

## CERTIFICATE OF INSURANCE - PROFESSIONAL LIABILITY

STER Name:   AFFILIATED PHYSICIANS PROGRAM OF BAPTIST HEALTH SYSTEMS         Effective Date*
ICY            OF SOUTH FLORIDA, INC.                                                      SEE BELOW
DER  Address:  8900 NORTH KENDALL DRIVE, MIAMI, FLORIDA  33176-2197

* 12:01 AM Standard Time at the place of location of risks insured.

iance Ins. Co. of Illinois              *Reliance Ins. Co. of Illinois*

ASTER POLICY NUMBER         MASTER EXCESS CERTIFICATE  NUMBER        POLICY PERIOD
NPD 1412189/7077                     NPD 130895                  01/01/97  TO  01/01/98

SICIAN MEMBER AND OFFICE ADDRESS

nique M. Bryan M.D.
uth Miami Hospital
00 Southwest 73rd Street
iami, Florida  33143

**certificate or verification of insurance is not an insurance policy** and does not amend, extend,
ter the coverage afforded by the primary policy and excess certificate(s) referred to above.
withstanding any requirement, term or condition of any contract or other document with respect
h this certificate or verification of insurance may be issued or may pertain, the insurance afforded
rimary policy and excess certificate(s) is subject to all the terms, exclusions, and conditions of such
y and certificate(s).  Limits include both Primary and Excess.

**OVERAGE PROVIDED**          **RETROACTIVE DATE**          **LIMITS OF INSURANCE**

rofessional Liability Including        06/30/97            **$1,000,000      Each**
ersonal Injury                                            Insured has shared limits of insurance for each
                                                          occurrence
See Policy for details.                                   Unlimited aggregate per calendar year.

> IT IS HEREBY AGREED THAT UPON CANCELLATION OR TERMINATION
> OF THIS POLICY OR POLICIES THE COMPANY WILL ENDEAVOR TO
> MAIL _45_ DAYS NOTICE IN WRITING THEREOF TO THE INTEREST
> SHOWN BELOW.  HOWEVER, CANCELLATION FOR NON-PAYMENT OF
> PREMIUM WILL BE 10 DAYS NOTICE.

tice of cancellation of the primary coverage automatically terminates all coverage.  A breakdown of
ess  limits will be provided upon demand.

ntification No.     Unit 41  Slot 5

ective Date         06/30/97

ce                  . **Boca Raton, Florida**

er Interest         . Baptist Health Systems of South Florida Inc
                     8900 North Kendall Drive
                     Miami, Florida 33176-2197

06/30/97 dmf                              *James E. Kelly*
DATE ISSUED              COUNTERSIGNED (Authorized Representative)

> **Sullivan, Kelly & Assoc., Inc.**
> **Insurance Brokers**
> **7900 Glades Rd., Suite 650**
> **Boca Raton, Florida 33434**
> **(561) 482-3359**

# CERTIFICATE OF INSURANCE

☒ Primary Insurance:  Reliance Insurance Co. of Illinois
☒ (Excess Insurance)  Reliance Insurance Co. of Illinois

Named • BAPTIST HEALTH SYSTEM OF SOUTH FLORIDA, INC.
Insured    SMH SOUTH MIAMI HOSPITAL

Address • 6200 South West 73rd Street
           MIAMI , FLORIDA 33143

| NPD0130894 NPD0130894 |
|---|
| Excess Certificate |

| 90-01-001 | NPB1412190/3165 |
|---|---|
| | Primary Policy |
| | N/A |
| | Primary Auto and/or General Liability Policy |

This certificate or verification of insurance is not an insurance policy and does not amend, extend, or alter the coverage afforded by the primary policy and excess certificate(s) referred to above. Notwithstanding any requirement, term, or condition of any contract or other document with respect to which this certificate or verification of insurance may be issued or may pertain, the insurance afforded by the primary policy and excess certificate(s) is subject to all the terms, exclusions, and conditions of such policy and certificate(s).  Limits include both Primary and Excess. Insured has Combined Limits or Single Limits as indicated below.

SINGLE LIMIT

| $500,000 | Each Occurrence* | Comprehensive        Professional Liability, General Liability, Bodily Injury & Property Damage Liability |
|---|---|---|
| | Each Occurrence* | Liability<br>Bodily Injury & Property Damage Liability<br>Deductibles:            Comprehensive<br>Collision |
| $4,500,000 | Each Occurrence* | Excess Liability |
| $5,000,000 | TOTAL LIMIT OF LIABILITY PER OCCURRENCE - NO ANNUAL AGGREGATE | |

DESCRIPTION OF OPERATIONS / VEHICLES / SPECIAL ITEMS / REMARKS:
   Addiction Treatment Center located at South  Miami Hospital

   Evidence of Comprehensive Hospital Professional Liability, General Liability, Bodily Injury & Property Damage Liability

After   Until Cancelled            this certificate becomes void and without effect.

IT IS HEREBY AGREED THAT UPON CANCELLATION OR TERMINATION OF THIS POLICY OR POLICIES FROM ANY CAUSE THE COMPANY WILL ENDEAVOR TO MAIL 45 DAYS NOTICE IN WRITING THEREOF TO THE OTHER INTEREST SHOWN BELOW.

Notice of cancellation of the primary coverage automatically terminates coverage.  A breakdown of the primary limits and the excess limits will be provided upon demand.

Effective • September 19, 1996
Date

Place • Boca Raton, FL

Other • Value Behavioral Health
Interest    Provider Relations Department.
           Attention:  Marsha Leberman

Address • 1511 North Westshore Blvd.
           Suite 700
           Tampa, Florida  33067

/96       baa
Typed

COUNTERSIGNED (Authorized Representative)
SULLIVAN, KELLY & ASSOCIATES, INC.
7900 Glades Road, Suite 650
Boca Raton, Florida  33434

FROM THE ST.      COPY               ID 58144    06               PAGE      3/8

THIS INSURANCE IS ISSUED PURSUANT TO
THE FLORIDA SURPLUS LINES LAW.
PERSONS INSURED BY SURPLUS LINES
CARRIERS DO NOT HAVE THE PROTECTION
OF THE FLORIDA INSURANCE GUARANTY
ACT TO THE EXTENT OF ANY RIGHT OF
RECOVERY FOR THE OBLIGATION OF AN
INSOLVENT UNLICENSED INSURER. (626.924)

**EXCESS**
**PROFESSIONAL LIABILITY &**
**GENERAL LIABILITY INSURANCE POLICY**

Prior Policy Number:    New
Policy Number:          NPD 0130894

Insuring Company and Location
Reliance Insurance Company of Illinois
Chicago, Illinois

NOTICE OF CLAIM
Notice shall be given to the
Insurer at the following address
Reliance National Risk Specialists
Claims Division
77 Water Street
New York, NY 10005

A Stock Insurance Company
herein called the Company

Producer Code, Name and Address
Sullivan, Kelly & Assoc., Inc.

**NOTICE**

**THIS IS A CLAIMS MADE POLICY**

**EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS INSURANCE IS LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED AND ARE REPORTED TO THE COMPANY WHILE THIS INSURANCE POLICY IS IN FORCE.**

**PLEASE REVIEW THIS INSURANCE POLICY CAREFULLY AND DISCUSS THE COVERAGE DESCRIBED HEREIN WITH YOUR INSURANCE AGENT OR BROKER. IF IT IS NOT CORRECT, RETURN IT IMMEDIATELY TO THE COMPANY, FOR APPROPRIATE ALTERATION.**

Declarations

Item 1.   Named Insured and Address:        Baptist Health Systems of South Florida, Inc.
                                             8900 North Kendall Drive
                                             Miami, FL 33176

Item 2:  Policy Period:
Effective Date: July 1, 1996              Expiration Date: July 1, 1997
(12:01 A.M. Standard Time at the address of the Named Insured shown in Item 1)

Item 3:  Retroactive Date:               as per Endorsement No. 2

Item 4:  Underlying coverage             Item 5: Limit of Liability
         as per attached schedule        as per Endorsement No. 3

                                         Surplus Lines Agent:  Carlota E. Redondo
                                         Agent's Address: 7800 Glades Road, Suite 660
Item 6:  Premium;                        Lic #:  596254099
FILE#      96     QUARTER   4th          Prod. Act.:   Sullivan, Kelly & Assoc.
PREMIUM             TAX                   City:   Boca Raton, FL 33434

NOTICE TO POLICYHOLDERS

This declarations page, together with the policy provisions and endorsements, complete the above numbered policy.

In witness whereof, the Company has caused this policy to be signed by its authorized officers, but this policy shall not be valid unless also signed by a duly authorized representative of the Company.

11-21-96          Countersigned by:   James E. Kelly
Date                                                    Authorized Representative

AGENT'S COUNTERSIGNATURE:   Carlota E. Redondo

DATE (MM/DD/..

**ISSUE DATE (MM/DD/YY)** 03/14/96

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|

SULLIVAN KELLY
7900 GLADES ROAD, SUITE 650
BOCA RATON, FLORIDA 33434

**COMPANIES AFFORDING COVERAGE**

| COMPANY A | RELIANCE INSURANCE COMPANY OF ILLINOIS |
|---|---|

| INSURED | COMPANY B | RELIANCE INSURANCE COMPANY OF ILLINOIS |
|---|---|---|

BAPTIST HEALTH SYSTEM OF SOUTH FLORIDA, INC.
SOUTH MIAMI HOSPITAL, INC.
6200 S.W. 79RD STREET
MIAMI, FLORIDA 33143

| COMPANY C | |
|---|---|
| COMPANY D | |

**COVERAGES**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES, LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>  X CLAIMS MADE ☐ OCCUR<br>  ☐ OWNER'S & CONTRACTOR'S PROT | NPB1412190/3165 | 10-01-96 | CONTINUOUS UNTIL CANCELLED | GENERAL AGGREGATE | $ NO |
| | | | | | PRODUCTS - COMP/OP AGG | $ NO |
| | | | | | PERSONAL & ADV INJURY | $ INC |
| | | | | | EACH OCCURRENCE | $ 500,0 |
| | | | | | FIRE DAMAGE (Any one fire) | $ INC |
| | | | | | MED EXP (Any one person) | $ 10,0 |
| | **AUTOMOBILE LIABILITY**<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS<br>☐ SCHEDULED AUTOS<br>☐ HIRED AUTOS<br>☐ NON-OWNED AUTOS | | | | COMBINED SINGLE LIMIT | $ |
| | | | | | BODILY INJURY (Per person) | $ |
| | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | PROPERTY DAMAGE | $ |
| | **GARAGE LIABILITY**<br>☐ ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | OTHER THAN AUTO ONLY: | |
| | | | | |   EACH ACCIDENT | $ |
| | | | | |   AGGREGATE | $ |
| B | **EXCESS LIABILITY**<br>☐ UMBRELLA FORM<br>X OTHER THAN UMBRELLA FORM | NPD0130894 | 07-01-96 | 07-01-97 | EACH OCCURRENCE | $ 1,500,00 |
| | | | | | AGGREGATE | $ |
| | **WORKER'S COMPENSATION AND EMPLOYERS' LIABILITY**<br>THE PROPRIETOR/ PARTNERS/EXECUTIVE OFFICERS ARE: ☐ INCL ☐ EXCL | | | | WC STATU- TORY LIMITS / OTHER | |
| | | | | | EL EACH ACCIDENT | $ |
| | | | | | EL DISEASE - POLICY LIMIT | $ |
| | | | | | EL DISEASE - EA EMPLOYEE | $ |
| | **OTHER** | | | | | |

**DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS**

LEASED PREMISES LOCATED AT: 6310 SW 79TH STREET #6, MIAMI, FL., 6320 SW 79TH STREET #8, MIAMI, FL., 6320 SW 79 STREET #10, MIAMI, FL., 6330 SW 79 ST #14, MIAMI, FL., 6330 SW 79 STREET 317, MIAMI, FL., 6340 SW 79 STREET #23, MIAMI, FL.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| TWIN OAKS APARTMENTS<br>6310 S.W. 79TH STREET, APT #1<br>MIAMI, FLORIDA 33143 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL **45** DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES. |
| | AUTHORIZED REPRESENTATIVE<br>*James E Kelly* |

ACORD 25-S (1/95)           ACORD CORPORATION 198

EXHIBIT #2 (A)



**scpie**

September 26, 1996

**VIA FACSIMILE (305) 663-5019**

Ms. Kathryn E. Townsend
Corporate Director of Risk Management
South Miami Hospital
Baptist Health System of South Florida, Inc.
6200 Southwest 73rd Street
Miami, Florida 33143

ᴏᴄᴛ 0 1 1996

Re:    **Baptist Health System of South Florida, Inc.**
       **Transfer Issues**

Dear Ms. Townsend:

I would like to take this opportunity to respond to and clarify SCPIE's position as respects the following issues.

1.    If incidents reported to The Truck Insurance Exchange, which appear on The Truck Insurance Exchange loss run become claims, and for any reason The Truck Insurance Exchange denies covering these claims, will SCPIE respond?

*     **SCPIE will not defend or indemnify these claims.**

2.    If an incident or claim has not been reported to The Truck Insurance Exchange, is it the intent of SCPIE to respond to these incidents or claims?

*     **SCPIE will defend and indemnify if the claim is covered under the terms of the policy.**

3.    If an incident or claim is known by someone at the "hospital," but not known by Kathryn Townsend (hence has not been reported to The Truck Insurance Exchange) is it the intent of SCPIE to respond to these incidents if they become claims?

*     **SCPIE will defend and indemnify if the claim is covered under the terms of the policy.**

4.    The current Truck Insurance Exchange policy issued to South Miami Hospital includes an endorsement which states the following:
      "It is understood and agreed that such insurance as is afforded by this policy is hereby extended to apply to the attached list of known occurrences."

---

Southern California
Physicians Insurance
Exchange

Program administration for SCPIE
performed by SCPIE Management
Company, *Attorney-in-fact*

9441 W. Olympic Boulevard
P.O. Box 4015
Beverly Hills, California 90213-4015
(310) 551-5900

In addition, the current AIG policy issued to Homestead Hospital includes an endorsement which states the following:

> "In consideration of the premium charged, any incident which has not satisfied the definition of an asserted claim under prior insurance policies by means of a third party action against the insured shall be considered reportable as a claim under the policy, provided that the incident occurred after the retroactive date **and is reported as a claim during the current policy period."**

We have been asked if SCPIE will honor the above referenced endorsements affixed to South Miami Hospital and Homestead Hospital?

Please be advised that SCPIE will issue an endorsement agreeing to cover these known occurrences/incidents. The endorsement to be issued by SCPIE will state the following:

> **"It is understood and agreed that such insurance as is afforded by this policy is hereby extended to apply to the attached list of known incidents and shall be considered reportable as a claim, provided that the incidents occurred after the retroactive date and is reported as a claim during the policy period.**

It is our belief that the endorsement issued by The Truck Insurance Exchange is intended to provide coverage for these know incidents provided the incident is reported as a claim **during the Truck Insurance Exchange policy period.** By issuing an endorsement containing the wording noted above, it is clear to all parties that in order for the known incidents to be covered. The incidents must be reported as a claim to the insurer during the policy period. To issue an endorsement containing ambiguous language would not be in the best interest of the insured or the insurer.

We note in a letter from South Miami Hospital dated November 13, 1995 to the Truck Insurance Exchange regarding "Prior Acts/Retroactive Coverage Request" that you sought clarification on this matter. In your letter you state the following:

> **"We understand that as an exception to the condition stated above, Truck Insurance Exchange will agree to cover the attached list of occurrences under the policy for which we are applying subject to the policy definition of claims made and all other terms and conditions of the policy. Further, we understand that for coverage to be effective, the occurrences must have resulted after the retroactive date of the policy, and must be reported as a claim during the Truck Insurance Exchange policy period."**

We believe that we are providing you with the same coverage as it now exists under the policy issued by The Truck Insurance Exchange.

We at SCPIE firmly believe that when dealing with our clients, it is best to clearly state our position and intent on matters of such importance and not leave them to be subject to interpretation.



The endorsement we wish to issue leaves no doubt as to our intent and does not burden you with the task of confirming same in writing.

As we indicated, SCPIE would like very much to become your Hospital Professional Liability Insurer. I would again like to thank you for receiving us during our visit to your fine facility and I hope the above answers all of your concerns.

Should you have any questions, please contact me at (800) 962 5549 ext. 8771.

Sincerely,

Van Anderson
Vice President
Hospital Underwriting

cc:    Carlota Redondo

**scpie**



THE
**scpie**
COMPANIES

September 25, 1998

Jackson McCoy, Esq.
Wicker, Smith, Tutan, et al.
2900 S.W. 28th Terrace, 5th Fl.
Miami, FL 33133

Re:    File Number:              CR000038
       Insured:                  Baptist Hospital of Miami
       Claimant:                 Marvin Singer
       Date of Incident:         11/8/96

Dear Mr. McCoy:

Be advised that the above-captioned file has been reassigned for my supervision.  Please notate your files
accordingly and address all future correspondence/billing to my attention.  By copy of this letter to our
insured, I am advising of this change.

Thank you for your anticipated courtesy and cooperation.  I look forward to working with you and your
firm on this matter.  Feel free to call me directly at (310) 556-7418, should you have any questions.

Sincerely,

Barbara Kuberry
Vice President
Hospital Unit Manager

cc:    Yvonne Zawodny ✓
       Kathryn Townsend
       Nancy Carr
       Marcia Antigua

BEK/njm



THE
**scpie**
COMPANIES

September 29, 1998

Jackson McCoy, Esq.
Wicker, Smith, Tutan, et al.
2900 S.W. 28th Terrace, 5th Fl.
Miami, FL 33133

Re:   File Number:        CR000005
      Insured:            Baptist Hospital of Miami
      Claimant:           Kathy Robinson (dec'd)
      Date of Incident:   11/2/96

Dear Mr. McCoy:

Be advised that the above-captioned file has been reassigned for my supervision.  Please notate your files accordingly and address all future correspondence/billing to my attention.  By copy of this letter to our insured, I am advising of this change.

Thank you for your anticipated courtesy and cooperation.  I look forward to working with you and your firm on this matter.  Feel free to call me directly at (310) 556-7418, should you have any questions.

Sincerely,

Barbara Kuberry
Vice President
Hospital Unit Manager

cc:   Yvonne Zawodny
      Kathryn Townsend
      Nancy Carr
      Melinda Walker
      P. Beach Kuhl

BEK/njm

---

**The SCPIE Companies**
9441 W. Olympic Boulevard • Beverly Hills, California 90212-4541 • (310) 551-5900 • (800) 962-5549

# THE SCPIE COMPANIES

### — LEADERS IN HEALTHCARE LIABILITY INSURANCE —

July 15, 1999

Baptist Hospital of Miami, Inc.
8900 No. Kendall Drive
Miami, FL 33176

ATTN: Kilby Strickland

RE:     File No.:          CR000038
        Insured:          Baptist Hospital of Miami
        Claimant:         Marvin Singer
        Date of Incident:  November 8, 1996

Dear Mr. Strickland:

As you are aware, the above-captioned case has been settled for $44,500. We are now proceeding to close our file.

I would like to take this opportunity to thank you for the cooperation you provided to defense counsel, to this office and to Maria Antigua from the offices of Claims and Risk Management Services. If there are any questions or comments regarding this closure, please contact the undersigned at (310) 556-7402.

Very truly yours,

Bonnie Omura
Litigation Supervisor
Hospital Unit

cc:     Maria Antigua
        Kathryn Townsend, Esq., Corporate Director

BO/mms/CR000038.cl

**The SCPIE Companies**
1888 Century Park East, Suite 800
Los Angeles, California 90067-1712

310 / 551-5900     800 / 962-5549
www.scpie.com

American Healthcare
Indemnity Company

American Healthcare
Specialty Insurance Company

SCPIE Holdings Inc.

SCPIE Indemnity Company

SCPIE Insurance
Services, Inc.

SCPIE Management
Company

SCPIE Management
Services, Inc.

LAW OFFICES

### WICKER, SMITH, TUTAN, O'HARA McCOY, GRAHAM & FORD, P.A.

5TH FLOOR GROVE PLAZA BUILDING

2900 MIDDLE STREET (S.W. 28TH TERRACE)

MIAMI, FLORIDA 33133

(305) 448-3939

TELECOPIER (305) 441-1745

**FORT LAUDERDALE OFFICE**
BARNETT BANK PLAZA, 5TH FLOOR
ONE EAST BROWARD BOULEVARD
P.O. BOX 14460
FORT LAUDERDALE, FLORIDA 33302
(954) 467-6405
TELECOPIER (954) 760-9353

**ORLANDO OFFICE**
NATIONSBANK CENTER • SUITE 1000
390 NORTH ORANGE AVENUE
P.O. BOX 2753
ORLANDO, FLORIDA 32802
(407) 843-3939
TELECOPIER (407) 649-8118

**WEST PALM BEACH OFFICE**
MELLON UNITED NAT'L BANK TOWER • SUITE 700
1645 PALM BEACH LAKES BOULEVARD
P.O. BOX 2508
WEST PALM BEACH, FLORIDA 33402
(561) 689-3800
TELECOPIER (561) 689-9206

**TAMPA OFFICE**
100 NORTH TAMPA STREET
SUITE 3650
TAMPA, FLORIDA 33602
(813) 222-3939
TELECOPIER (813) 222-3938

August 15, 1999

Ms. Bonnie Omura
Assistant Vice President/Hospital Unit Manager
SCPIE
1888 Century Park East, Suite 800
Los Angeles, CA  90067-1712

99 AUG 18 PM 12: 25 RECEIVED BY RISK MANAGEMENT

RE:    Robinson v. Baptist
       Claim No.      :    CR000005
       Date of Loss  :    11/02/96
       Claimant      :    Kathy Robinson
       Insured       :    Baptist Hospital of Miami, Inc.
       Our File No.  :    40274-1

Dear Ms. Omura:

    Enclosed herewith please find a copy of the executed Hold Harmless Agreement and General Release as well as a copy of the executed Stipulation and Final Order of Dismissal for your file regarding the above captioned case.

    At this point, we will final bill and close our file unless you have any further instructions.  I wish to take this opportunity to thank you for forwarding this matter to us for handling.

                        Very truly yours,

                        Jackson F. McCoy

# THE SCPIE COMPANIES

### LEADERS IN HEALTHCARE LIABILITY INSURANCE

August 17, 1999

Baptist Hospital of Miami, Inc.
8900 No. Kendall Drive
Miami, Florida 33176

ATTN: Yvonne Zawodny, Risk Manager

RE:    File No.:           CR000044
       Insured:           Baptist Hospital of Miami, Inc.
       Claimant:          Sergio Perez
       Date of Incident:  February 1, 1995

Dear Ms. Zawodny:

As you are aware, the above-captioned case has been settled for $10,000. We are now closing our file. I would like to take this opportunity to thank you for the cooperation you provided to this office, to defense counsel and to Nancy Carr from Claims and Risk Management Services.

Should there be any questions regarding this closure, please contact the undersigned at (310) 556-7402.

Very truly yours,

Bonnie Omura
Litigation Supervisor
Hospital Unit

cc:    Kathryn Townsend, Esq.
       Corporate Director of Risk Management
       Nancy Carr, President
       Claims and Risk Management Services
       Melinda Walker, Esq.

BO/mms/CR000044.cl

**The SCPIE Companies**
1888 Century Park East, Suite 800
Los Angeles, California 90067-1712

310/551-5900      800/962-5549
www.scpie.com

American Healthcare
Indemnity Company

American Healthcare
Specialty Insurance Company

SCPIE Holdings Inc.

SCPIE Indemnity Company

SCPIE Insurance
Services, Inc.

SCPIE Management
Company

SCPIE Management
Services, Inc.

**EXHIBIT #3**



November 14, 2001

The Office of Liquidations, Rehabilitations and Special Funds
5 Hanover Square
New York City, NY 10004
Attention: Statutory Liquidator for Reliance

Ladies and Gentlemen:

The purpose of this letter is to request approval from the Liquidator of Reliance Insurance Company of a novation transaction whereby Reliance would be relieved of all obligations with respect to the SCPIE Companies Hospital Professional Program (the "SCPIE Program"). This letter sets forth a brief description of the SCPIE Program, as well as the purposes and proposed procedure for the novation transaction.

SCPIE Holdings Inc. (NYSE: SKP) is a holding company engaged, through its insurance subsidiaries, in providing medical malpractice and related liability insurance products to physicians, healthcare facilities and others engaged in the healthcare industry. Based on direct premiums written in 2000, SCPIE is one of the nation's leading providers of healthcare liability insurance. SCPIE is currently rated "A" by AM Best.

**The SCPIE Program**

In order to write hospital professional liability risks in certain states in which SCPIE did not have rate and other filings approved for its program, SCPIE entered into a fronting arrangement with Reliance. Under the fronting arrangement, beginning August 1, 1996, SCPIE's subsidiary American Healthcare Indemnity Company ("AHIC") (i) reinsured 100% of the SCPIE Program policies, which were written by Reliance on an excess and surplus lines basis, pursuant to an automatic facultative quota share reinsurance agreement (the "Reinsurance Agreement"), and (ii) pursuant to agreements between Reliance and other SCPIE subsidiaries, SCPIE managed and administered the SCPIE Program and all claims thereunder. Reliance received a 5% ceding commission, and holds a guarantee of SCPIE and a letter of credit to secure AHIC's performance. Reliance ceased writing policies under the SCPIE Program, and the Reinsurance Agreement was cancelled, October 1, 1999, but SCPIE's administration of the runoff and claims processing has continued. The agreements with Reliance pursuant to which the SCPIE Program operated are listed on Exhibit A, and copies will be furnished upon request. Policies written by Reliance under the SCPIE Program are listed on Exhibit B (the "Policies"); all have expired.

Early in 2001, SCPIE inaugurated discussions with Reliance concerning a potential novation of the SCPIE Program whereby SCPIE would assume all obligations of Reliance under the SCPIE Program and Reliance would be released.  At that time, it came to the attention of the parties that there were certain discrepancies in premium accounting between them with respect to the SCPIE Program, and Reliance requested that these be reconciled.  SCPIE and Reliance agreed to a novation subject to the accounting reconciliation.  Attached as Exhibit C is SCPIE's calculation of amounts owed to Reliance, totaling $103,866.89.  A check in this amount is being mailed under separate cover.

SCPIE has continued to administer claims under the Policies in accordance with its agreements with Reliance. Many of these claims are ripe for settlement or adjudication, and trials, motions, discovery, and negotiations are pending in several states. Attached on Exhibit D is a list of litigation and claims pending.

In light of the Order of Liquidation dated October 3, 2001, it is imperative that we resolve this matter expeditiously in order to avoid or diminish any potential adverse effects to the Reliance estate and SCPIE which may be a consequence of uncertainty and delay.

## Purposes of the Novation Transaction

The purposes of the novation transaction are to (i) eliminate the administrative burden and expense to the Reliance estate of the SCPIE Program, (ii) accelerate resolution of claims under the SCPIE Program, and (iii) provide the least disruption to Reliance insureds under the SCPIE Program.  Due to Reliance's minimal involvement in the SCPIE Program, policyholders look to SCPIE, and SCPIE believes that preserving policyholder trust and its good name in the circumstances would best be served by a novation.

## Procedures for the Novation Transaction

The proposed novation transaction would be accomplished in the most expeditious and efficient manner available. If possible, the novation could be approved by the Liquidation Court without the need to solicit individual policyholder consent (although, because it is in the policyholder's best interest to do so, each policyholder would presumably consent).  Alternatively, the transaction may be accomplished by either seeking such policyholders' consent, or by an assumption reinsurance transaction in which Reliance's obligations under the Policies would be assumed and reinsured by AHIC in their entirety. SCPIE would be pleased to furnish forms of documentation for such a transaction upon request.  Upon consummation of the transaction, SCPIE's guarantee would be released and its letter of credit returned.

Alternatively, if the formality of the above were an obstacle to prompt implementation, upon receipt by SCPIE of appropriate assurances from the Liquidator, SCPIE would continue to administer and resolve claims as if it were the insurer (with SCPIE agreeing not to make further claims against the Reliance estate, and vice versa).

We request your urgent attention to this matter so that SCPIE may continue to resolve claims under the Policies.

We thank you for your time and consideration of the novation transaction. Please contact Donald P. Newell at (310) 407-2723 or Thomas W. Dobson at (213) 485-1234 with any questions.

Very Truly Yours,


s/Donald P. Newell

Donald P. Newell
Senior Vice President and
Legal Counsel

**EXHIBIT #4**

PARENTI, FALK, WAAS, HERNANDEZ & CORTINA

PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
113 ALMERIA AVENUE
CORAL GABLES, FLORIDA 33134

MICHAEL P. BONNER
ARMANDO CORTINA
ROBERT S. COVITZ
ROBERT O. DUGAN
GLENN P. FALK
EDWARD HERNANDEZ
SCOTT L. MENDLESTEIN
GAIL LEVERETT PARENTI
MICHAEL J. PARENTI, III
SCOTT E. SOLOMON
KHRISTEN S. VACHAL
NORMAN M. WAAS

TELEPHONE (305) 447-6500
TELEFAX (305) 447-1777

May 14, 2002

Jody Lehman, Esquire
General Counsel
Baptist Health Systems of Florida
6855 Red Road
Suite 600
Coral Gables, Florida 33143-3632

Re:   Claimants:        Julie Padron and Alexa Padron
      Insured:          South Miami Hospital
      Date of Incident: 4/29/97
      Claim Number:     CR000155
      Our File Number:  4477

Dear Ms. Lehman:

    Pursuant to your request, we enclose herewith payments by
SCPIE for attorney's fees and costs for the subject lawsuit for
2001.  We have requested evidence of payment prior to this period
of time, but need to retrieve this information from storage.  If
you need any further documentation, then please advise.

    Further developments shall be reported.

                        Very truly yours,

                        Scott E. Solomon
                        For the Firm

SES/smm
Enclosures
cc:  Yvonne Zawodny, R.N.
     Ms. Nancy Carr
     Ms. Vivien Knight
     Ms. Paige Stone
     Richard Cole, Esquire (w/enc)

Lehman-08-enc evidence pymt 2001.wpd



**scpie**
MANAGEMENT SERVICES, INC.
Union Bank of California   16-49
1220

2911

PAYEE TAX ID #592361828   CJZ

| CLAIM NUMBER | POLICY NUMBER | NAMED INSURED | DATE OF LOSS | CHECK DATE |
|---|---|---|---|---|
| CR000155 | HPL0543165 - 003 | SOUTH MIAMI HOSPITAL, INC | 6/29/1997 | 1/18/2001 |

Pay to the Order of: PARENTI, FALK, WAAS, ET AL

The Sum of: EIGHTEEN THOUSAND NINE HUNDRED EIGHTY-SEVEN DOLLARS AND SIXTY-NINE CENTS      $18,987.69

In Payment of: PADRON VS. SOUTH MIAMI HOSP. STATEMENT DATED NOV. 17, 2000

VOID IF NOT PRESENTED WITHIN
SIX MONTHS FROM DATE OF ISSUE

PARENTI, FALK, WAAS, ET AL
118 ALMERIA AVENUE
CORAL GABLES      FL 33134

TWO SIGNATURES REQUIRED FOR
AMOUNTS EXCEEDING $2,000.00

⑈000029⑈⑈⑈ ⑆122000496⑆ 0700489345⑈

**scpie**
MANAGEMENT SERVICES, INC.
1888 CENTURY PARK EAST, SUITE 800, LOS ANGELES, CA 90067-1712 - (310) 551-5900

DATE:   1/18/2001

DESCRIPTION

2911

| POLICY # | CLAIM | NAME INSURED | DATE OF LOSS | AMOUNT |
|---|---|---|---|---|
| HPL0543165 003 | CR000155 | SOUTH MIAMI HOSPITAL, INC. | 4/29/1997 | 18,987.69 |
| | | | Total | $18,987.69 |

4477



scpie

1888 CENTURY PARK EAST, SUITE 800, LOS ANGELES, CA 90067-1712   (310) 551-5900

DATE:   4/02/2001
POLICY #

3020

| | CLAIM | NAME INSURED | DATE OF LOSS | AMOUNT |
|---|---|---|---|---|
| HPL0543165 003 | CR000155 | SOUTH MIAMI HOSPITAL, INC. | 4/29/1997 | 15,044.54 |
| | Invoice Number: 9 | 2/16/2001 | | |
| | | | Total | $15,044.54 |

DESCRIPTION

VOID VOID VOID VOID

SCPIE MANAGEMENT SERVICES INC.

Union Bank of California   16-49   3182

CLAIM NUMBER   POLICY NUMBER   NAMED INSURED   DATE OF LOSS   CHECK DATE
"VARIOUS CLAIMS"   7/12/2001

FEE TAX ID #59-69828   CA2

**$32,109.11**

THE SUM OF:
THIRTY-TWO THOUSAND ONE HUNDRED NINE DOLLARS AND ELEVEN CENTS
In Payment of:   OJEDA VS. BAPTIST HOSP. OF MIAMI STATEMENT DATED MAY 17, 2001

PARENTI, FALK, WAAS ET AL
115 ALMERIA AVENUE
CORAL GABLES       FL  33134

IF NOT PRESENTED WITHIN
SIX MONTHS FROM DATE OF ISSUE
TWO SIGNATURES REQUIRED FOR
AMOUNTS EXCEEDING $2,000.00

⑈"0000 3 1 8 2"⑈  ⑆122000496⑆:  0700489345"⑈

---

**scpie** MANAGEMENT SERVICES INC.

1888 CENTURY PARK EAST, SUITE 800, LOS ANGELES, CA 90067-1712   (310) 551-5900

DATE:   7/12/2001
POLICY #                                    **3182**

| POLICY # | CLAIM | NAME INSURED | DATE OF LOSS | | AMOUNT |
|---|---|---|---|---|---|
| HPL0543165 001 | CR000065 | BAPTIST HOSPITAL OF MIAMI | 2/14/1997 | 00106 4540 | 8,366.98 |
| HPL0543165 003 | CR000155 | SOUTH MIAMI HOSPITAL, INC. | 4/29/1997 | 00106 4477 | 12,181.60 |
| | | Invoice Number: 10 | 5/17/2001 | | |
| HPL0540438 001 | CR000239 | PALM SPRINGS GEN HOSP ET AL | 11/02/1996 | 00106 4345 | 10,030.41 |
| | | Invoice Number: 12 | 5/17/2001 | | |
| HPL0540438 001 | CR000394 | PALM SPRINGS GEN HOSP | 1/21/1998 | 00106 4959 | 1,530.12 |

Total      $32,109.11

**VOID VOID VOID VOID**
**VOID VOID VOID VOID**
**VOID VOID VOID VOID**

Union Bank of California

3222

PAYEE TAX ID #59-

| CLAIM NUMBER | POLICY NUMBER | NAMED INSURED VARIOUS CLAIMS | DATE OF LOSS | CHECK DATE 8/16/2001 |
|---|---|---|---|---|

TEN THOUSAND THREE HUNDRED FOUR DOLLARS AND EIGHTY-THREE CENTS     $10,304.83

In Payment of:     BETANCOURT VS. LOWER FLORIDA KEYS STATEMENT DATED JULY 5, 2001.

PARENTI & FALK - WAAS - RETAIL
#1 ALMERIA AVENUE
CORAL GABLES        FL  33134

DO NOT PRESENTED WITHIN
SIX MONTHS FROM DATE OF ISSUE
TWO SIGNATURES REQUIRED FOR
AMOUNTS EXCEEDING $2,000.00

*Kein Beck*

⑈00003222⑈ ⑆122000496⑆ 0700489345⑈

scpie
1888 CENTURY PARK EAST, SUITE 800, LOS ANGELES, CA 90067-171   (310) 551-5900

DATE:  8/16/2001                                    3222

| POLICY # | CLAIM | NAME INSURED | DATE OF LOSS | | AMOUNT |
|---|---|---|---|---|---|
| HPL0543190 001 | CR000053 | LOWER FLORIDA KEYS HEALTH SYS | 2/14/1997 | 00106 | 55.58 |
| HPL0543165 001 | CR000065 | BAPTIST HOSPITAL OF MIAMI | 2/14/1997 | 00106 | 848.05 |
| HPL0543165 003 | CR000155 | SOUTH MIAMI HOSPITAL, INC. | 4/29/1997 | 00106 | 3,839.47 |
| HPL0540438 001 | CR000239 | PALM SPRINGS GEN HOSP ET AL | 11/02/1996 | 00106 | 1,059.27 |
| HPL0540438 001 | CR000394 | PALM SPRINGS GEN HOSP | 1/21/1998 | 00106 | 3,279.19 |
| HPL0540438 001 | CR000401 | PALM SPRINGS GEN HOSP | 4/30/1998 | 00080 | 1,223.27 |

Total     $10,304.83



```
"00003260"  ::122000496:  0700489345"
```

scpie
MANAGEMENT SERVICES, INC.    1888 CENTURY PARK EAST, SUITE 800, LOS ANGELES, CA 90067-1713    (310) 551-5900

DATE:   9/19/2001                                    DESCRIPTION                          3260
POLICY #            CLAIM    NAME INSURED                    DATE OF LOSS           AMOUNT

HPL0543165 003    CR000155  SOUTH MIAMI HOSPITAL, INC.      4/29/1997    00106      661.93
HPL0540438 001    CR000239  PALM SPRINGS GEN HOSP ET AL     11/02/1996   00106      117.22

                                                            Total          $779.15

**VOID VOID VOID VOID**
**VOID VOID VOID VOID**
**VOID VOID VOID VOID**

scpie

3308

Union Bank of California

PAYEE TAX ID #59

CLAIM NUMBER          POLICY NUMBER          NAMED INSURED          DATE OF LOSS          CHECK DATE
                                          PADRON CLAIMS                              11/09/2001

PARENTE, FALK, WAAS, ET AL.

The Sum of
FOUR THOUSAND NINE HUNDRED DOLLARS AND FORTY-FOUR CENTS
In Payment of:   PADRON VS. SOUTH MIAMI HOSP. STATEMENT DATED SEPT. 6, 2001.

NOT PRESENTED WITHIN
MONTHS FROM DATE OF ISSUE
TWO SIGNATURES REQUIRED FOR
AMOUNTS EXCEEDING $2,000.00

PARENTE, FALK, WAAS, ET AL.
1 ALMERIA AVENUE
CORAL GABLES        FL   33134

⑈00003308⑈ ⑆122000496⑆ 070048 9345⑈

---

scpie
MANAGEMENT SERVICES, INC.

1888 CENTURY PARK EAST, SUITE 800, LOS ANGELES, CA 90067-1712   (310) 551-5900

DATE: 11/09/2001                          DESCRIPTION                                          3308

| POLICY #        | CLAIM    | NAME INSURED                   | DATE OF LOSS |        |      | AMOUNT     |
|-----------------|----------|--------------------------------|--------------|--------|------|------------|
| HPL0543165 003  | CR000155 | SOUTH MIAMI HOSPITAL, INC.     | 4/29/1997    | 00106  | 4477 | 584.04     |
| HPL0543165 003  | CR000155 | SOUTH MIAMI HOSPITAL, INC.     | 4/29/1997    | 00106  | 4477 | 538.08     |
| HPL0540438 001  | CR000394 | PALM SPRINGS GEN HOSP          | 1/21/1998    | 00106  | 4959 | 300.00     |
| HPL0540438 001  | CR000394 | PALM SPRINGS GEN HOSP          | 1/21/1998    | 00106  | 4959 | 800.00     |
| HPL0543190 001  | CR000053 | LOWER FLORIDA KEYS HEALTH SYS  | 2/14/1997    | 00106  | 4448 | 112.95     |
| HPL0543190 001  | CR000053 | LOWER FLORIDA KEYS HEALTH SYS  | 2/14/1997    | 00106  | 4448 | 178.85     |
| HPL0543165 001  | CR000065 | BAPTIST HOSPITAL OF MIAMI      | 2/14/1997    | 00106  | 4590 | 1,232.30   |
| HPL0543165 001  | CR000065 | BAPTIST HOSPITAL OF MIAMI      | 2/14/1997    | 00106  | 4590 | 1,116.72   |
| HPL0540438 001  | CR000401 | PALM SPRINGS GEN HOSP          | 4/30/1998    | 00080  | 4703 | 37.50      |

Total        $4,900.44

LAW OFFICES

WICKER, SMITH, TUTAN, O'HARA
McCOY, GRAHAM & FORD, P.A.

5TH FLOOR GROVE PLAZA BUILDING
2900 MIDDLE STREET (S.W. 28TH TERRACE)
MIAMI, FLORIDA 33133
(305) 448-3939

TELECOPIER (305) 441-1745

**FORT LAUDERDALE OFFICE**
BARNETT BANK PLAZA, 5TH FLOOR
ONE EAST BROWARD BOULEVARD
P.O. BOX 14460
FORT LAUDERDALE, FLORIDA 33302
(954) 467-6405
TELECOPIER (954) 760-9353

**WEST PALM BEACH OFFICE**
UNITED NAT'L BANK TOWER • SUITE 700
1645 PALM BEACH LAKES BOULEVARD
P.O. BOX 2508
WEST PALM BEACH, FLORIDA 33402
(561) 689-3800
TELECOPIER (561) 689-9206

**ORLANDO OFFICE**
BARNETT BANK CENTER • SUITE 100
390 NORTH ORANGE AVENUE
P.O. BOX 2753
ORLANDO, FLORIDA 32802
(407) 843-3939
TELECOPIER (407) 649-8118

**TAMPA OFFICE**
100 NORTH TAMPA STREET
SUITE 3650
TAMPA, FLORIDA, 33602
(813) 222-3939
TELECOPIER (813) 222-3938

June 21, 1999

Ms. Bonnie Omura
Assistant Vice President/Hospital Unit Manager
SCPIE
1888 Century Park East, Suite 800
Los Angeles, CA  90067-1712

      RE:     Robinson v. Baptist
             Claim No.    :  CR000005
             Date of Loss :  11/02/96
             Claimant     :  Kathy Robinson
             Insured      :  Baptist Hospital of Miami, Inc.
             Our File No. :  40274-1

Dear Ms. Omura:

      This will confirm that this matter has been settled on behalf of Baptist Hospital of Miami, Inc., for the total sum of Two Hundred Thousand ($200,000.00) Dollars. Enclosed please find a copy of the executed W-9 Form Request for Taxpayer Identification Number Certification Form. Please have the draft drawn and made payable as follows:

      **James Robinson, individually and as Personal Representative of the Estate of Kathy Robinson, and Leeds & Colby, P.A., his attorneys.**

      Additionally, we have forwarded the Release, Hold Harmless Agreement and Stipulation and Order of Dismissal to the Plaintiff and upon receipt of the executed documents, we will then forward the draft to the Plaintiff's attorney.

                    Very truly yours,

                    Jackson F. McCoy

LAW OFFICES
## WICKER, SMITH, TUTAN, O'HARA
## McCOY, GRAHAM & FORD, P.A.
GROVE PLAZA BUILDING, 5TH FLOOR

2900 MIDDLE STREET (S.W. 28TH TERRACE)

MIAMI, FLORIDA 33133

(305) 448-3939

TELECOPIER (305) 441-1745

**FORT LAUDERDALE OFFICE**
SOUTHTRUST TOWER, 5TH FLOOR
ONE EAST BROWARD BOULEVARD
P.O. BOX 14460
FORT LAUDERDALE, FLORIDA 33302
(954) 467-6405
TELECOPIER (954) 760-9353

**ORLANDO OFFICE**
BANK OF AMERICA CENTER, SUITE 1000
390 NORTH ORANGE AVENUE
P.O. BOX 2753
ORLANDO, FLORIDA 32802
(407) 843-3939
TELECOPIER (407) 649-8118

**WEST PALM BEACH OFFICE**
MELLON UNITED NAT'L BANK TOWER · SUITE 700
1645 PALM BEACH LAKES BOULEVARD
P.O. BOX 2508
WEST PALM BEACH, FLORIDA 33402
(561) 689-3800
TELECOPIER (561) 689-9206

**NAPLES OFFICE**
AMSOUTH BANK BUILDING, SUITE 402
4851 TAMIAMI TRAIL NORTH
NAPLES, FLORIDA 34103
(941) 430-1120
TELECOPIER (941) 430-1121

**TAMPA OFFICE**
100 NORTH TAMPA STREET, SUITE 3650
P.O. BOX 2152
TAMPA, FLORIDA 33602
(813) 222-3939
TELECOPIER (813) 222-3938

April 3, 2001

Bonnie Omura
SCPIE Management Services
1888 Century Park East, Suite 800
Los Angeles, CA  90067-1712

      Re:    Arbelaez v. Baptist Hospital
             Date of Loss:  11/25/96
             Claimant:    Ruben Arbelaez
             Insured:      Baptist Hospital of Miami, Inc.
             Our File No.:  45858-1

Dear Ms. Omura:

    As you will recall, this lawsuit arises out of allegations that Ruben Arbelaez, a then-54 year old white Hispanic male, tripped and fell when entering the fourth floor tower elevator while delivering flowers for his employer, Curbside Florist & Gifts.  Mr. Arbelaez allegedly sustained injuries to his back and neck, and suffers from frequent headaches, depression and panic attacks.  Further, the plaintiff contends that Baptist Hospital, by and through its agents and/or independent contractor, Executive Elevator Service, negligently and carelessly breached the duties of reasonable care owed to the plaintiff by failure to keep property in reasonably safe condition and failure to warn plaintiff of concealed dangers.

    Given the nature of the liability issues asserted by the plaintiff, we request your authority to retain an elevator expert to evaluate the case.  We recommend William Wayne Smith and have attached a copy of his Curriculum Vitae for your review and information.  Although we have not had an opportunity to work with Mr. Smith in the past, I recently consulted with him on the telephone and was impressed by our initial conversation.  We briefly discussed the nature of plaintiff's complaint and the situation regarding Executive Elevator's maintenance records (none allegedly exist due to flood waters caused by Hurricane Irene).  He was quick, nonetheless, to

Bonnie Omura
April 3, 2001
Page 2

suggest several other strategies, and, overall, it was my impression that he will make a good impression on his own behalf. Mr. Smith's fees are $125 per hour and he requires a $1,000 retainer fee.

      Please let us know if at your earliest convenience if we have your authority to retain this expert to evaluate this case.

      Should you have any questions, please feel free to contact us. We will keep you advised of all material developments.

                             Very truly yours,

                             Carl W. Capper

CWC:gw
Enclosure
cc:  Yvonne Zawodny, Baptist Hospital of Miami, Inc.
      Maria Antigua, Nancy E. Carr Claims and Risk Management Services

# Nancy E. Carr
## Claims and Risk Management Services
8900 S.W. 107th Avenue - Capital Plaza II - Suite 300
Miami, Florida 33176
Telephone 305-274-4070
Fax: 305-274-2701
e-mail: necarr @gate.net

May 8, 2000

Ms. Bonnie Omura
Litigation Supervisor
Hospital Unit
SCPIE
1888 Century Park East
6th Floor
Los Angeles, CA  90067-1712

Re:      Claimant:       Maria Elena De Miguel
         Insured:        Baptist Hospital of Miami, Inc.
         D/I:            07/27/96
         File No.:       CR000069

Dear Ms. Omura:

This will confirm our telephone discussion of 5/4/00, wherein you authorized up to $40,000 (forty thousand dollars) for the purpose of resolving this case at mediation. This authority was extended with the understanding that we try to get out of this case without making any payment at all, if possible.

I trust that this adequately outlines our conversation and the authority extended.  We will report back to you following mediation.

Very truly yours,

Nancy E. Carr/pal
Claims and Risk Management Services

NEC/pal

cc:   Kilby Strickland
      Kathryn Townsend
      Jon Lynn, Esq.
      Sedgewick/FL 30395CM

**scpie**
MANAGEMENT SERVICES, INC.   9441 W. OLYMPIC . .EVARD, BEVERLY HILLS, CA 90212-4541 - (310) 55    0

DATE: 11/23/1998

| POLICY # | CLAIM | NAME INSURED | DATE OF LOSS | AMOUNT |
|---|---|---|---|---|
| | | DESCRIPTION | | **126** |
| HPL0543165 - 001 | CR000087 | BAPTIST HOSPITAL OF MIAMI | 4/05/1997 | 218,500.00 |

**scpie**     **126**
Union Bank of California   16-49/1220

CR000087   HPL0543165 - 001   BAPTIST HOSPITAL OF MIAMI   4/05/1997   11/23/1998

Upon Acceptance, Pay to the Order of: STEVEN & MARTHA CHAVOUSTIE AND THEIR ATTORNEYS, RUSSO &
HEFFERNEN, P.A.                                                                          $218,500.00

The Sum of TWO HUNDRED EIGHTEEN THOUSAND FIVE HUNDRED DOLLARS AND NO CENTS
IN SETTLEMENT OF ALL CLAIMS

VOID IF NOT PRESENTED WITHIN
SIX MONTHS FROM DATE OF ISSUE
TWO SIGNATURES REQUIRED FOR
AMOUNTS EXCEEDING $2,000.00

PARENTS: PACK MARTHA
ATTN: ED HERNANDEZ
143 ALMERIA AVENUE
CORAL GABLES FL 33134

⑈000001 26⑈ ⑈122000496⑈ 0700489353⑈

**EXHIBIT #5**

JUN-26-2002  17:22        DES & MOUNT                      212 261 8750    P.02/03

# MENDES & MOUNT, LLP

LOS ANGELES OFFICE

725 SOUTH FIGUEROA STREET

NINETEENTH FLOOR

LOS ANGELES, CA 90017-5419

TELEPHONE: (213) 955-7700

FACSIMILE: (213) 955-7725

DIRECT DIAL:  (212) 261-8253

750 SEVENTH AVENUE
NEW YORK, NY 10019-6829
TELEPHONE: (212) 261-8000
FACSIMILE: (212) 261-8750

NEW JERSEY OFFICE

ONE NEWARK CENTER

NEWARK, NJ 07102-5259

TELEPHONE: (973) 639-7300

FACSIMILE: (973) 639-7350

June 26, 2002

## VIA FACSIMILE & MAIL
(1-305-373-2294)

Richard P. Cole, Esq.
Adam J. Steinberg, Esq.
Cole, Scott & Kissane, P.C.
Pacific National Bank Building
1390 Brickell Bank Building, Third Floor
Miami, FL 33131

Re:  American Healthcare Indemnity Company in relation
to Reliance Insurance Company (In Liquidation)
Our File:      378,850

Dear Messrs. Cole & Steinberg:

Further to my letter of April 10, 2002 and Mr. Steinberg's telephone discussion with
Lawrence Rose, as you are aware, in March 2002, M. Diane Koken, Pennsylvania Insurance
Commissioner, in her capacity as Liquidator of Reliance, filed a Petition requesting the court to
approve proposed Guidelines regarding the direct payment of reinsurance proceeds.   On
April 26, 2002, Presiding Judge James Gardner Collins granted the Liquidator's Petition and
approved the Guidelines. (Copies of the executed Order and Guidelines are enclosed. We again
also refer you to reliancedocuments.com.)

The Liquidator's Petition relied on the requirement in Pennsylvania Statute 40 P.S.
§221.34 that payment made to an insured shall not diminish the reinsurer's obligation to
Reliance except where the reinsurance contract provides for direct coverage of an individual
named insured or the reinsurance contract specifically references or identifies the named insured
by Reliance policy number(s) and payment is made in discharge of that obligation.   The
Guidelines, as enacted, require that a reinsurance contract specifically provides for payment to an
individual named insured. The Liquidator has determined the requirement to be satisfied where
(1) the cut-through provision in the reinsurance contract specifically cites each insured by name;
(2) the named insured is a defined term in the reinsurance contract and the definition of the term
specifically names the insured or incorporates an attached schedule that lists the insured by
name; or (3) the reinsurance contract specifically references or identifies the insured by policy
number.

As previously advised, the American Healthcare Indemnity Company reinsurance
agreements do not identify the individual insureds by name or policy number, nor do they

6.26.02

File: 378,850                    -2-

incorporate a list of named insureds by name or policy number. Therefore, the agreements do not appear to satisfy the Liquidator's criteria. As such, American Healthcare's proposed novation has, to date, not been allowed, albeit never formally rejected. (Copies of the reinsurance contracts issued by American Healthcare to Reliance effective August 1, 1996 until terminated on October 1, 1999 are enclosed.)

As you will note from the enclosed contracts, American Healthcare provided facultative reinsurance on a 100% basis in connection with certain healthcare business written by Reliance covering nursing homes and hospitals. That Reliance was fronting for American Healthcare does not alter the fact that these facilities were direct insureds of Reliance under policy contracts issued by Reliance. American Healthcare's coverage of Reliance is strictly reinsurance. Although the insolvency clause in the reinsurance contracts contains a novation provision, the Reliance insureds are not identified by names or by incorporated list, and they are not parties to the reinsurance agreements.

Apparently, the Guaranty Association in your client's state has refused to provide coverage and a defense in pending lawsuits on the grounds that the particular Reliance subsidiary that issued the policy(ies), Reliance of Illinois, was not an admitted carrier and the coverage was issued on a surplus lines basis. That decision would not be different if American Healthcare was the issuer of the direct insurance policy(ies). A review of Best's Insurance reveals that during the operative period, Reliance and, by affiliation, its subsidiaries, were rated A- (excellent) by Best's. It is somewhat disingenuous to now assert that American Healthcare is really the "direct insurer" when your client's policy(ies) with Reliance and the reinsurance contracts between Reliance and American Healthcare clearly indicate otherwise. There is no doubt that if SCPIE/American Healthcare was in liquidation rather than Reliance, your client and any other healthcare facility insured by Reliance would expect Reliance to honor its obligations as the direct policy issuer regardless of the status of its reinsurer; and Reliance would have no choice but to fulfill its direct insurance obligations.

As you are aware from our earlier correspondence, SCPIE submitted written requests to Reliance (in Rehabilitation) and Reliance (in Liquidation), and the undersigned met with representatives of Reliance (in Liquidation) and the Reliance Liquidator prior to the Liquidator's filing the March 2002 Petition. The purpose of the letters and meeting were to assert SCPIE's desire to novate American Healthcare's reinsurance agreements and assume the direct obligations of Reliance to Reliance policyholders.

Following review of the Liquidator's Petition and shortly prior to Judge Collins' April 26, 2002 Order, we wrote directly to the Liquidator and her counsel, Pepper Hamilton, LLP, again expressing SCPIE's willingness to novate the American Healthcare reinsurance contracts in order to protect the concerned Reliance policyholders' best interests. While acknowledging that American Healthcare's reinsurance contracts did not appear to satisfy the Liquidator's criteria, we specifically requested a special exception in view of the nature of American Healthcare's reinsurance of Reliance and expectations of the involved Reliance policyholders. These latter points refer to Reliance acting as a "front" and the fact that another SCPIE subsidiary, SCPIE Management Services, served as Third-Party Administrator in adjusting claims on behalf of Reliance.

JUN-26-2002  17:23                 )ES & MOUNT                    1 212 261 8750      P.04/92

File: 378,850                          -3-

Neither we nor SCPIE have ever received a formal reply from the Liquidator or Reliance (in Liquidation). We were, however, orally referred to the now signed Order granting the Liquidator's Petition and approving the Guidelines, presumably with the expectation that we would conclude that American Healthcare's proposed novation would not likely be allowed since the reinsurance agreements do not meet the Guidelines. As such, based on the original Order of Liquidation, this means that SCPIE Management Services lacks the authority to manage or pay claims and/or defense expenses, while American Healthcare remains fully obligated to Reliance (in Liquidation) pursuant to its reinsurance contracts. SCPIE Management Services has sent copies of all its claim files to Reliance (In Liquidation).

The dilemma is that SCPIE/American Healthcare is willing to novate and assume a direct coverage obligation and, quite apparently, your client would consent, but the language of the American Healthcare reinsurance contracts with Reliance does not apparently satisfy the requirements of 40 P.S. §221.34 as set forth in the Guidelines. Under such circumstances, the Liquidator would likely deny a direct payment request and any direct payment of reinsurance proceeds would not be recognized by the Liquidator as discharging American Healthcare's obligation to pay all reinsurance proceeds to the Liquidator. However, as you will note, the Guidelines provide that objections to the Liquidator's denial of a direct payment request may be filed by an insured or reinsurer within thirty (30) days of receipt of a notice of denial of a direct payment request.

As has already been demonstrated by SCPIE's efforts to obtain Liquidator approval of a novation, American Healthcare will cooperate with your client and join in any direct payment request to the Liquidator, and any subsequent filing of objections for reconsideration should the request be denied.

Should you submit a direct payment request on behalf of your client, please copy us in and, upon authorization by SCPIE, we will join with you.

As indicated above, SCPIE Management Services has sent copies of its claim files to Reliance (In Liquidation). All requests for direct payment should be filed pursuant to the Guidelines, but, on an ongoing basis, all claim information, status reports, etc. should be sent directly to Mr. Robert E. Haberle, Acting President, Reliance (In Liquidation), 5 Hanover Square, 11th Floor, New York, NY 10004. The Liquidator's counsel are Deborah Cohen and Eric Rothchild of Pepper Hamilton, LLP, Two Logan Square, Philadelphia, PA 19103.

Please do not hesitate to contact us if you have any questions or concerns.

Very truly yours,

MENDES & MOUNT, LLP

Edward M. Manganiello

Encs.

**EXHIBIT #6**

# RELIANCE NATIONAL

1997
AUTOMATIC FACULTATIVE
QUOTA SHARE
REINSURANCE AGREEMENT

between

Reliance Insurance Company

Reliance Nacional Compania Argentina de Seguros, S.A.,
Reliance National (Barbados) Insurance, Ltd,.
Reliance National Insurance Company (U.K.) Ltd.,
Regent International Insurance Company, Ltd.,
Seguros Renamex, S.A.,
Reliance Surety Company

("Company")

and

American Healthcare Indemnity Company
(formerly named F G Insurance Corporation)
("Reinsurer")

Effective:       October 1, 1997

1

defense, resolution or settlement of any such claim or suit, or any other acts, omission or decisions related to the defense or trial of any action by or against an Insured or to the preparation or defense of any appeal consequent upon such action. The date of the Second Generation Loss shall be deemed to be the same date as the original claim or loss.

    G.    "Subject policy" means any policy that is Business Covered.

    H.    "Ultimate net loss" means 100% of the amounts paid or payable in defense and/or settlement of loss or liability under Company's policies.

## ARTICLE II.  REINSURANCE COVERAGE.

    . With respect to Business Covered, Company shall cede and Reinsurer shall accept 100% of the Company's "ultimate net loss" each and every loss, each and every subject policy.

    In addition to the coverage provided in the preceding paragraph, any claim or loss that arises out of an award in respect of a Second Generation Loss related to Business Covered shall be treated as a separate claim or loss and the Reinsurer shall be liable to and reimburse Company for 100% of the amount of the Second Generation Loss plus the associated allocated loss adjustment expenses.

    Except as expressly provided otherwise in this Agreement, the reinsurance coverage of this Agreement shall be subject to the same terms, limits, conditions, and endorsements of Company's original policies and to all interpretations, modifications, waivers, and alterations thereto.

    Any additional companies established or acquired by Company shall be automatically covered under this Agreement.

## ARTICLE III.  POOLING ARRANGEMENT

    Reliance Insurance Company of Illinois assumes 100% of the liability of Reliance Lloyds after deductions for facultative reinsurance. Reliance Insurance Company assumes 100% of the liability of Reliance National Indemnity Company, Reliance Insurance Company of California, Reliance Insurance Company of Illinois, Reliance National Insurance Company and United Pacific Insurance Company after deductions for facultative reinsurance and ceded captive reinsurance programs. Notwithstanding any other provisions of this Agreement, this Agreement protects such assumed reinsurance liability as if it were written directly by Reliance Insurance Company and attaches prior to redistribution to those companies under the terms of Company's intercompany reinsurance pool, which redistribution will be disregarded for all purposes hereunder. In the event that this Agreement applies on a per risk basis, and a single occurrence affects two or more of the pooling companies named above under different policies, the Company will continue to maintain a separate retention and separate limit for each risk as if the policies were written by separate companies.

5

Initials:  RIC:_____  RHIC:_____

## ARTICLE IV.  EXCLUSIONS.

This Agreement does not apply to any account whose primary business is not in the health care field.

## ARTICLE V.  TERM AND TERMINATION.

This Agreement shall commence at 12:01 A.M. Standard Time October 1, 1997, at the location of the risk and shall continue until terminated on at least ninety (90) days prior written notice of cancellation by either party to the other.

In the event of termination, reinsurance coverage shall remain in force and Reinsurer shall remain liable to Company for all losses, including losses with a date of loss after the date of termination of this Agreement, on all business covered in force at the date of termination until their natural expiration plus odd time and/or any run-off provision or any, extended reporting period option or any discovery period contained in the subject original policies.

However, should any business covered to which this Agreement applies be extended, continued or renewed due to regulatory, or other legal restrictions, this Agreement shall automatically continue to provide Reinsurance coverage until that business covered is actually terminated by Company.

Alternatively, if mutually agreed between Company and Reinsurer, coverage under this Agreement may be terminated by "cut-off" as respects business covered in force as of the date of termination and in that event Reinsurer shall not be responsible to Company for losses or any portion thereof with a date of loss on or after the termination date and Reinsurer will return, within thirty (30) days of Company's notice, the unearned reinsurance premium reserve in respect of the business covered and U.S. currency in that amount net of any applicable ceding commission thereon. In the event this clause is applicable and a loss covered under this Agreement has commenced, the entire loss covered under the policy to which this Agreement originally attached shall be covered under this Agreement regardless of the number of dates of loss that may be involved with that occurrence/accident.

## ARTICLE VI.  REINSURANCE PREMIUM

As reinsurance premium, Company shall pay Reinsurer 100% of Company's Gross Net Written Premium actually received by Company on Business Covered.

## ARTICLE VII.  CEDING COMMISSION

Reinsurer shall allow Company a ceding commission equal to any applicable brokerage commission plus five percent (5%) of the Reinsurance Premium payable under this Agreement

6

Initials:  RIC:_____  AHTC _____

## ARTICLE XIV.  CURRENCY.

All settlements of account between Company and Reinsurer shall be made in cash or its equivalent. Wherever the word "Dollars" and the sign "$" shall appear in or in connection with this Agreement, they shall be construed to mean United States Dollars unless clearly indicated to the contrary.

In the event of Company being involved in an ultimate net loss requiring payment in two currencies, the amount recoverable under this Agreement shall be apportioned to the two currencies in the same proportion as the amount of ultimate net loss in each currency bears to the total amount of ultimate net loss paid by Company.

For the purposes of this Agreement, where Company should receive premium or pay ultimate net loss in currencies other than United States currency, those premiums and ultimate net loss shall be converted into United States Dollars at the actual rates of exchange at which these premiums and ultimate net losses are entered on Company's books.

## ARTICLE XV.  THIRD PARTY BENEFICIARY.

Except as expressly provided for in the Article entitled Insolvency, the provisions of this Agreement are intended solely for the benefit of Company and Reinsurer. Nothing in this Agreement shall in any manner create or be construed to create any obligations to or establish any rights against any party to this Agreement in favor of any other persons not party to this Agreement.

## ARTICLE XVI.  ERRORS AND OMISSIONS.

Any inadvertent act, neglect, delay, omission, or error by either party to this Agreement, or by its representatives shall not be held to relieve either party to this Agreement from any liability that would attach to it under this Agreement if that act, neglect, delay, omission, or error had not been made, providing that act, neglect, delay, omission, or error is sought to be rectified after discovery.

## ARTICLE XVII.  ACCESS TO RECORDS.

Reinsurer shall have the right at any reasonable time upon five (5) working days prior notice during or at any time after the expiration of this Agreement, and as frequently as deemed reasonably necessary by Reinsurer, to visit the offices of Company to inspect, examine, audit, and verify any of the policy or claim files ("records") relating to the business reinsured under this Agreement. Reinsurer shall have the right to make copies, at its own expense, or extracts of any records. Notwithstanding the above, Reinsurer shall not have any right of access to the records of Company if it is not current in all payments due to Company and Company shall have no right

9

Initials:  RIC:_____  AHIC _____

to reimbursement under this Agreement if it fails or refuses to provide the access required by this section other than by reason of Reinsurer's failure to pay. Reinsurer shall keep confidential all information and reports derived from the records of Company to which it has received access and shall not publish or communicate that information or report(s) to any other person or reinsurer without Company's express prior written consent. Reinsurer shall promptly upon Company's request deliver a complete copy of any report(s) concerning the records and information to which it has received access.

ARTICLE XVIII.  INSOLVENCY.

In the event of the insolvency of one (or more) of the reinsured companies, this reinsurance shall be payable immediately upon demand directly to the insolvent Company, or to its liquidator, receiver, conservator or statutory successor on the basis of the liability of that Company without diminution because of the insolvency of that Company or because the liquidator, receiver, conservator or statutory successor of that Company has failed to pay all or a portion of any claim.

The liquidator, receiver, conservator or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against that Company indicating the policy or bond reinsured which claim would involve a possible liability on the part of that Reinsurer within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses that they may deem available to the Company or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, such to the approval of the court, against that Company as part of the expense of conservation or liquidation to the extent of a pro rata share of the benefit which may accrue to that Company solely as a result of the defense undertaken by the Reinsurer.

Where two or more Reinsurers are involved in the same claim and a majority in interest elect to interpose defense to such claim, the expense shall be apportioned in accordance with the terms of the reinsurance Agreement as though such expense had been incurred by that Company.

The reinsurance shall be payable by the Reinsurer to that Company or to its liquidator, receiver, conservator or statutory successor, except as provided by applicable Insurance Law, or except (a) where the Agreement specifically provides another payee of such reinsurance in the event of the insolvency of that Company, and (b) where the Reinsurer with the consent of the direct insured or insureds have assumed such policy obligations of that Company as direct obligations of the Reinsurer to the payees under such policies and in substitution for the obligations of that Company to such payees. Prior to the implementation of a novation, any assumption certificates on New York risks must be approved in advance by the Superintendent of Insurance for New York.

10

Initials:  RIC:_____   AHIC _____

IN WITNESS WHEREOF, Company and Reinsurer intending to be bound have caused this Agreement to be executed by their duly authorized representatives on the dates set forth next to their names below.

COMPANY:

Reliance Insurance Company
Reliance Nacional Compania Argentina de Seguros, S.A.,
Reliance National (Barbados) Insurance, Ltd,.
Reliance National Insurance Company (U.K.) Ltd.,
Regent International Insurance Company, Ltd.,
Seguros Renamex, S.A.,
Reliance Surety Company,

through the Reliance National Division of Company

BY:_____          _____

TITLE:_____      _____

DATE:_____       _____


REINSURER:

American Healthcare Indemnity Company
(formerly named F G Insurance Corporation)

BY:_____

TITLE:_____

DATE:_____    _____

20

TOTAL P.5.

**EXHIBIT #7**



July 21, 1997


Dear Healthcare Client:

Sullivan, Kelly and The SCPIE Companies have agreed not to extend their exclusive insurer-broker relationship beyond October 1, 1997. Both parties agree, in light of SCPIE's financial strength and public ownership, SCPIE is in the enviable position of being able to write a great deal more business than only that submitted through Sullivan, Kelly. SCPIE will continue to offer Professional Liability insurance to healthcare enterprises through brokers on a non-exclusive basis and directly. Sullivan, Kelly will continue to offer its extensive brokerage services to healthcare clients.

The joint nature of this release should clearly indicate that SCPIE and Sullivan, Kelly will maintain the same close working relationship as they have had for the past two years, for those accounts in which Sullivan, Kelly is named as the broker of record and SCPIE is selected as the insurer. Sullivan, Kelly and SCPIE may thereby continue to work together on certain accounts or may offer competing programs.

During this period our relationship has benefitted our mutual clients. Both Sullivan, Kelly and SCPIE wish to assure you that the excellent service which you have come to expect from both organizations will continue.

If you have any questions, feel free to call either of us. SCPIE's phone number is (310) 551-5900 and Sullivan, Kelly's is (800) 252-5752.

Sincerely,

The SCPIE Companies                                     Sullivan, Kelly

Donald J. Zuk                                           James E. Kelly
President and                                           President and
Chief Executive Officer                                 Chief Executive Officer

---

**EXHIBIT #8**



August 27, 1996

CONFIDENTIAL

Ms. Kathryn Eblen Townsend
Director of Risk Management
South Miami Hospital
6200 S.W. 73rd Street
Miami, FL 33143

Re:    Comprehensive Hospital Liability, Including Malpractice

Dear Kathryn:

The Farmers unexpected decision to terminate our forty plus year relationship has disrupted many of our clients and colleagues lives at a corporate and personal level. We have been working around the clock to provide continued and uninterrupted service and coverage to our clients. Sullivan Kelly wants to make sure that our clients know that with the years of experience, reputation, and our strategic layering of the program, we can handle unexpected and needed changes at any time.

For your convenience and at your request, we can replace the Farmers Insurance Group $500,000 layer with an A, VIII carrier. The Southern California Physician Insurance Exchange (SCPIE) has agreed to a bordereau transfer, no underwriting is required. This transfer will be automatic and almost seamless to include the following:  *(Please note that your $49,500,000 excess of $500,000 will remain the same.)*

**Policy Form:**

Modified Occurrence as well as Claims Made is available. Tail coverage is available and offered to all Claims Made clients. Retro active coverage is also available.

**Policy Coverage and Service:**

The SCPIE policy coverage will be much like the Farmers Insurance Group policy with the following **service and coverage** enhancements.

1.      Medical Payments Coverage Included, $2,500 limit.
2.      Reimbursement for Loss of Earnings due to trial appearances.
3.      Automatic Coverage for Real Estate Managers, Landlords of Insured
        Premises and Lessors Equipment.

■   ■   ■

Ms. Kathryn Eblen Townsend
August 27, 1996
Page 2

4.      Non Owned Auto Liability Coverage included.
5.      On-line Risk Management consultants available 24 hours a day
        as well as ongoing visits to the facility.
6.      On-line 24-hour Claim Reporting Services available
        as well as on going visits and claims review by claims examiner.
7.      "A" rated insurance carrier.
8.      Availability of physician individual policies through the same carrier
        but separate from hospital policy.

**SCPIE has also agreed to continue the use of the following services:**

a.      Legal panel and TPA representing your account.
b.      Issue any pending Named or Additional Insured Endorsements.
c.      All categories under the Monthly Report Form to remain the same.

Enclosed for your convenience is the following **reading material:**

-       Claims Management Services
-       Risk Management Services
-       1996 Best's Key Rating

I am looking forward to meeting with you at 9:30 AM on September 6, 1996.  Please call
me if you have any questions.

Sincerely,

Carlota E. Redondo
Vice President

CER:meh

Enclosures

cc:     Mr. Ralph Ricketson, AIM

P.S.  Policy format and comparisons will follow shortly.

**EXHIBIT #9**



# ACCOUNT MANAGEMENT TEAM

# Your Hospital



**Sullivan Kelly**
Account Executive

**SCPIE**
Chief Executive Officer
**Donald J. Zuk**

**SCPIE**
Senior Vice President
**Patrick S. Grant**

Account Executive
**L. Elizabeth Harner**
**(310) 557-8732**

Underwriting Coordinator
**Van A. Anderson**
**(310) 557-8771**

Hospital Claims Unit Manager
**Barbara Kuberry**
**(310) 556-7418**

Claims Reporting
**(800) 464-4467**

Risk Manager
**Elaine Ziemba**
**(310) 556-7492**

24-Hour Hotline
**(800) 585-7799**

Actuarial Coordinator
**Joseph P. Henkes**
**(310) 551-5909**

SCPIE (Los Angeles)
**(800) 962-5549**

**EXHIBIT #10**

# WHEN YOU NEED ASSISTANCE

## SCPIE ACCOUNT MANAGEMENT TEAM
## FOR LIABILITY INSURANCE PROGRAM

**Account Executive:  L. Elizabeth Harner - (800) 962-5549/ (310) 557-8732**

Elizabeth is a Vice President with responsibility for Business Development and the SCPIE hospital program. Her other responsibilities at SCPIE include the development of new business, products and services. As an Account Executive, her duties extend to the servicing of hospitals and large medical group clients. She has been active in the professional liability, risk financing, and risk management fields for over a decade. Her combined experience, knowledge, and understanding in these areas will bring your program a special quality of service.

**Actuarial Coordinator:  Joseph P. Henkes - (800) 962-5549 / (310) 551-5909**

Joe is a Senior Vice President and Actuary at SCPIE with over 15 years of experience in Property/Casualty Insurance. He has been an Associate of the Casualty Actuarial Society since 1975 and a member of the American Academy of Actuaries since 1980. His areas of expertise include casualty loss reserving, rate making and financial analysis. He has been involved with medical professional liability since 1986. Joe graduated from U.C.L.A. in 1973 with a B. A. degree in Mathematics.

**Risk Manager:  Elaine Ziemba - (800)  246-1107 / (310) 556-7492**

Elaine is the Assistant Manager of SCPIE's Risk Management Department. She holds a B.A. degree in Business Administration from the University of Maryland, a Masters degree in health care Administration from George Washington University and a law degree from Golden Gate University in San Francisco. She has over 15 years experience in hospital administration and Risk Management. Prior experience includes serving as Assistant Director, Medical Center Administration at the University of California, Irvine, and Risk Management Director at the University of California, San Francisco Medical Center.

**Underwriting Coordinator:  Van A. Anderson - (800) 962-5549 / (310) 557-8771**

Van is a Vice President with SCPIE and has over 16 years of experience in professional liability underwriting. His prior experience includes performing as Assistant Director of Underwriting Operations for Program Beta, a self-insured retention group hospital program. He has also served as a Professional Liability Underwriter for MIEC and Norcal Mutual Insurance Company. Van holds a B.A. degree in History from Livingstone College.

**Claims Hospital Unit Manager:  Barbara E. Kuberry - (800) 464-4467/ (310) 556-7418**

Barbara is a 21-year veteran in the Professional Liability field, having held positions in Claims, Risk Management and Marketing in Illinois, Colorado and California. Her Claims experience includes Physician and Hospital Claims and she has acted as claims liaison to Huntington Memorial Hospital in California, Kaiser Permanente in Denver and Rush-Presbyterian- St. Luke's and American Hospitals in Chicago.

**EXHIBIT #11**



MANAGEMENT SERVICES, INC

January 10, 1997

*SENT VIA FAX AND MAIL*

Baptist Health Systems of South Florida
6200 S.W. 73rd St.
Miami, Florida 33143

Attn:   Kathryn Eblen Townsend, Esq.
Director of Risk Management                           JAN 1 4 1997

Re:     **Hospital On-line Claims Access System**

Dear Kathryn:

Pursuant to our telephone conversation, I am enclosing copies of the Hospital On-line Claim Access System screens for your review. During our meeting in February, we would like to have you and Jody meet with our MIS people so that we can facilitate installation of the system into each of your facilities and designate what information each Risk Manager should have available to them. Per your request, I am providing you with hard copies of these screens for your review. At the time of this meeting we will give you an actual demonstration of the on-line system itself.

The following is a brief explanation of each screen. Should you have any questions after going over these screens, please feel free to call me directly so that we may further discuss any particular screen. The screens that I am enclosing are demonstration screens and contain the names of fictitious hospitals and claimants.

Hospital Access - Claims by Claimant Name:

This screen affords the viewer a complete list of all open and closed claims by claimant name for the facility. By placing a number in the left hand column, the actual claim data can be accessed.

Hospital Claims Inquiry - General Information:

This screen provides a brief summary of information on a specific claim and affords the user the opportunity to move the cursor to an identified field to obtain additional information.

January 10, 1997
Page Two

Hospital Claim Inquiry - All Transaction Inquiry:

This screen is accessed through the hospital claim inquiry general information screen by moving the cursor to the expense figure and pressing F2 for additional detail. This allows you to view a compete history of both expenses paid and reserves set.

Hospital Claims Inquiry by Incident Number:

This screen allows you to view a claim in which there is more than one co-defendant insured by SCPIE through the hospital program. We will need to make a determination at the meeting whether we are going to intersperse the hospital information and the affiliated physician program showing any physicians insured under that program as a companion file to the hospital file. This topic of discussion will be included on the claims agenda.

Hospital Claims Inquiry - General Information Reserve History Screen:

The reserve review screen is an additional screen which is accessed off the hospital inquiry screen by moving the cursor to the reserved amount and entering through the F5 committee screen button. This allows you to review the reserve history on the claim.

 Hospital Claims Inquiry - Endorsement Information:

This screen affords the viewer an opportunity to review all endorsements to the policy.

Hospital Claims Inquiry - Diary:

This screen affords the viewer a review of the existing diary on any selected case.

 Hospital Claims Inquiry - First Report Screens:

These screens represent information entered into the computer at the time of the first report. Additional information is entered as it becomes available.

 Hospital Claims Notepad:

This provides you with day-to-day entries made by the Litigation Supervisor and the Unit Manager describing the activities occurring on a given day.

The above screens are "view only" screens and the hospital cannot enter or change any information on these screens. Additionally, the system provides the facility with E-mail access and samples are provided on the last two exhibits.



January 10, 1997
Page Three


I trust this will provide you with the information necessary for you to determine which individual should have access to given screens and we will be in the position to discuss your needs at our February meeting.  Again, should you have any questions, please feel free to call me.

Very truly yours,

Barbara E. Kuberry
Vice President
Hospital Unit Manager

BEK:vdr

Encls.

cc:     Margaret McComb, Vice President/Claims Manager

scpie

# Hospital On-line Claim Access System

SSHC625          Hospital Access - Claims by Claimant Name          11/08/96
                              for ACME Hospital

Search Name: _____          or Claim Number: _____

| Claim # | Claimant Name | Incident | Status | Incurred |
|---------|---------------|----------|--------|----------|
| _ 00000017 | MARY JONES | 3/23/94 | CLOSED-IND & EXP | 93,288.19 |
| 1 00000155 | SAM SMITH | 3/06/93 | OPEN | 264,998.45 |
| _ 00000211 | KAREN THOMAS | 9/01/93 | OPEN | 43,500.00 |
| _ 00000091 | GRACE WILLIAMS (DEC) | 2/10/94 | CLOSED-EXP ONLY | 130.00 |
| _ 00000019 | BLANCA ZORBA | 12/21/92 | CLOSED W/O PAYMENT | .00 |

. . . .

                                                              More. . . .

F3=Exit    F6=E-Mail    1=Select

                              (c) Copyright SCPIE 1995

**EXHIBIT #12**

| | |
|---|---|
| **From:** | Kathryn Townsend |
| **To:** | BHM_Main_Campus.Main_PO.WENDYG, BHM_Main_Campus.Ma... |
| **Date:** | 8/29/97 10:36am |
| **Subject:** | Malpractice Premiums - Mailing |

Effective TODAY, please **do not mail** the monthly insurance premiums and reporting forms to Sullivan Kelly in Pasadena for our malpractice payments.  I have learned that Sullivan Kelly is slashing their personnel load in anticipation of selling their business and there is a concern that payments may not be forwarded to SCPIE in a timely manner.

Please mail all payments for the malpractice insurance to:

MR. PATRICK LO, CFO
SCPIE
9441 W. OLYMPIC BLVD.
BEVERLY HILLS, CA  90212

If you have any questions, please contact me immediatley at 663-5018.  Thanks.  - KET

 **Baptist Health Systems of South Florida**

8900 North Kendall Drive

Miami, Florida 33176-2197

Phone: (305) 596-1960

(Sent via Fax @ 828-0735 and U.S. Mail)

August 29, 1997

Mr. Luis R. Figueroa
President, CEO
Infusal
6490 West 20th Avenue
Miami, FL 33016-2609

RE: **Malpractice Premium Payments**

Dear Luis:

Thank you for your kind words during our discussion this morning. I certainly hope that we can realize some significant insurance savings for Infusal once the RFP proposal is concluded.

As we discussed, I have learned that Sullivan Kelly is slashing their personnel load in anticipation of selling to either SCPIE or Executive Risk. Due to this action, I am quite concerned that the few employees left will not be able to administratively handle the required paperwork to refer the premiums to the appropriate parties. Therefore, effectively immediately, I recommend that your malpractice premiums should be sent directly to:

Mr. Patrick Lo, CFO
SCPIE
9441 W. Olympic Blvd.
Beverly Hills, CA 90212

If you have any questions, please feel free to call me at any time.

Sincerely,

Kathryn Ellen Townsend
Corporate Director, Risk Management
Baptist Health Services

cc: Ralph Ricketson, AIM
Carlota Redondo, SCPIE

INS-MAL\SULLIVAN.LTR

BAPTIST HOSPITAL ▪ SOUTH MIAMI HOSPITAL ▪ HOMESTEAD HOSPITAL ▪ MARINERS HOSPITAL

**EXHIBIT #13**

From:
To:          Kathryn Townsend
Date:        MillieO, PatB, KilbyS, YvonneZ, JudyE, ChristiK
Subject:     2/17/97 8:20am
             SCPIE Toll-Free



SCPIE now has a toll-free number dedicated to Baptist Health System. The number is 1-800-968-5638.  It goes directly to Bonnie Adams.  If the office is closed, it rings to her beeper.  - KET

cc:  MAG, VMK

**EXHIBIT #14**

# Baptist Health Systems of South Florida, Inc.

## AFFILIATED PHYSICIANS PROGRAM

### SCPIE/RELIANCE INSURANCE COMPANY OF ILLINOIS
### MEDICAL PROFESSIONAL LIABILITY

## Policy No. NPD1412189/7077

### Risk Management

**24 Hour Hotline   (800) 246-1107**
*This will connect you to the Risk Mananger on Duty.*

**Risk Managers:   Lee Loman/George Schroeder**

### Claims

**24 Hour Service    (800) 555-0486**
**Fax        (800) 944-4026**
*This will connect you to the Claims Desk.*
*All claims are to be reported directly to SCPIE.*

**Claims Examiner:    Barbara Kuberry**

*(They are at your service and welcome your calls.)*

*(12/30/96)*

**EXHIBIT #15**



January 7, 1997


Marie A. Gongora
South Miami Hospital
6200 S.W. 73rd St.
Miami, FL 33143

Re:    File No.:           CR000022
       Insured:           South Miami Hospital
       Claimant:         Thomas Reid
       Date of Incident:  10/26/92

Dear Ms. Gongora:

Pursuant to your fax of 12/20/96, I wish to thank you for the purchase agreement and your letter of explanation regarding how the hearing aid came to be lost. From this letter, it appears that a nursing personnel was negligent in giving the hearing aid to another individual rather than to the patient or his wife. It appears you did a rather extensive investigation at the hospital in order to determine the factual situation and I ask that you provide me with copies of your notes or dictated summary so that I might further document this file.

Additionally, by copy of this letter to Kathryn Townsend, I am requesting she provide me with written consent to settle this matter in the amount of $2,750. You might want to enclose this with a copy of the check that was issued from the hospital, so that I might reimburse the hospital directly. In the future, we would prefer to make the check payable to the claimant, but inasmuch as this was already accomplished, I do not foresee any difficulty in reimbursing the hospital directly in this one instance.

If you have any questions, please contact me directly at (800) 555-0486.


Very truly yours,

Barbara E. Kuberry,
Vice President, Claims
Hospital Unit Manager

BEK:vdr

cc:    Kathryn Townsend, Esq. - Corp. Director of Risk Management

JAN 1 5 1997
RISK MANAGEMENT

---

Southern California          Program administration for SCPIE          Claims Office
Physicians Insurance      performed by SCPIE Management          405 S. Beverly Drive, Suite 300
Exchange                        Company. *Attorney-in-fact*          Beverly Hills, California 90212-4425

**EXHIBIT #16**



October 30, 2001

Parenti, Falk, Waas, Hernandez & Cortina
113 Almeria Ave.
Coral Gables, FL  33134
Attn: Scott E. Solomon, Esq.

RECEIVED
NOV 0 5 2001
RISK MANAGEMENT
DEC 0 6 2001

**The SCPIE Companies**

American Healthcare
Indemnity Company

American Healthcare
Specialty Insurance
Company

SCPIE Holdings Inc

SCPIE Indemnity
Company

SCPIE Insurance
Services, Inc

SCPIE Management
Company

SCPIE Management
Services, Inc.

Re:     File No.:      CR0000155
        Insured:       South Miami Hospital
        Claimant:      Julie Padron and Alexa Padron
        D/Incident:    4/29/97
        Your File No.: 4477

Dear Mr. Solomon:

Please be advised the above-captioned case is being transferred to our Florida claims office for further handling.  All future correspondence and bills should be addressed to the attention of:

> **Ms. Susan Ball**
> **Litigation Supervisor**
> **The SCPIE Companies**
> **401 E. Jackson St., Ste. 1700**
> **Tampa, FL  33602-5227**
> **(813) 222-4220; FAX (813) 222-4274**
> **Toll Free:  (866) 538-0483**

By copy of this letter to the insured, I am advising that they should continue to report any new claims to the Los Angeles Claims office.  The files will be created in Los Angeles and transferred to Florida for further handling.

Should you have any questions regarding this matter, please feel free to contact the undersigned at (800) 555-0486.

Very truly yours,

Barbara E. Kuberry
Vice President/Hospital Unit Manager

cc:     Yvonne Zawodney - Baptist Health Systems of South Florida
        Vivien Knight - South Miami Hospital
        Connie Leahy - Sedgwick, Detert, Moran & Arnold
        Nancy Carr

1888 Century Park East
Suite 800
Los Angeles, California
90067-1712

310/551-5900
800/962-5549

www.scpie.com

**EXHIBIT #17**

# "Partners In Change"

## with

### Your Hospital

**SULLIVAN KELLY**

*and*

**scpie**

*Our Goal:*

Help your hospital achieve its vision by providing a cost-effective and quality professional and general liability insurance program.

# SCPIE: The Secure Choice For Your Hospital

For more than 20 years, SCPIE has been the leader in medical professional liability insurance for California physicians --

- ■ Largest writer of professional liability insurance in California

- ■ A.M. Best Co. rating: A (Excellent)

# SCPIE: The Secure Choice
## For Your Hospital

### SCPIE's Financial Picture*

| | |
|---|---|
| Total Assets | $744 million |
| Surplus | $241 million |
| Loss Reserves | $449 million |
| Net Premiums Written | $ 32 million |
| Reserve-to-Surplus Ratio | 1.83:1 |

*As of August 1, 1996

# Your Account Team



President & Chief Executive Officer
**Donald J. Zuk**

Vice President
Sullivan Kelly

Account Executive
**L. Elizabeth Harner**

Senior Vice President
**Patrick S. Grant**

Underwriting Coordinator
**Van A. Anderson**

Claims Hospital Unit Manager
**Barbara E. Kuberry**

Risk Manager
**Elaine M. Ziemba**

Actuarial Coordinator
**Joseph P. Henkes**

# SCPIE: The Service Choice

## Effective Communication With Your Hospital

- Ongoing risk management evaluation and education
- Annual program reviews
- Annual premium reporting audits

# SCPIE: The Service Choice

## Effective Communication With Your Hospital

- Claim runs
- Ongoing claim reviews
- Coverage reviews
- Continuous assessment of the changing risk needs of your organization

# SCPIE: The Industry-Focused Choice

To keep abreast of industry changes, SCPIE / SK participates in regional and national health care-specific organizations:

- HFMA - Industry perspective

- ASHRM - National risk management perspective

- MGMA - Medical group management viewpoint

- AHA - Hospital and health care system issues and trends

- FSHRM - Local risk management perspective

# SCPIE: The Industry-Focused Choice

■ Forums and regularly scheduled meetings with our insureds encourage open exchange on matters relating to insurance product development and expansion of value-added services.

# Health Care Professional Liability Program Structure

## $40,000,000 Limits of Liability

| | |
|---|---|
| $20 XS $20 | Lloyd's & Companies / Claims-made or Modified Occur. |
| $10 XS $10 | Lloyd's & Companies / Claims-made or Modified Occur. |
| $3 XS $2 | Lloyd's & Companies / Claims-made or Modified Occur. |
| $1.5 XS $500,000 | Lloyd's & Companies / Claims-made or Modified Occur. |
| $500,000 | SCPIE / Claims-made or Modified Occur. |

# SCPIE: The Informed Choice

## Access To Your Underwriting Partner

The mission of SCPIE's Hospital Professional Liability Program is to protect the assets of hospital organizations.

# SCPIE: The Informed Choice

The program is designed specifically for hospitals and includes coverage for:

■ Liability arising from allegations of defamation, illegal restraint, autopsies and inquests

■ Nuclear medicine

■ Operational or premises liability

■ Professional liability, direct patient treatment and health care services

# SCPIE: The Comprehensive Choice

- Medical products liability
- Medical staff activities (including defense of alleged antitrust)
- Negligent administration of employee benefit programs
- Pollution
- Employment practices
- Medical payments

# SCPIE: The Comprehensive Choice

## Program Overview

- Broad coverage

- Claims-made and reported or modified occurrence policy

- Reporting endorsement

# SCPIE: The Cost-Effective Choice

■ Our guiding principle has been the prevention and control of professional liability litigation.

# SCPIE: The Proactive Claims Management Choice

- Proactive, local claims management

- Vigorous defense of non-meritorious claims

- Accommodating your needs

# SCPIE: The Proactive Claims Management Choice

## Proactive Claims Management

- ■ Experienced personnel

- ■ Early identification of Potentially Compensable Events (PCEs)

- ■ Early investigation, evaluation and resolution of liability claims

- ■ Interaction with all in-pro-per claimants

- ■ 24-Hour Hotline access

# SCPIE: The Proactive Claims Management Choice

## Vigorous Defense of Non-Meritorious Claims

- Dedicated hospital unit
- Approved hospital attorney firms
- Coordinated defense
- Expert referral program

# SCPIE: The Proactive Claims Management Choice

## Accommodating Your Needs

- Written consent to settle professional liability claims
- Allocated expense reduction program
- MIS on-line query access
- Maximum levels of communication and flexibility

# SCPIE: The Flexible Risk Management Choice

## Hospital Risk Management Services

- 24-Hour Hotline
- Survey(s)
- Action plan
- Education programs
- On-site participation
- Risk analysis review(s)

# SCPIE: The Flexible Risk Management Choice

## 24-Hour Hotline

- 24-hour access to a SCPIE risk manager
- Telephone consultation anytime
- Direct dial 800 number
- Pager access

# SCPIE: The Flexible Risk Management Choice

## Risk Management Survey

- Coordinated scheduling with your risk management team
- On-site review as scheduled
- Survey report and analysis



# SCPIE: The Flexible
# Risk Management Choice

## Action Plan :

- Developed with the your risk management team

- Incorporates on-site review information, application information and your needs

- Allows for periodic evaluations and revisions as indicated / requested

- Accommodates new programs / trends

- Maximizes flexibility in program design

# SCPIE: The Flexible Risk Management Choice

## Education Programs

- Coordinated with your risk management team
- Hospital staff
- Medical staff
- General overview or topic specific

# SCPIE: The Flexible Risk Management Choice

## On-Site Visits

- Proactive support of the risk management team
- Committee meetings
- Periodic visits

# SCPIE: The Flexible
# Risk Management Choice

## Risk Analysis Reviews

- New ventures and programs
- Operational changes
- Policies and procedures

# SCPIE: The Solid Choice For Your Hospital

What makes SCPIE the ideal partner for your hospital --

- Experience
- Expertise
- Service excellence

- Commitment
- Capability
- Financial strength & stability

# SCPIE: The Right Choice For Your Hospital

Expertise

■ Knowledge of the developing health care delivery systems and understanding of the impact of these new relationships on your liability exposures and unique needs.

■ Ability to provide risk financing options through innovative insurance coverages, products and programs.

# SCPIE: The Right Choice For Your Hospital

## Service Excellence

- Account team management philosophy

- Comprehensive risk management program

- Proactive claims investigation and expert local defense counsel

# SCPIE: The Right Choice For Your Hospital

## Capability

- Financial strength
- Stability
- Flexibility

# SCPIE: The Right Choice For Your Hospital

## Commitment

- ■ Protection for the health care provider
- ■ Client driven

# SCPIE: The Right Choice For Your Hospital

## In Summary, SCPIE Offers:

- A.M. Best Co. rating: A (Excellent)
- Local coordinated claims handling
- Physician / hospital perspective
- Seamless transition

SCPIE and Sullivan Kelly want to thank you for this opportunity to present our program.

**EXHIBIT #18**

<u>SETTLEMENT AGREEMENT AND RELEASE</u>

This Settlement Agreement and Release (the "Settlement Agreement") is made and entered into this ___ day of November, 1998 by and between the following (the parties:

"Plaintiff"          Steven Chavoustie and Martha Chavoustie

"Defendant"          Baptist Hospital of Miami, Inc., Baptist Health Systems South Florida, Inc.

"Insurer"            SCPIE Indemnity Company

RECITALS:

    A.   Plaintiff filed a complaint against Baptist Hospital of Miami, Inc. ("Defendant") in the Circuit Court, County of Dade, State of Florida, Court Action No. 97-26600 CA 11 (the "Complaint"), which Complaint arose out of certain alleged negligent acts or omissions by Defendant.  In the Complaint, Plaintiff sought to recover monetary damages as a result of that certain occurrence on or about April 5, 1997 at Baptist Hospital, which allegedly resulted in physical injuries and personal injuries to Plaintiff.

    B.   Insurer is the liability insurer of the Defendant, and as such, would be obligated to pay any claim made or judgment obtained against Defendant which is covered by its policy with Defendant.

    C.   The parties desire to enter into this Settlement Agreement in order to provide for certain payments in full settlement and discharge of all claims which are, or might have been, the subject matter of the Complaint, upon the terms and conditions set forth below.

AGREEMENT

The parties agree as follows:

1.0   RELEASE AND DISCHARGE

1.1   In consideration of the payments set forth in Section 2, Plaintiff hereby completely releases and forever discharges Defendants, Baptist Hospital of Miami, Inc., Baptist Health Systems South Florida, Inc. Nadine Dixon, Patty Janicek, Catherine Philpot, Frank Zuniga, Maria Medina, Marian Bell, Elizabeth Cambridge and Insurer from any and all past, present or future claims, demands,

PICS CASE NUMBER 031007    . 182 PAGES

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

M. Diane Koken, Insurance Commissioner,    :
Commonwealth of Pennsylvania,              :
           Plaintiff                   :
                                           :
                  v.                :    No. 183 M.D. 2002
                                           :
Legion Insurance Company,                  :
           Defendant                   :

RE:   Petition for Liquidation of Legion Insurance Company (In Rehabilitation)

## **OPINION**

          Before this Court are Petitions for the Liquidation of Legion Insurance Company (In Rehabilitation) (Legion) and of Villanova Insurance Company (In Rehabilitation) (Villanova) that were filed on August 29, 2002, and amended on October 18, 2002. The Petitions were filed by the Pennsylvania Insurance Commissioner, Honorable M. Diane Koken, in her capacity as Rehabilitator of Legion and Villanova. The Rehabilitator asserts the following grounds for a liquidation: Legion and Villanova have consented to their liquidation; Legion and Villanova are insolvent;[1] further rehabilitation of Legion and Villanova is futile and may substantially increase the risk of loss to creditors, policyholders and the public. The Rehabilitator also asserts the need to trigger state guaranty funds.

---

[1] The insolvency claim was based upon Legion's and Villanova's asserted cash flow problems, the very problems that prompted the Insurance Commissioner's filing of Petitions for Rehabilitation of Legion and Villanova. *See* Notes of Testimony 11/14 at 14-15 (N.T. ___). Orders of Rehabilitation were entered on March 28, 2002.

The ultimate controlling shareholder of Legion and Villanova, Mutual Risk Management, Ltd. (MRM), was granted intervention [2] to contest the liquidation of these insurers.  MRM asserts that Legion and Villanova did not consent to their liquidation.  It also contests the Rehabilitator's claim that "further" rehabilitation would be futile, noting that a reasonable attempt at rehabilitation has yet to be initiated.  Far from preventing harm to creditors and policyholders, MRM asserts that a liquidation will adversely affect these parties.  Further, it denies that shifting the claims of Legion and Villanova to state guaranty funds is in the best interests of either the policyholders or the public.

Article V of The Insurance Department Act of 1921, Act of May 17, 1921, P.L. 789, added by Section 2 of the Act of December 14 1977, P.L. 280, *as amended*, 40 P.S. §§221.1-221.63 (Article V), governs the rehabilitation and liquidation of insolvent insurers.  It specifies the procedure and grounds for the conversion of an insurance company rehabilitation into a liquidation.  It states, in relevant part, as follows:

> Whenever he has reasonable cause to believe that further attempts to rehabilitate an insurer would substantially increase the risk of loss to creditors, policy and certificate holders, or the public, or would be futile, the rehabilitator may petition the Commonwealth Court for an order of liquidation. A petition under this subsection shall have the same effect as a petition under section 520. The Commonwealth Court shall permit the directors to take such actions as are reasonably necessary to defend against the petition and may order payment from the estate of the insurer of such costs and other expenses of defense as justice may require.

---

[2] As the controlling shareholder, MRM continues to have the authority to direct the election or appointment of the directors of Legion and of Villanova.  The statute expressly authorizes the directors of an insurer to contest a liquidation.

Section 518(a) of Article V, 40 P.S. §221.18(a).   It is against this statutory provision that the positions of the Rehabilitator and MRM must be measured.

A pre-hearing conference was held on October 4, 2002.   Evidentiary hearings were conducted on November 7, 8, 14, 15 and 22, 2002.   Prepared statements were received from interested persons,[3] who were not granted party status as intervenors.   The Rehabilitator and MRM each submitted post-hearing briefs; the final brief was submitted on January 13, 2003.   *Amicus curiae* briefs were filed by several state insurance departments and state guaranty associations.[4]

Thereafter, certain policyholders petitioned to intervene, and other policyholders, who had been previously denied intervention, requested that their denials be certified for immediate appeal.   A conference was conducted on February 11, 2002, at the request of the policyholders.   The Court granted intervention to American Airlines, Inc., Rural/Metro Corporation, Pulte Homes, Inc. and the Psychiatrists' Purchasing Group, Inc. (collectively Policyholder Intervenors).   The record was opened to allow Policyholder Intervenors to present evidence on their position that a liquidation would be harmful to their interests.

On March 5, 2003, a collection of underwriters from Lloyds of London, known as Syndicate 271, filed an emergency petition to intervene in this liquidation proceeding for the purpose of opposing the request for relief of Policyholder Intervenor, American Airlines, Inc.   Intervention was granted to

---

[3] Statements were received from Pulte Homes, Inc., Psychiatrists Purchasing Group, Inc., American Airlines, Inc., Rural/Metro Corporation, who later became intervenors, third-party administrators, insurers, national trade associations and several state insurance departments.

[4] These include: the state insurance departments of Alabama, Georgia, Kansas and Iowa; the National Conference of Insurance Guaranty Associations; the National Organization of Life and Health Guaranty Associations; and the National Association of Insurance Commissioners.

Syndicate 271, but its request for a 45 day postponement of the hearing was denied.

Evidentiary hearings on the Policyholder Intervenors' petitions were conducted on March 6, 7, 19, and 20, 2003. The Rehabilitator and Syndicate 271 presented evidence on April 3, 2003. Post-hearing briefs were filed by the Policyholder Intervenors, Syndicate 271 and the Rehabilitator. An *amicus curiae* brief was filed by the Reinsurance Association of America (Reinsurance Association). The last brief was filed on May 27, 2003.

The matter now is ready for disposition.

## I.   FACTUAL FINDINGS.

### A.   Financial Condition of Legion and Villanova.

Legion and Villanova are property and casualty insurers organized and existing under the laws of the Commonwealth of Pennsylvania that operated principally as "fronting companies" in various commercial insurance programs. As fronting companies, Legion and Villanova issued policies of insurance that were largely reinsured by other insurers. The commercial insurance they "fronted" generally fell into two basic categories: corporate account business and program business. The goal in writing this business was to generate earnings from fees, not underwriting profits; accordingly, Legion Group retained little underwriting risk. Instead, the insured retained most of the risk of loss, but the insured's total loss was capped at a certain point through excess coverage or a reinsurance agreement.

The corporate account business was written in two ways. Legion and Villanova issued a guaranteed cost policy that was reinsured by a captive



reinsurer,[5] owned or rented by the policyholder.[6] Legion and Villanova also issued a large loss deductible policy. Under this policy, the insured retained a large, per-occurrence risk through a large deductible.[7] The insured then purchased a second policy, called a deductible reimbursement policy, from a Legion affiliate, Mutual Indemnity Reinsurer. The insured posted collateral with the Mutual Indemnity Reinsurer to secure the amounts to be paid by the Mutual Indemnity Reinsurer. Legion and Villanova billed losses and expenses that fell under the insured's deductible obligation directly to the appropriate Mutual Indemnity Reinsurer.

The program business consisted of a group of commercial risks that were homogenous in their business and risk. This business was usually presented to Legion Group by a Managing General Agent or by a reinsurer. Legion Group ceded all, or nearly all, of the underwriting risk to one or more reinsurers. The program of Policyholder Intervenor, Psychiatrists Risk Purchasing Group, Inc., is an example of this second type of Legion business.

Under the corporate account and program business, Legion Group's insureds were policyholders in name only; in effect, they were self-insureds[8] that

---

[5] A "captive" is an insurance company established and owned by its policyholder, or parent corporation, to reduce premiums and to retain policyholder control over disposition of claims. Earnings of the captive insurer benefit, in different ways, the parent corporation/policyholder, which may claim a tax deduction for premiums paid. If the parent were to self-insure, it cannot claim a tax deduction. LEE R. RUSS & THOMAS F. SEGALLA, 3 COUCH ON INSURANCE §39.2 (3d ed. 2000).

[6] This permitted the insured to benefit (through the payment of a dividend or some other mechanism) if actual losses in a policy period were less than expected.

[7] In the case of one Policyholder Intervenor, Rural/Metro Corporation, the deductible was $1 million on each occurrence.

[8] This description does not apply to American Airlines, Inc. Legion acted as a fronting company, and it assumed no underwriting risk. However, the risk was not borne by the airline but, rather, by the reinsurers.

used Legion and Villanova as the means of obtaining stop loss coverage from a reinsurer. Because Legion and Villanova did not function as true insurers, their underwriting and claims departments were minimally staffed; typically, claims were handled by a third-party administrator that was engaged and paid by the insured. Legion and Villanova did not place the reinsurance or negotiate its terms;[9] as is appropriate for a fronting company, Legion Group evaluated the reinsurance for quality. By all accounts, the reinsurers of Legion Group are financially strong and responsible companies.

This paradigm began to change somewhat in early 2000, when Legion and Villanova began to accept some underwriting risk in order to generate more cash flow through increased premium retention. Nevertheless, its total responsibility for claims, in the aggregate, for all years and all lines, did not exceed 10%.

In most cases, Legion Group funded the loss payouts and then sought reimbursement from the reinsurers. Beginning in 1999, Legion Group began to experience cash flow problems, which it attempted to remedy by establishing loss escrow accounts and by billing reinsurers on a more timely and accurate basis.[10] However, reinsurance disputes developed between 1999 and 2000. Because of these increased reinsurance disputes, A.M. Best reduced the rating of Legion and Villanova from A to A- in December 2000. At the end of 2000, MRM contributed $50 million to both companies. However, on February 15, 2001, A.M. Best placed Legion and Villanova "under review with negative implications." In September of

---

[9] This is true, at least, for the Policyholder Intervenors. The Court did not hear testimony on every insurance program.

[10] Legion's problems in collecting reinsurance were exacerbated by its poor software, ironically called "Faster."

{PAGE }

(6)

2001, MRM made a capital contribution to Legion and Villanova of approximately $80 million.  Despite this infusion of additional capital, by December 2001, A.M. Best again placed the A- rating of Legion and Villanova "under review," citing the need for even more capital.

In February of 2002, Ernst & Young determined that a deferred tax asset could no longer be carried as an admitted asset on the respective statutory financial statements of Legion and Villanova; this charge reduced their collective admitted assets by approximately $50 million.  Prior to this event, Legion Group had been discussing with A.M. Best the need for a $70 million capital infusion; the Ernst & Young charge increased the total capital need to $120 million. Accordingly, in February of 2002, A.M. Best downgraded Legion to a B rating (thereby bypassing two intermediate steps, B+ and B++).  As a result, many of the Legion Group insureds, whose risk managers required an insurer to have an A or A- rating from A.M. Best, ceased doing business with Legion Group.

MRM provided $130 million in additional capital to Legion and Villanova in late 2000 and September 2001.  By March 2002, all but approximately $30 million of that capital was gone, having been used to fund operations.

In March of 2002, Legion paid approximately $90 to $100 million in losses, and it incurred expenses of $5 to $6 million.  At that point, Legion Group reported admitted assets of over $400 million; however, only a portion of these assets were liquid and available to pay claims and fund expenses.  A significant portion of Legion's admitted assets were statutory deposits held by the insurance departments of other states.  As of August 31, 2002, Legion's statutory deposits totaled $185,088,928, and Villanova's statutory deposits totaled $40,043,706.

Legion's premium collections dropped from $49.6 million in April of 2002 to $11.1 million in September of 2002. During the period from April through September 2002, Legion's reinsurance collections were (in millions) as follows:

| {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC |
|---------|---------|---------|---------|---------|---------|
| {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC |

During that same period, April through September 2002, Legion's total sources of cash have been (in millions) as follows:

| {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC |
|---------|---------|---------|---------|---------|---------|
| {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC |

During the period April through September 2002, Legion's total expenditures have been (in millions):

| {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC |
|---------|---------|---------|---------|---------|---------|
| $44.4 | $45.8 | $49.1 | $49.8 | $46.1 | $51.0 |

Since April 1, 2002, Legion has continued to pay worker's compensation and accident and health insurance claims. Claims not being paid, *i.e.*, liability, are estimated by the Rehabilitator to total $25 million per month.

Villanova's premium collections dropped from $4.5 million in April 2002 to $2.0 Million in October. In the period April through September 2002, Villanova's total sources of cash have been (in millions) as follows:

| {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC |
|---------|---------|---------|---------|---------|---------|
| {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC |

During that same period, Villanova's total expenditures have been (in millions) as follows:

| {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC |
|---------|---------|---------|---------|---------|---------|
| {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC | {ADVANC |

Since April 1, 2002, Villanova has continued to pay worker's compensation, accident and health claims. Claims not being paid, *i.e.*, liability, are estimated by the Rehabilitator to total $1.5 million per month.

The unpaid claims identified by the Rehabilitator had been funded directly by reinsurers or were reimbursed by reinsurers promptly upon Legion's or Villanova's payment. In addition, much of the captive reinsurance was secured by letters of credit or trust funds which could be drawn down as payment was made. In short, the putative claims backlog of $162.5 million can be substantially reduced by reinsurance payments that the Rehabilitator has refused to allow since placing Legion and Villanova into rehabilitation and by collateralized reinsurance.

The rehabilitations of Legion and Villanova were prompted by their cash flow problems, caused by reinsurers that did not make timely payments. As explained in the hearing, once the rehabilitation began, "it was pretty clear that the issue in regards to its ability to survive as a going concern going forward was its ability to collect the reinsurance." Notes of Testimony 11/14 at 28 (N.T. __). The reinsurance payments, as of June 30, 2002, that were past due and owing to Legion and Villanova total $310 million.[11]

---

[11] There are ten to fifteen major reinsurers who owe Legion $3 to $5 million or more. Prior to rehabilitation in 2001, Legion's and Villanova's reinsurance collections approached $1 billion.

⑨

Joseph DiMemmo, Director of the Bureau of Liquidation and Rehabilitation Management, was the Rehabilitator's principal witness. He testified knowledgeably about the reinsurer's past due obligations to Legion and Villanova. He noted that reinsurers "can hold off for whatever reasons they use, whether legitimate or non-legitimate, and not pay, earn investment income over a period of years, be in a position to pay it back sometime later." N.T. 11/14 at 30-31.

Gregg Frederick, Senior Vice President for Reinsurance, Reinsurance Manager for the Rehabilitator, explained that these reinsurers are unjustified in their refusal to pay and are simply playing games by asserting invalid defenses. N.T. 11/7 at 226.   The failure of the reinsurers to honor their contractual obligations is not limited to Legion Group; it is endemic to the industry.

The Rehabilitator asserts, nevertheless, that the reinsurance will be collected "to the greatest extent;" only the timing of these collections is uncertain. N.T. 11/14 at 34, 56-57, 82.  To date, however, the Rehabilitator has had little success in collecting on the overdue $310 million owing by Legion Group's reinsurers.[12]  The Rehabilitator has declined the assistance of Robert Mulderig, a member of Legion and Villanova's board at the time of the hearing, even though, prior to the Rehabilitation, he had been instrumental in negotiating significant reinsurance commutations and collections where the balances were substantial or the issues difficult.[13]  The Rehabilitator has not followed the course of the Reliance

---

[12] The Rehabilitator does not have a business plan or written strategy for collection of reinsurance proceeds.  A formal forecast for reinsurance collections was not due until September of 2002, six months after the rehabilitation commenced.  The Rehabilitator acknowledges the duty to pursue reinsurance proceeds.

[13] Further, Mr. Mulderig, was instrumental in closing commutation deals and reinsurance collections prior to the rehabilitation and that he had useful skills in that area.  Mr. Frederick, in

**(Footnote continued on next page . . . )**

Insurance Company receivership, where the Commissioner made telephone calls and sent letters on official Department stationery regarding the importance of timely payments. Only one arbitration has been commenced by the Rehabilitator in the months since the rehabilitation orders were entered. As of December 1, 2002, only two commutations[14] -- one for $500,000 and one for $300,000 -- had been finalized with reinsurers.

Prior to the rehabilitation, several reinsurers made direct payments to Legion's and Villanova's insureds. After the rehabilitation orders were entered, one or more reinsurers offered to make direct payments, but the offers were rejected by the Rehabilitator.

Edward B. Wallis, testified on behalf of the National Conference of Insurance Guaranty Funds (NCIGF).[15] It is his view that the majority of states require a court to enter an order of liquidation with a finding of insolvency in order to trigger guaranty fund coverage. With regard to claims other than workers' compensation claims, every state has adopted a maximum per-claim limit on what will be paid by state guaranty funds. The most common maximum per-claim payment is $300,000.[16] In addition, many states have policyholder net worth provisions that allow guaranty funds to seek reimbursement of claim payments from policyholders with a net worth that exceeds a certain level stated in the

---

**(continued . . . )**

charge of reinsurance collections for Legion, testified that Mr. Mulderig's assistance would have been helpful and that it could have changed the results.

[14] A commutation is a settlement of all amounts owing under a reinsurance arrangement, future, present and past.

[15] When the NCIGF filed its *amicus* brief in this matter, its principal concern was that workers' compensation payments might be cut off in all states, but this has not happened.

[16] This amount is adequate for personal lines insurance but not for the large commercial insurance programs fronted by Legion and Villanova.

{PAGE }

applicable statute.   The state guaranty funds, through the NCIGF, have not expressed an opinion on whether Legion can be successfully rehabilitated.

Peter G. Gallanis, President of the National Organization of Life and Health Guaranty Associations (NOLHGA), testified that none of the life and health state guaranty funds have been triggered.  In rehabilitation, Legion has been paying all accident and health claims on a current basis, which are in the range of $1 million to $2 million per month.

The Rehabilitator asserts that 84.77%[17] of all claims of Legion and Villanova will fall within the maximum limits of coverage available from guaranty associations.   However, this estimate does not take into account the following factors:  the ineligibility of policyholders that exceed defined net worth requirements that exist in the majority of states; the high deductibles in the Legion program and corporate account business;  the exclusion of certain types of insurance policies; the deadlines for filing claims that will bar coverage of claims that are slow to develop; and other statutory limitations on coverage that vary from state to state.  Because it is not the case that all claims falling under $300,000 will be covered by guaranty funds, the actual percentage of claims to be paid by guaranty funds is unknown.

The rehabilitation orders allow the Rehabilitator the discretion to pay claims, and the amended rehabilitation orders specifically authorize the Rehabilitator to make direct payments in hardship cases such as those arising from

---

[17] The Policyholder Intervenors *strongly objected to the admissibility of Liquidator's Exhibit 125* (LIQ Ex. ___).  It was admitted, but the Court accepts the exhibit as showing only what is obvious: most claims fall under $300,000.  Of course, the Rehabilitator cannot identify the total dollar amounts owing on either side of the $300,000 breakpoint.  The Court assigns the exhibit little weight on the exact percentage of claims covered by guaranty funds.

{PAGE }

the California non-standard automobile program.[18]  It was not done.  According to Mr. Mulderig, shortly after the rehabilitation was entered, the reinsurers on the California automobile program offered to pay those claims either immediately upon payment by Legion and Villanova or directly to claimants.  Mr. Mulderig asserts that this offer was declined by the Rehabilitator.  The California Insurance Department failed to use the Legion and Villanova statutory deposits in its possession and control to pay these hardship claims.[19]  These actions, or lack of actions, are inexplicable.

MRM's expert, Michael J. FitzGibbons, an individual with experience working as a rehabilitator and liquidator for several state insurance departments, testified that it is premature to order the liquidation of Legion.  Mr. FitzGibbons projected cash flows for Legion and Villanova through the year 2016 by using the expected loss and loss adjustment expense payments that were prepared by the Rehabilitator's expert, Terry Goldberg.   Based on those projections, Mr. FitzGibbons concluded that Legion and Villanova will be able to honor all of their direct policyholder obligations over the long run, that is, through 2016, in spite of their current liquidity crisis.

Mr. FitzGibbons further testified that the Rehabilitator's projections do not show whether the liquidity crisis of Legion and Villanova is short term or long term.   There are a number of potential sources for alleviating the liquidity

---

[18] This program, unlike most of Legion Group's business, was personal, not commercial insurance.  Subsequently, the Court has approved the Rehabilitator's proposed guidelines for the payment of hardship and small claims.  They are good guidelines; the delay in their adoption is unfortunate but perhaps unavoidable.

[19] The Rehabilitator also made the judgment not to pay the California automobile claims.  N.T. 11/14 at 103.

crisis, including statutory deposits, reinsurer deposits, the then-pending commutation with Legion affiliates, giving policyholders direct access to reinsurance, such as those insured in the California nonstandard auto program.

Finally, Mr. FitzGibbons explained that reinsurance, the single largest source of funds for Legion and Villanova, will be easier to recover in a rehabilitation than in a liquidation. This is because in a liquidation, claim files are forwarded to the various guaranty associations, which will complicate and delay the collection of claim data needed to effect reinsurance accounting, billings and collections. Keeping Legion and Villanova in rehabilitation will reduce claims adjustment expenses because much of the claims adjustment expenses of Legion and Villanova have been prefunded through third-party administrators. If the companies are placed in liquidation, the cost of handling these claims will be paid by guaranty funds, which will then bill these costs to the estates of Legion and Villanova.

Mr. FitzGibbons opined that further attempts to rehabilitate Legion and Villanova would not be futile and, indeed, that the Rehabilitator needs to do further analysis before deciding whether the companies need to be liquidated.

Mr. Mulderig is a director of Legion and Villanova. He opposes liquidation and denies that either insurer has consented to the Rehabilitator's petition to liquidate. In support of this opposition, Mr. Mulderig testified about the bizarre results produced by a liquidation. Policyholders that are responsible for claims adjustment, such as Pulte Homes, Inc., will lose control of claims. Further, they will have to pay guaranty funds to adjust claims even though they have already paid for this service. Using the example of claims of members of the American Psychiatric Association program and American Airlines, Mr. Mulderig

{PAGE }

described the limits of guaranty fund coverage as disastrous. A liquidation would provide a windfall to the recalcitrant reinsurers, tax the guaranty funds and the insurers who must fund them,[20] and negatively affect the administration of the claims.

Mr. Mulderig further testified as to the usefulness of putting pressure on the reinsurers by inviting them in for a meeting to come up with a funding plan that would allow Legion to meet their obligations as they fall due. Notably, Mr. Mulderig testified that that he was informed by the Insurance Department that it attempted to do just such a thing in the case of Reliance Insurance Company and had been optimistic that it might have worked. However, the events of September 11 intervened. Mr. Mulderig was informed that such an effort could, however, be successful with Legion and Villanova. These conversations were, apparently, instrumental in the decision of Legion and Villanova to consent to a rehabilitation.

There is no question that Legion and Villanova are unable to meet their claim obligations as they come due. This was the situation that caused the companies to be placed into rehabilitation. Inability to pay claims timely is, by statute, an indication of insolvency.

Until substantial payments are recovered from reinsurers, Legion and Villanova will remain in this situation. As Mr. DiMemmo explained, it is impossible to predict when collections will exceed loss payments. "I believe we

---

[20] In many states, including Pennsylvania, funding is ultimately the responsibility of the taxpayers. Insurers receive a dollar-for-dollar credit against their premium taxes for assessments paid to guaranty funds. Section 902.1 of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, added by Section 11 of the Act of May 24, 2000, P.L. 106, *as amended*, Section 16 of the Act of June 22, 2001, P.L. 353, 72 P.S. §7902.1.

{PAGE }



are going to collect [the reinsurance].  The hesitancy I have is putting a time frame on when that's going to be done." N.T. 11/14 at 115.

As of June 30, 2002, Legion had a statutory surplus as regards to policyholders of $289 million, and Villanova had a surplus of $37 million.  Stated otherwise, combined, their net worth exceeds $326 million.  This proceeding is, therefore, unique.  The problem is not impairment of statutory surplus, but the problem is with cash flow.  As the Rehabilitator has acknowledged to the Court, the Insurance Department, at least since 1989, has never sought to liquidate an insurance company with a positive net worth, as is the case here.

### B.    Interests of Policyholder Intervenor: Pulte Homes, Inc.

Pulte Homes, Inc. (Pulte) is a single-family residential construction company and one of the largest in the nation.  Last year, for example, Pulte built approximately 28,000 homes in 25 states.  In 2002, Pulte's total revenues approximated $7.5 billion; its net worth was $2.7 billion.  Since 1991, Pulte has provided for its general liability claims through a program of its own design that involves: (1) direct negotiation and purchase of reinsurance for Pulte's sole benefit; (2) a licensed fronting, or a pass-through, insurance company to issue certificates of insurance so that Pulte could satisfy financial responsibility requirements;[21] a (3)

---

[21] State or local financial responsibility laws are enacted where a particular activity requires a license or permit before the activity can be undertaken.  Many states, for example, require that an owner of a motor vehicle demonstrate financial responsibility as a condition of having the vehicle registered by the state.  Financial responsibility laws may take different forms.  They may require one of the following: (1) that the licensee be qualified as a self-insurer; (2) that the licensee purchase an insurance policy with specified limits; or (3) that the licensee post a bond or other security.  *See* GEORGE E. REJDA, PRINCIPLES OF RISK MANAGEMENT AND INSURANCE 195 (6th ed. 1998).

the handling all liability claims by a third-party administrator (TPA) chosen and compensated by Pulte.   The reinsurance companies bear the entire risk of any losses in excess of the Pulte self-insured retention, up to the limit of liability, and the fronting company bears none.

For many years, Pulte's reinsurance has been placed by its reinsurance consultant, Northern States Management, whose principal is John Middleton. Annually, Mr. Middleton has met with reinsurers, using Pulte's loss runs, exposure information and claims exhibits, provided by Pulte's TPA, to provide reinsurers the information needed to underwrite and price the Pulte risk.   Since 1991, two companies, Swiss Reinsurance America Corporation (Swiss Re) and American Reinsurance Company (Am Re), separately or in tandem, have provided 100% of the reinsurance for the Pulte insurance program.   Am Re and Swiss Re were chosen because they are two of the largest and financially strongest reinsurance companies that sought Pulte's business.[22]

In most years, Swiss Re and Am Re participated on a 50% quota share basis, meaning that for any losses in excess of Pulte's self-insured retention, Swiss Re and Am Re would each pay 50% of the claim.   In 1997, Pulte retained liability of up to $1 million per occurrence and $5 million in the aggregate.   Swiss Re and Am Re functioned as the excess insurers on Pulte claims that exceeded $1 million per occurrence or $5 million in the aggregate in a single year.   They assumed up to $9 million per occurrence, and up to $5 million for aggregate losses.   In later years,

---

[22] Swiss Re's 1997 renewal proposal was made to Pulte, not to Legion, and it touts Swiss Re's financial strength.   It also demonstrates that Swiss Re's insurance "partner" was Pulte, not Legion. Pulte Ex. 14.

(17)

the split between Swiss Re and Am Re was a bit more complicated, but they always accepted all of the risk in excess of Pulte's self-insured retention.[23]

Swiss Re and Am Re issued facultative reinsurance[24] certificates to Pulte that specifically identified Pulte as the insured. They were boilerplate certificates, and, as is the case with reinsurance, often disregarded.[25] However, the Pulte program operated along the lines of the parties' reasonable expectations.

In 1997, Legion became the fronting company on the Pulte general liability insurance program. For its services, Legion received a flat fronting fee of $100,000 per year. Pulte paid premium to Legion to cover the fronting fee, the taxes, and the reinsurance premium; Legion disbursed the premium to the reinsurers.

The declarations page of the Legion 1997-1998 Policy contains an aggregate coverage limit of $10 million and a per occurrence limit of $10 million. This policy includes a deductible endorsement that makes Pulte responsible for claims up to $1 million per occurrence and $5 million in the aggregate. The premium for the 1997-1998 Policy is listed as $929,540. Of that amount, $800,000 was paid to the reinsurance companies, $100,000 was retained by Legion as its fronting fee, and the remaining $29,540 was used by Legion to pay premium taxes.

---

[23] Pulte's captive insurer is involved in the primary layer retained by Pulte. Rush Testimony, N.T. 3/6 at 162.

[24] There are two types of reinsurance: facultative and treaty. Facultative reinsurance reinsures one particular risk, and treaty reinsurance reinsures a program, for example, a collection of homeowners' risks underwritten by a ceding company. In treaty reinsurance, the reinsurer may not reject a particular risk of the ceding company; it must accept all risks covered by the treaty.

[25] One point to emerge in the many days of hearings is the casual nature of the contractual relationship between ceding companies and their reinsurers. The parties operate on the handshake rather than the "get in writing" principle. It is quite unlike the contractual relationship between insurers and their policyholders that requires pre-approval of policies, exacting attention to coverage applications, notice obligations and the like.

Legion issued similar policies in 1998, 1999, 2000 and 2001.  They followed an identical paradigm; the only changes were in the limits of coverage.

The principal type of claim asserted against Pulte is a construction defect claim that requires a repair to the home.  In dealing with claims, Pulte focuses on customer satisfaction.  Pulte tries to create a homeowner for life, hoping to sell a home to a first-time home buyer, then another at the "move up home stage" and, finally, a retirement home.  In order to achieve a high level of customer satisfaction, Pulte works for a fair, quick and cost effective resolution of customer problems.  As of February 28, 2003, 416 claims have been asserted against Pulte that are covered by the Legion fronting policies; those 416 claims constitute 390 separate occurrences.  Only five or six of those 390 occurrences are currently expected to exceed Pulte's "per occurrence" retention.

Pulte's TPA is RiskCap, which is located in Denver, Colorado.  Legion is also a party to the TPA agreement;[26] however, Legion does not pay the TPA's fees and has no actual involvement in the handling of claims.  Indeed, it was the intent of all parties to the TPA agreement that Legion,[27] as a pass-through, would play no role in the administration of claims or supervision of RiskCap.  RiskCap has total authority and responsibility for all claims adjusting and administration services.  Accordingly, RiskCap sets the loss reserves (with the input of Pulte), maintains all claims files, pays claims and performs the claims

---

[26] Legion has to be a party because technically the claims adjusted are covered by the Legion policy, and Legion has an obligation stated in the fronting policy to adjust claims.  This is technical coverage because of Pulte's $1 million/$5 million deductible, at which point the reinsurers become responsible.

[27] The TPA Agreement specifically provides that RiskCap was to act as an independent contractor and not as an officer or employee of Legion.

19

adjustment function that otherwise Legion would be required to perform under the policy. Pulte has final authority and control over most claims; Legion is entitled to notice of certain types of claims.

In contrast to Legion, the reinsurance companies played a large role in Pulte's claims process. RiskCap often communicated with the reinsurance companies, and there were annual meetings to which Pulte, RiskCap, Am Re, and Swiss Re would send multiple representatives. Legion never sent a representative.

One of the Rehabilitator's stated objectives in this liquidation proceeding is to transfer a backlog of property and liability claims to state guaranty funds. Thirty-one guaranty funds bar coverage to claimants with a certain net worth, and funds will make claims against the Legion estate for services in handling claims as well as for their payment.

The Rehabilitator's objective has untoward consequences for Pulte. Upon liquidation, RiskCap will be required to deliver Pulte's claims files to the guaranty funds, which will assume the handling of claims on "behalf" of Legion even though Legion never adjusted a Pulte claim. Claims personnel at the guaranty funds are necessarily unfamiliar with Pulte's particular files and with Pulte's business. This will lead to significant claims administration expenses – in the guaranty funds' obtaining of the files, becoming familiar with the files, and perhaps even mishandling the claims. In addition, because Pulte did business in many states, jurisdictional disputes will arise as to claim responsibility: the state where the claim arose or the state where Pulte was domiciled. *See, e.g., Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868 (7th Cir. 2000); *Ruiz de Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351 (11th Cir. 2000). Finally, Pulte's net worth of $2.7 billion will render it ineligible for guaranty fund coverage in most of

{PAGE }

20

the states in which it operates.  Notwithstanding that lack of eligibility, Pulte will still be required to send its files to guaranty funds which, in turn, will charge Pulte for its services and claim payments.

If Pulte is forced to transfer claims adjustment to guaranty funds, it will lose the oversight it needs to ensure that the claims of its customers are promptly and equitably resolved.  Maintaining control over claims is essential, Pulte believes, to building a lifetime customer base and was its principal objective in setting up its program.  Pulte believes that the Rehabilitator has an obligation to it and to other policyholders before moving to a liquidation.  It believes that it should have direct access to its reinsurance, which will save the Rehabilitator (or Liquidator) the expenses attendant to claims administration and collection of reinsurance.  A liquidation will take 15 to 20 years to complete.[28]  Even a partial distribution on policyholder claims would take years.[29]  This delay will be harmful to Pulte as well as to its customers, who are the claimants.

C.   **Interests of Policyholder Intervenor: Psychiatrists' Purchasing Group, Inc.**

The American Psychiatric Association (APA) is an organization of physicians who specialize in psychiatry, and it has approximately 35,000 members worldwide.  The APA provides advocacy, educational and professional services to psychiatrists.  One of the benefits of membership in the APA is the opportunity to participate in its professional liability insurance program (Program) that was established in 1984.

---

[28] The Reinsurance Association notes that the estates of Mission and Integrity are still open 16 years after being placed in liquidation.  Reinsurance Association Brief at 5.
[29] Mullin Testimony, N.T. 3/20 at 458.

At present, the Program is delivered through a risk purchasing group, Psychiatrists' Purchasing Group, Inc. (PPG), which is governed by the federal Liability Risk Retention Act, 15 U.S.C. §3901-3906.[30] In accordance with federal law, PPG acts on behalf of the physician members of the APA to obtain: (1) coverage tailored to the practice of psychiatry, and (2) the economies of scale that result from purchasing insurance on a group, as opposed to an individual, policy basis.

Since 1984, the APA has offered its members malpractice insurance through the Program.[31] The Program has always operated through fronting companies. On May 1, 1988, Legion became the principal fronting company for the Program, and it continued as the fronting insurer until it was placed into rehabilitation. The purpose of the fronting arrangement was to give each psychiatrist a certificate of insurance from a licensed insurer to satisfy the psychiatrist's financial responsibility obligations.[32]

---

[30] A purchasing group is defined under federal law as: any group which - (A) has as one of its purposes the purchase of liability insurance on a group basis; (B) purchases such insurance only for its group members and only to cover their similar or related liability exposure; (C) is composed of members whose businesses or activities are similar or related with respect to the liability to which members are exposed by virtue of any related, similar, or common business, trade, product, services, premises, or operations; and (D) is domiciled in any State. 15 U.S.C. §3901(a)(5). Purchasing Groups are exempt from certain state laws that would prohibit them from obtaining the premium and coverage benefits derived from purchasing liability insurance on a group basis. 15 U.S.C. §3903(a).

[31] Participation in the Program was and is limited to members of the APA. The Program has historically been offered through fronting companies. In the early years of the Program a large percentage of the risk was reinsured by Psychiatrists Mutual Insurance Company (PMIC) a "captive" insurer owned and operated by the APA through the "American Psychiatric Insurance Trust." PMIC in turn obtained reinsurance for itself, and for portions of the Program that it did not reinsure, through commercial reinsurers.

[32] For example, hospitals may require all physicians with admitting privileges to hold medical malpractice coverage from a licensed insurer. Some states, such as Pennsylvania, require

**(Footnote continued on next page . . . )**

In contrast to the Pulte program, Legion retained a nominal risk for the payment of claims arising from the Program.   In order to satisfy Legion's regulatory issues,[33] Legion retained some risk; however, the amount of that risk was fully funded by the Program.[34]   For example, in 1988, Legion retained risk for $8.5 million in claims; for that risk, it received $8.5 million reduced to present value.   This is not a true underwriting risk where the policyholder pays a premium calculated by actuaries to pay expected, but uncertain, losses.   This pre-funding by PPG rendered Legion's retention risk-free.

In 1988, Legion became the principal fronting company for the Program.   At first it issued a master group claims-made policy that was subject to a group aggregate limit (a limit that was shared in by all Program participants).[35]   By 1996, Legion no longer issued policies subject to a group aggregate limit.   Instead, it offered individual policies issued on either an occurrence or claims made basis, at the option of the participant.   At all times, Legion was fully reinsured for the

---

**(continued . . . )**

physicians to have malpractice coverage from a licensed or admitted insurer in order to be licensed.  *See* Section 701(a) of the Health Care Services Malpractice Act, Act of October 15, 1975, P.L. 390, *as amended*, 40 P.S. §1301.701(a).

[33] These issues were not specified in the hearing.  It appeared, however, that Legion needed to establish at least the appearance of assuming some claim liability.

[34] From 1988 to 1996, Legion retained, on an annual basis, between $8.5 million and $13.3 million for PPG claims.  From 1996 to 2002, Legion's retention was stated as a percentage of premium; it was 7.5%.  Legion never accepted an underwriting risk because in all years its retention was fully funded by PPG.

[35] The Legion coverage was supplemented by a policy issued by Psychiatrists' Risk Retention Group, Inc. (PRRG), a Tennessee domiciled insurer that was also owned indirectly by the APA (through the American Psychiatric Insurance Trust).  PRRG provided coverage where Legion's group aggregate limit left off, and also coverage for claims that were filed after Legion's policy expired -- an unlimited extended reporting period that resulted in the Program offering the equivalent of occurrence-based coverage.

23

coverage it issued, subject to a small retention for which it received additional premium monies in an amount equal to its risk.

In 1991, PMIC, through its reinsurance intermediary, William Galtney,[36] obtained reinsurance for a portion of the Program losses from Transatlantic Reinsurance Company (TRC). This reinsurance was issued to Legion and PRRG, as the Program's two fronting companies. The Chief Executive Officer of TRC, Robert Orlich, regularly attended PMIC board meetings. Beginning in 1991 and continuing to the present, TRC was a reinsurer for the Program. By April 1, 2002, TRC provided reinsurance for almost 100% of the Program's underwriting risk. Legion had no role in bringing TRC into the APA program. Mr. Galtney's relationship with TRC was the key factor in its becoming a reinsurer of the Program. The beneficiaries of the TRC reinsurance are the psychiatrists insured under the Program.

Over a period of years, TRC took on a larger and larger share of the Program's underwriting risk. By the time Legion was placed in rehabilitation in April 2002, TRC was reinsuring almost 100% of the risk under the Program. As noted, to the extent Legion had any liability for claims, it had received dollar-for-dollar pre-funding for the claims, in addition to its fronting fee.

During 1997, TRC also took on a large part of the risk that previously had been underwritten by Legion, PRRG and PMIC, through a "loss portfolio transfer." Under the loss portfolio transfer, TRC assumed from Legion, PRRG and PMIC losses not to exceed approximately $131 million arising from Program years

---

[36] Mr. Galtney's company subsequently became Healthcare Risk Management Services.



prior to 1991.[37]  The reinsurance issued by TRC was negotiated by PMIC and other Program entities, not Legion, for the benefit of PPG's members.

Since 1986, the Program has been administered by Professional Risk Management Services, Inc. (PRMS).[38]  PRMS's services include the issuance of policies, the handling of claims and financial administration of the Program.  It has handled marketing, underwriting, premium collection and billing, claims defense and settlement, and almost all other aspects of the Program, with little or no input or involvement from Legion.  By contrast, PRMS has worked and continues to work closely with TRC, for example in the area of claims settlement and setting premium rates for participants.[39]

PPG has acted as the Program's "ombudsman" since 1990, and even after a reorganization in October, 2000 (when the APA sold its interest in PMIC and PRRG),[40] PPG continues to operate as such under the current Insurance Program Agreement.  Over the years, PPG has entered into a number of contracts with PRMS under which PRMS provided the above-described administrative services to the Program, not to Legion.  It was PMIC and PPG, not Legion, that engaged Mr. Galtney's services to place reinsurance for the Program.

---

[37] Over time, and by October 2000, that limit was increased to $191 million, plus fifty percent of losses in excess of that amount.  TRC received premiums in excess of $100 million from PRRG and PMIC, and also Legion, as consideration for taking on this risk.  It is axiomatic that the source of this consideration was the premium dollars paid by PPG's members through the Program's insurers, including the two captives (PRRG and PMIC).

[38] APA formed PRMS to administer the Program.  PRMS became a subsidiary of PRRG in 1998, and in 2000, it become a subsidiary of Legion.  It continues to handle the day-to-day functions as manager of the Program even though Legion is no longer the fronting company.

[39] Since 1986 the Program has had its own actuary, Mr. Charles Gruber, who reports to the Program entities, but not to Legion, which has its own actuarial staff.

[40] A material requirement for the APA's sale of these assets was the continued support for the Program of TRC as 100% reinsurer.

@ 5

In summary, as a fronting company, Legion did not participate in Program administration and did not assume a true underwriting risk.[41] TRC and PRMS (and PMIC prior to October 2000) have handled the claims and all other aspects of the Program. PRMS has received instructions from and dealt directly with TRC and PPG, bypassing Legion, on virtually every aspect of the Program.[42] The reinsurance agreements between Legion and TRC, with the exception of the Loss Portfolio Transfer, do not contain "cut through" provisions;[43] however, the intended beneficiaries of the Program reinsurance are the individual Program participants.

If Legion is placed into liquidation, state guaranty funds may be inadequate or unavailable to pay all the claims of PPG's members.[44] The availability of state guaranty funds for claims that may not develop for 25 years is unlikely.[45] Guaranty funds will not cover claims in excess of $300,000, and claims paid on behalf of PPG members, on occasion, have exceeded that amount by multiples. For the years in which the risk retention group, PRRG, provided coverage to the Program, there may be no coverage at all from guaranty funds because policyholders of risk retention groups do not have any access to guaranty

---

[41] Legion's aggregate retention, for all years, is estimated by the APA's consulting actuary to be $8 million, at that point in the future when all claims have fully developed. Its liability could reach $16 million, which is the maximum. However, these payouts have already been fully funded.

[42] PRMS is ready, willing and able to continue providing these services with regard to all claims that are reported for the years in which Legion was the front company and TRC was the reinsurer.

[43] *See infra* p. 38 for explanation of a cut-through provision.

[44] The Rehabilitator asserts that most claims of PPG will fall within the limits of guaranty fund coverage.

[45] Dr. Levenson testified about a recent claim of malpractice asserted against an ADA member arising from occurrences over 25 years old. N.T. 3/7 at 245.



funds.   15 U.S.C. §3902(a)(2).   The bar date[46] for filing claims against the liquidated estate requested by the Rehabilitator could have adverse consequences for the Program.  An act of alleged malpractice by a psychiatrist may not result in a claim until the patient reaches the age of majority, which may be decades after the original date of treatment.  By that time, the bar date will have long passed, and the member's ability to collect against a residual estate gone, assuming a residual estate exists after payment of those claims filed before the bar date.

PPG opposes a liquidation of Legion; it believes that Legion can be rehabilitated and that a rehabilitation is in the best interest of the members of PPG. It requests the development of a plan of rehabilitation that allows the Program direct access to payments from TRC.[47]  Absent this relief, Program members may find themselves exposed to massive, devastating personal liability arising from claims that would not be covered in a liquidation.

### D.    Interests of Policyholder Intervenor: Rural/Metro Corporation

Rural/Metro Corporation (Rural/Metro) is an emergency and medical transportation company that is headquartered in Scottsdale, Arizona; its stock is publicly traded.  Rural/Metro operates through approximately 120 subsidiaries in 26 states to provide 911 ambulance service and fire prevention services as well as

---

[46] The Rehabilitator contends that the bar date for filing claims will not prevent a liquidator from collecting from reinsurers for claims arising after the bar date.  The bar date establishes the universe of claims to be paid from the estate.  A late claims procedure is contemplated under Article V; however, claims accepted under the late claims procedure generally are paid only if funds remain in the estate.

[47] Indeed, if such access is not granted, PPG estimates that TRC could enjoy a windfall of $48 million.



certain non-emergency services. Rural/Metro employs over 10,000 paramedics, emergency medical technicians (EMT) and other personnel who make approximately 1,000,000 medical transports, both emergency and non-emergency, per year.

As of December 13, 2002, Rural/Metro reported a net worth of –$160 million. Annual revenues exceeded $500 million in 2002. A recent corporate restructuring has allowed Rural/Metro to meet its cash flow needs; however, unanticipated cash needs would impair the restructuring and require additional debt or equity financing. Such financing may not be available to Rural/Metro on reasonable terms or at all, which would have a material adverse effect on the company.

To cover the liabilities arising from its medical transportation and fire prevention services, Rural/Metro has arranged for automobile, professional and general liability insurance (the liability insurance program). In arranging its liability insurance program, Rural/Metro was represented by Healthcare Insurance Services and its affiliate Healthcare Risk Management Services, a certified reinsurance intermediary.

After considering several candidates, Rural/Metro selected TRC[48] for two reasons. First, reliable insurance coverage is essential to Rural/Metro's need to maintain community trust, and TRC's high financial rating provided this reliability. Second, Rural/Metro was looking for a long-term partner, and TRC was willing to underwrite Rural/Metro as a credit risk as well as an underwriting risk. All essential terms of Rural/Metro's liability insurance program, including

---

[48] This is the same company that reinsures PPG.

{PAGE }

28

scope of coverage exclusions, limits of liability, self-insured retention and premiums, were negotiated directly by Rural/Metro with TRC.

Once the reinsurance was in place, Rural/Metro approached several carriers to issue a fronting insurance policy so that Rural/Metro could comply with state licensing and regulatory requirements relating to financial responsibility.[49] Legion was selected as the fronting carrier because it maintained licenses in all states where Rural/Metro operated. TRC issued a Certificate of Casualty Facultative Reinsurance (Certificate) that identified Rural/Metro as the sole insured and Legion as the ceding insurer. Legion issued fronting policies to Rural/Metro for two policy periods: June 5, 2000 to June 5, 2001, and June 5, 2001 to June 5, 2002. TRC issued Certificates for both periods.

The 2000 Legion Policy provided coverage in the amount of $2 million per occurrence, with an annual aggregate of $20 million. This coverage was in excess of Rural/Metro's self-insured retention (SIR) of $1 million per occurrence with an annual aggregate SIR of $4,250,000. The 2001 Legion Policy provided Rural/Metro the same coverage but it increased Rural/Metro's aggregate SIR for the policy to $5 million. The coverages, limits of liability, Rural/Metro's SIR and other essential terms of the 2000 and 2001 Legion Policy were derived from, and consistent with, the terms set forth in the TRC Certificates.

Rural/Metro employs Gallagher Bassett Services, Inc. (Gallagher Bassett), a TPA, to adjust its liability claims. Rural/Metro's in-house risk management staff works with Gallagher Bassett to investigate, review and adjust

---

[49] *See supra*, n.21. It is common in most states that registrants of motor vehicles be able to demonstrate financial responsibility, usually with proof of insurance, as a condition of registration. *See, e.g.*, 75 Pa. C.S. §§1782, 1786.

{PAGE }



claims.   Rural/Metro is responsible for the payment of Gallagher Bassett's fees. Rural/Metro and Gallagher Basset, in coordination with TRC, set reserves for the liability program on a claim-by-claim basis, which are recorded and periodically updated in a computerized database known as Risx Facs.   Legion has no involvement in the adjustment of claims or the setting of claim reserves.

Several state guaranty associations have requested that Rural/Metro forward its workers' compensation claim files.   This has adversely affected Rural/Metro's ability to adjust and pay claims promptly and to maintain its loss prevention program.

Rural/Metro sought TRC's agreement to assume Legion's liability. After lengthy discussions, TRC, in March 2003, agreed in principle to assume all Legion's liability under the 2000 and 2001 Policies pursuant to Rural/Metro's liability insurance program.[50]  Rural/Metro believes this Court's approval of this agreement would benefit Legion in several respects.   First, it would relieve the Rehabilitator of the costly and time-consuming burden of collecting reinsurance from TRC for Rural/Metro's claims.   Twenty-percent of Legion's operating budget is spent on reinsurance collection efforts.   Second, Legion would be relieved of the administrative expenses that would be paid to state guaranty associations for adjusting Rural/Metro's claims.   Third, Legion would be relieved of a $400,000 exposure that it incurred under the fronting policies.

To provide for its workers' compensation claims, Rural/Metro purchased a Legion large deductible policy for the period of May 1, 2001 to May

---

[50] To be effective, Rural/Metro asserts that the agreement requires court approval and an order releasing TRC from potential double liability pursuant to Section 534 of Article V, 40 P.S. §221.34.

1, 2002. The deductible is $500,000 per occurrence. A second policy, a Deductible Reimbursement Policy (the DR Policy), was issued by Mutual Indemnity (Bermuda), Ltd. (Mutual Indemnity) to cover claims falling under the deductible. Rural/Metro funded a $6.6 million collateral account (the Claims Fund) that is used by Mutual Indemnity to pay claims under its policy. The Legion Large Deductible Policy and the Mutual Indemnity DR Policy are designed to operate in concert. Using the Claims Fund, Mutual Indemnity reimburses Legion for payment of claims falling under the deductible.

Rural/Metro agreed to put $6.6 million into the Claims Fund through the payment of monthly installments; mistakenly, Rural/Metro also funded workers' compensation claims directly. Mutual Indemnity "reimbursed" Rural/Metro for the double-paid claims through a credit to Rural/Metro's monthly payments to the Claims Fund. Rural/Metro estimates that the credits provided by Mutual Indemnity totaled approximately $1 million, leaving an estimated $1.1 million of double-paid claims to be recovered.[51]

Gallagher Bassett also adjusts Rural/Metro's workers' compensation claims under a second TPA agreement. Claim payments, reserves, and total loss experience are maintained on a claim-by-claim basis in Gallagher Basset's Risx-Facs System. In estimating reserves, Rural/Metro employs a conservative philosophy that is intended to "approximate 100 percent of ultimate payout on that claim." As a result, the development factor on Rural/Metro's claims is fairly low.

---

[51] Rural/Metro asserts that Mutual Indemnity estimates the excess collateral in the Rural/Metro Claims Fund to be $1.14 million. Mutual Indemnity filed a brief noting its objection to this characterization and to this Court's jurisdiction over a contractual relationship governed by the laws of Bermuda.

Rural/Metro does not favor transferring the adjustment of its workers' compensation claims to guaranty funds.

Rural/Metro requests an accounting under the supervision of the Court to determine the amount of the credit it is owed for funding workers' compensation claims from the Claim Fund.  It also requests that guaranty funds seek payment from the Claims Fund for amounts under the deductible, rather than from Rural/Metro; that any excess amount in the Claims Fund be returned to Rural/Metro and that its Claims Fund only be used to pay Rural/Metro claims. With respect to its liability insurance program, Rural/Metro requests direct access to the TRC facultative reinsurance for their payment.

###    E.    Interests of Policyholder Intervenor: American Airlines, Inc.

American Airlines, Inc., its parent, AMR Corporation, and their subsidiaries and affiliates (collectively American) are headquartered in Fort Worth, Texas.  American is the largest commercial air carrier in the world.  Against risks that it faces in its business, including aircraft accidents and a myriad of smaller losses, American purchases insurance known as hull, spars and liability insurance that provides first-dollar coverage with per occurrence limits in excess of $1 billion and with no aggregate limit of liability.  Because of American's size and the enormity of its potential losses, no single insurer can underwrite the risk on its own.  Thus, American obtains liability coverage from multiple insurers, each of which is responsible for a portion of the total risk.

American has traditionally used Aon's brokerage services to obtain coverage in the United States and abroad.  American relies on a broker because it does not have the expertise to deal with the appropriate insurance markets,

particularly the London markets.  In addition, under the rules established by Lloyds of London, participating syndicates may deal only with intermediaries and never with insureds directly.    American and Aon (along with Aon's corporate predecessors) have a relationship spanning seventy years.    American pays approximately $1 million a year to Aon for its brokerage services.

American meets with Aon[52] in July or August of each year to discuss its goals for the coming year and to provide the information needed by underwriters to understand American's operations and needs.  American and Aon make joint presentations to the aviation insurance marketplace.  Following these presentations, Aon negotiates with insurers in this market, and then provides American with its recommendations on the coverages that American should bind.

In May of 1997, Aon began to develop an aviation insurance quota share program (quota share program or program) that would coordinate the services of Aon's many business units for the purpose of gaining market penetration.  Scott Arledge was one of the six Aon representatives who were principally responsible for developing Aon's quota share program for airlines.  Mr. Arledge was Senior Vice President and Regional manager for the Southeast Region for Aon Aviation; however, he left Aon's employ in September 2002.  Mr. Arledge has been involved in aviation insurance for almost nineteen years.

Mr. Arledge testified at length and with impressive specificity about the quota share program that he developed with colleagues while employed at Aon.

_____

[52] With respect to the transactions relevant to this proceeding, American worked primarily with Vincent Catalli.  Mr. Catalli has been an Aon (or its predecessor) insurance broker for approximately thirty-five years, and has a thirty year relationship with American's insurance manager, Michael Stoeckert.  Mr. Catalli's expertise is in crafting aviation hull and liability coverages.

He was personally involved in the negotiations with reinsurers participating in the quota share program.  He testified that it was the intent of the parties that in the event Legion should become insolvent Syndicate 271 would make payments directly to American.[53]  The Court finds that Mr. Arledge testified completely and truthfully about the negotiations and the intent of the parties with respect to the reinsurance provided by Syndicate 271 to American by way of Legion.

Aon was successful in enlisting aviation underwriters to make their entire aviation insurance capacity available to the insurance quota share program.  For the most part, the insurers that agreed to participate from the London market were traditional direct insurers, not traditional reinsurers, and, thus, experienced at dealing with insureds directly.  They were required to take all of the underwriting risks just as if they had written the insurance on a direct basis.  These London market insurers were willing to underwrite coverage through the Aon quota share program at a discount because the program provided them the desired increase in their share of the U.S. aviation insurance market.  It was Aon's goal that airlines that participated in the quota share program would be in the same position as if they had purchased insurance on a direct basis from the reinsurers participating in the quota share program.

After enlisting the London underwriters for the quota share program, Aon sought a U.S. fronting company, *i.e.*, a U.S.-based insurer with licenses in every state.  The fronting company would consolidate the coverage of reinsurers into one package.  After Aon was introduced to Legion, it made presentations

_____

[53] His testimony was confirmed by Mr. Catalli of Aon, the individual who persuaded American to use the quota share program.  Mr. Catalli confirmed that in the event Legion could not or would not pay claims, the reinsurers would pay on behalf of American.

34

about the quota share program to Legion at its offices in Philadelphia.   The presentations specifically provided that Legion would not be required to use any of its own assets to pay losses under its fronting policy.   Rather, losses would be funded by reinsurers participating in the quota share program.[54]   In approximately July of 1998, Legion agreed to provide the "paper," or fronting policy, to give the London reinsurers in Aon's quota share program access to the U.S. market. Legion's participation legalized the transaction; the London insurers were not licensed to write direct business in the U.S.

The quota share program was initially offered to smaller, non-trunk airlines; however, one year later, the quota share program became available to major trunk airlines, again with Legion as the fronting company for the London reinsurers.   Legion participated in the trunk airline quota share program for two years, beginning on July 6 of each year.   Thus, the annual periods in which Legion participated in the trunk quota share program were for the years beginning July 6, 1999, and on July 6, 2000.   Any aviation hull and liability insurance policy placed by Aon after July 6 of the year in question was covered by the trunk quota share program for that year.   Legion indicated its participation for the policy year beginning July 6, 1999, by signing a Final Placement Slip,[55] containing a summary

---

[54] The first lead underwriter in the London market was Busbridge Syndicate; thereafter, Aon solicited other London underwriters.  Each underwriter had to make its own intelligent decision on whether they wanted to sign onto the program or not.  In those discussions, Aon made it clear that Legion was not to have any underwriting liability for the program and would not have responsibility for advancement of funds to pay claims.  Legion expressly required that it not have to make claims payments prior to receiving funds from the reinsurers.

[55] A placement slip is signed by the ceding insurer, and the cover note is signed by the assuming insurer, *i.e.*, reinsurer.  Here, the "Final Placement Slip" was a cover note; its title and form were unusual.  These points were conceded by Syndicate 271's expert.  American Airlines Ex. 3 (AA Ex. __).

of the relevant terms and conditions of the agreement.   There were five Lloyds syndicates, including Syndicate 271, participating in the program for the policy year beginning July 6, 1999.

Placement slips contain the salient terms and conditions of a reinsurance agreement.   Placement slips can contemplate the preparation of a contract that sets the provisions of the parties' agreement in detail, or they can refer to standard contractual provisions, the terms of which are readily available.   The latter type placement slip is known as a "slip wording."   Unless a placement slip indicates that it is a "slip wording," the full agreement of the parties will be set forth in a separate reinsurance contract known as the "wording."   The placement slips that were signed by Legion and by the reinsurers were not slip wordings and, thus, required a separate wording or agreement.   Legion signed a separate placement slip for each year.

Under the trunk airlines quota share program, Legion fronted two policies of aviation hull and liability coverage for American.   The first policy ran from December 1, 1999 to November 30, 2000 (2000 Policy) and the second from December 1, 2000 to November 30, 2001 (2001 Policy).   Legion fronted 7.5% of the American 2000 policy and 5% of the American 2001 Policy.   Of the participating reinsurers, only Syndicate 271 chose to underwrite the American 2001 Policy issued by Legion.   Accordingly, Syndicate 271 agreed to take all 5%, or 100% of the Legion participation, under the American aviation insurance for the 2001 Policy.

36

The actual reinsurance contract,[56] or wording, was prepared by Aon. The reinsurance issued to cover Legion's participation in American's aviation insurance is known as a facultative obligatory treaty. It is a hybrid that combines facultative and treaty insurance. It functioned as a treaty in that the terms and conditions were set in the contract and were not further negotiable; this included such terms as premium payment schedules and coverage limits. It was obligatory in that the reinsurers were obligated to provide a line of coverage. The contract was facultative in that the reinsurers provided coverage for specific airlines in amounts that fluctuated depending on the reinsurer's comfort level in underwriting a particular airline.

In consideration for its participation, Legion received a 7.5% fronting fee in the trunk quota share program's first year, and a 5.75% fronting fee in the program's second year. American paid the premium to Aon Risk Services, which in turn, paid Legion. Legion retained its fronting and other fees and then remitted the remainder of the premium to Aon Re. Aon Re paid Aon Group, Limited, which, in turn, forwarded the net premium payment to the reinsurers. Through its agent Aon, therefore, American was dealing directly with the reinsurers on the payment of premiums owing under the quota share program.

The reinsurance contract stated that the reinsurers' obligation was created when Legion became "liable" for a payment, not when Legion actually

---

[56] The reinsurance contract evolved over the two years that Legion participated. It included: the initial agreement, entered into when the program began on July 6, 1999, together with a number of Endorsements. Endorsement No. 1 is the annual renewal and shows both the new effective date of the agreement -- July 6, 2000 -- and the reduction in the overall insurance capacity under the program from 13.75% to 7.5%. AA Ex. 7.

made a payment.  The contract also required the reinsurer to make payment 10 days after demand from Legion without any reservation of rights by the reinsurer.

Large claims, those in excess of $50,000 or, in the second year of the program, $75,000, were processed differently from "small" claims.  For a large claim, the lead underwriter would issue a market call to all the insurers that underwrote a particular airline's coverage.  Upon receipt of such notice, the reinsurers had 10 days to pay the full amount of the claim.  Legion did not make any payment to the underlying insured or to the lead underwriter before it received payment for the full amount of the claim; Legion did not advance any funds.  Even if Legion were to make a wrongful payment, the reinsurers had to seek recovery from the third-party, not from Legion.

Small claims[57] were paid from a "Paid Loss Fund," which ensured that Legion did not have to use its funds to pay claims while minimizing administrative costs.  The Paid Loss Fund was funded by the reinsurers; Legion deducted the funds needed from the premium otherwise due and owing to the reinsurers.  The payments of small claims were made under the direction of the lead underwriter; Legion did not adjust these claims.

In negotiating the reinsurance contract for the quota share program, Aon pressed for a provision that would permit its aviation clients to obtain payment directly from reinsurers in the event of Legion's insolvency.  This provision is known generally as a "cut through."  Aon considered a cut-through provision important because Legion was a new entity in the aviation insurance market with relatively modest capital.  Aon wanted to be able to give its airline

---

[57] Small claims complement the "large claims," *i.e.*, they were under $50,000 in 2000 and $75,000 in 2001.

38

clients comfort that, if something happened to Legion, these airline clients would be able to obtain coverage from the reinsurers, which in reality were the source of direct coverage.

The final language included in the Insolvency Article of the reinsurance contract states in pertinent part as follows:

> In the event of [Legion's] insolvency, the reinsurance afforded by this Agreement will be payable by the Reinsurers on the basis of [Legion's] liability under the policies reinsured without diminution because of [Legion's] insolvency or because its liquidator, receiver, conservator, or statutory successor has failed to pay all or a portion of any claims. The reinsurance will be payable by the Reinsurers directly to [Legion], its liquidator, receiver, conservator, or statutory successor . . . except (a) where this Agreement specifically provides another payee of such reinsurance in the event of [Legion's] insolvency or (b) where the Reinsurers, with the consent of the direct insured or insureds, have assumed such policy obligations of [Legion] as direct obligations of themselves to the payees under such policies in substitution for [Legion's] obligation to such payees. Then, and in that event only, [Legion], . . . is entirely released from its obligation and the Reinsurers will pay any loss directly to payees under such policies.

AA. Ex. 7 at 19. Provision (b) was included in the contract to provide the airlines direct access to the reinsurers in the event of Legion's insolvency.

On September 11, 2001, terrorists flew American Flight 11 into the North Tower of the World Trade Center and American Flight 77 into the Pentagon. On November 12, 2001, American Flight 587 crashed in Queens, New York. As a result of these tragedies, American faces extensive claims from the estates of passengers on board the three airplanes, claims from individuals on the ground who were injured or killed, claims for property damage to buildings and claims for loss of income.

(39)

The lead underwriter[58] under American's aviation insurance policy has reserved the September 11 loss at approximately $2.3 billion. The Flight 11 loss is reserved at $1.7 billion, and the Flight 77 loss is reserved at $600 million. Legion's share of the amount reserved for the September 11 loss is approximately $105 million.

Three separate market calls of $5 million each were made for the September 11 loss. These calls occurred on September 13, 2001; September 28, 2001; and July 18, 2002. Legion's share of each market call was $250,000. In response to the market calls of September 13, 2001 and September 28, 2001, Syndicate 271 paid Legion the full amount of the market call and, after receipt of this amount, Legion paid the lead underwriter. The market call of July 18, 2002, was made after Legion was placed into rehabilitation. By that time, the Rehabilitator was refusing to pay any claims of American under the policy, regardless of whether Legion received the money to pay the claim from Syndicate 271. The lead underwriter under American's aviation insurance policy sent the claim to American and asserted that American must stand in Legion's shoes and pay the claim.

The lead underwriter under American's aviation policy has reserved the Flight 587 loss at $700 million, and Legion's share of this loss is approximately $35 million. On November 19, 2001, a $20 million market call was made for loss arising from the Flight 587 tragedy. Legion's share of this market call was $1 million. Syndicate 271 paid Legion the full amount of the market call and, upon receipt, Legion remitted this amount to the lead underwriter. On December 12,

---

[58] It is the lead underwriter on American's aviation policy, not Legion, that sets the reserves for American's losses.



2001, a $25 million market call was made for losses arising from the Flight 587 tragedy. Legion's share of this market call was $1.25 million. Syndicate 271 did not pay this market call within 10 days as required by the reinsurance contract. In accordance with the premium offset provision of the reinsurance contract, the $1.25 million due and owing on this market call was offset against $1.31 million in premiums owed to Syndicate 271 by Legion. Legion used $1.25 million of the premium to pay the lead underwriter under the policy, and the remaining premium was paid to Syndicate 271. As with all previous claims, Legion used Syndicate 271's money, and not its own, to pay the claim.

In February 2002, the lead underwriter made a market call for the value of the hull claim arising out of the Flight 587 tragedy. Legion's share of the Flight 587 hull claim was approximately $2 million. Payment of the hull claim was to be made in part to American and in part to the lender that had a security interest in the hull. Syndicate 271 did not make this payment within 10 days of receiving the request for payment. Consequently, Legion used premium payments due to Syndicate 271, as well as a cash contribution from Aon, to pay the hull claim to American and its lender. Once again, even where Syndicate 271 failed and refused to pay the hull claim, Legion only paid the claim after it had received funds from others. Syndicate 271 delayed reimbursing Legion for seven months.

After Legion entered rehabilitation, its reinsurers, including Syndicate 271, ceased making payments, apparently because they feared that they would be held liable for double payments, both to American and to the Rehabilitator. The lead underwriter under American's aviation insurance policy then began seeking payment directly from American for the share owed by Legion and Syndicate 271.

{PAGE }

41

Further, the Rehabilitator refuses to allow Syndicate 271 to pay on behalf of Legion.

American has been harmed by these events. So far, American has laid off 20,000 people, reduced its flight operations, cut back on aircraft orders and lost approximately $4 billion. American has also implemented significant cutbacks in customer service and is seeking concessions from its unions to avoid bankruptcy. In addition, American has incurred significant additional costs because of new federal security regulations. Moreover, increasing insurance costs have affected American. For example, the aviation insurance market imposed a $1.25 per passenger surcharge, which added approximately $130 million in insurance costs after September 11.

American opposes a liquidation of Legion unless American is allowed direct access to Syndicate 271 under the reinsurance contract. Guaranty fund coverage is meaningless to American because the size of its claims dwarfs any amount available from a guaranty fund. Further, American's net worth is too great to make it eligible for coverage from most state guaranty funds. Alternatively, American seeks an amendment to the Rehabilitation Order to compel Syndicate 271 to pay Legion and, in turn, have Legion pay the claims arising out of September 11 and the Flight 587 loss.

F. **Interests of Reinsurer for Claims of American Airlines, Inc.: Syndicate 271**

Syndicate 271 is that collection of Lloyds' underwriters that participated in the part of the Aon quota share program that was fronted by Legion.

42

Syndicate 271 [59] has no particular interest in the issues underlying the Rehabilitator's liquidation petition. It opposes any order from this Court that would give American direct access to the reinsurance provided by Syndicate 271 under the quota share program.

Syndicate 271 first presented the testimony of John Langen, who was involved in reinsurance from 1970 to 1997. He worked for a number of brokers, including Guy Carpenter, Marsh & McClennan, G.L. Hudson; he also worked for Alexander Re.[60] He testified at length about his work at G.L. Hudson drafting reinsurance slips, cover notes and full length contracts, also called "wordings." However, he had no experience,[61] as far as he could recall, in the drafting of aviation trunk airline reinsurance agreements, treaty or facultative, or in the negotiation of their terms.

Mr. Langen explained that a "reinsurance" slip[62] is prepared by a reinsurance broker on behalf of a ceding company. The reinsurance slip contains

---

[59] On March 20, 2003, this Court granted Syndicate 271's Application for the Issuance of a Letter of Request for the Examination of Witnesses and Production of Documents in the United Kingdom seeking the depositions of three witnesses employed by Aon London, as well as the production of the Aon London guidelines for drafting cut-through agreements, endorsements or provisions and all Aon London exemplars of cut-through agreements, endorsements or provisions. At Syndicate 271's request, the Court reissued two Amended Applications. They conformed to the applicable Hague Convention requirements, but they were denied. However, these materials have limited relevancy to the issues raised by the quota share program.

[60] Mr. Langen holds no insurance certifications and he was not educated beyond high school. However, he has extensive experience, which includes participation in the preparation of a reinsurance text, ROBERT W. STRAIN, REINSURANCE CONTRACT WORDING (3rd ed. 1998). He also teaches at reinsurance seminars.

[61] His experience also does not include offering an expert opinion on reinsurance contract formation, insolvency clauses or cut-through provisions.

[62] At different points in his testimony, Mr. Langen called the reinsurance slip, a slip or placement slip.

---

{PAGE }

the salient terms and conditions of the reinsurance coverage sought by the ceding company. Upon the signature of the reinsurer, the reinsurance broker prepares the reinsurance cover note, which also contains the salient terms and conditions of the reinsurance coverage. It is presented by the broker to the ceding company to confirm the terms of the reinsurance placed by the broker on the ceding company's behalf. The cover note also identifies the reinsurers providing the coverage, including the percentage of their participation. The reinsurance slip and the cover note are mirror images of one another.

The 1999 placement slip includes a reference to an insolvency clause as a term of the reinsurance. It does not specify American as an alternate payee, and it does not contain the phrase "cut-through." The 1999 Legion cover note, the Final Placement Slip,[63] includes a reference to "insolvency" as a condition of the reinsurance. It does not specify American as an alternate payee, and it does not contain the phrase "cut through." These facts are also true for the 2000 Final Placement Slip.[64]

Mr. Langen testified about the purposes of an insolvency clause. He explained that if a ceding company wishes to take credit for reinsurance on its statutory financial statement, the ceding company must include an insolvency clause in the appropriate reinsurance contract. This credit relieves the ceding company of the need to post reserves for liabilities that have been transferred to a reinsurer; it enhances the ceding company's surplus. There are various forms of insolvency clauses, depending upon the requirements of the ceding company's state of domicile. Generally, an insolvency clause must provide that the reinsurer

---

[63] AA Ex. 3.
[64] Syndicate 271 Ex. 23.

{PAGE }

44

will pay to the statutory receiver, liquidator or rehabilitator of an insolvent ceding company any amounts for which the reinsurer may become liable, without diminution due to the ceding company's insolvency.  A cut-through agreement changes the direction of reinsurance loss proceeds to the beneficiary of the cut-through.  Cut-through clauses are not common in reinsurance transactions involving U.S. domiciled companies.

Mr. Langen acknowledged that the Insolvency Article in the reinsurance contract between Legion and Syndicate 271 contained a reference to an alternate payee in the event of Legion's insolvency.  However, he believes that it simply gave the parties the right, as opposed to the obligation, to redirect the flow of reinsurance payments in the event of Legion's insolvency.  He stated that a second agreement or endorsement would have to be executed to make it an obligation.[65]  However, because the reinsurance contract was not executed by Syndicate 271, Mr. Langen opined that the slip defines the agreement of the parties, and the slip does not contain an express reference to a cut-through endorsement.

Mr. Langen has many years of experience in drafting reinsurance agreements, using slips and cover notes as his sources.  However, the agreements he drafted were used in personal lines insurance, such as homeowners and automobile; he has never drafted a contract for a program as unusual as the Aon quote share program developed for trunk airlines.  Accordingly, his knowledge of the custom and practice of the industry, while impressive, is not directly relevant to

---

[65] Mr. Delehy, for the Rehabilitator, also testified that an endorsement was required in order to effect a cut-through right in American.  However, he had not noticed, until cross-examined, the variation in the Insolvency Article with the use of "or," instead of the typical "and," which allows each clause to operate independently.  *See supra*, p. 39 for text of the Insolvency Article.

45

this case.  Further, because cut-through provisions are unusual, there is no custom and practice for their use.  Finally, Mr. Langen was not involved in the negotiations of the terms of the Aon quota share program.  Accordingly, Mr. Langen's testimony has little weight in the resolution of the discrete question of the parties' actual intent with respect to the reinsurance arrangement between Legion and Syndicate 271.  Notably, Syndicate 271 did not produce any witnesses to refute Mr. Arledge's[66] testimony about the negotiations and the intent of the parties.

Syndicate 271 also offered the testimony of Colin Taylor, who is employed as run-off manager[67] for Syndicate 271.  He is an associate of the Chartered Insurance Institute and has experience in aviation underwriting;[68] he has been employed by Syndicate 271 since 1986.  His work at Syndicate 271 involves claims adjustment.  Mr. Taylor had no involvement with the negotiations of the reinsurance arrangement between Legion, or any of the fronting carriers on the quota share program, and Syndicate 271.  He testified that Syndicate 271 did not knowingly remit funds to Legion before Legion paid the lead underwriter on American's claims.

---

[66] Mr. Arledge was not an expert in contract drafting; he relied on Aon Re to draft and negotiate the insolvency clause for the 1998 non-trunk quota share program.  This clause was then repeated for the 1999 trunk quota share program.
    Greg Dawson and Robin Pearson, Syndicate 271 underwriters in 1999 and 2000, were involved in the quota share program.  They were interviewed by Syndicate 271's attorneys without the benefit of the Hague letters.  An adverse inference is drawn from the fact that Messrs. Dawson and Pearson did not testify.
[67] Syndicate 271 stopped writing new aviation business at the end of 2000; it is now simply paying claims for business previously written.
[68] However, he has not done any underwriting for Syndicate 271.

{PAGE }

However, Mr. Taylor authorized payment of American claims without requesting proof that Legion had already paid the claims. Further, he acknowledged that the small claims, which he called attritional claims, were paid from the Claims Fund, which was established with reinsurer moneys, not Legion moneys. Accordingly, while it was to be the general practice of a reinsurer to indemnify the ceding company only after it has paid a claim, that practice was not followed here. Syndicate 271 paid claims without waiting for proof[69] that they had been paid by Legion.

Most of the risk assumed by Syndicate 271 applicable to American claims has been ceded to other reinsurers, called the retrocessionares. Syndicate 271 is required by Lloyds of London to secure its obligations on U.S. business by posting funds with Lloyds' "Credit for Reinsurance Trust Fund" (Trust Fund). In large part, Syndicate 271 has satisfied its Trust Fund obligations with contributions provided by its retrocessionares.

With respect to the Syndicate 271's exposure for the American September 11 and Flight 587 losses, the retrocessionares have posted letters of credit into the Trust Fund. If Syndicate 271 were required to issue an assumption reinsurance agreement to American, pursuant to subparagraph (b) of the Insolvency Article, Syndicate 271's reinsurers may contest the classification of the risk and seek a change in the classification from "U.S. reinsurance" to "non-regulated." In that event, Syndicate 271's reinsurers might demand release of their letters of credit, which might require Syndicate 271 to take a bad debt provision on

---

[69] In January of 2002, Syndicate 271 allowed Legion to meet a market call by withholding $1.25 million of $1.31 million in premium owed to Syndicate 271.

{PAGE }

47

its books.  This, in turn, may require Syndicate 271 to make a cash call upon its underwriting names.

The reinsurance contract between Legion and Syndicate 271 that relate to American's losses was not signed.  Accordingly, Syndicate 271 believes that the language of the slips control, and they only use the term "insolvency" not cut-through.[70]

The cut-through is imbedded in the Insolvency Article of the reinsurance contract, and, therefore, the slip provides no answer to the question of the parties' intent.  Further, the parties have acted in accordance with the terms of the unsigned reinsurance contracts.   It is not uncommon for reinsurance agreements to take effect and be acted upon by the parties, in good faith, as if signed.  Mr. Taylor acknowledged that it can take "months and even years for wordings to be signed in the marketplace in London."  N.T. 4/3 at 180.  The Court finds that the reinsurance contract between Legion and Syndicate 271, not the Final Placement Slip, states the parties' intentions.

Syndicate 271 posits harm if American is allowed direct access. Certainly, direct access will terminate Syndicate 271's respite from paying any party under the reinsurance contract.  When payments resume, Syndicate 271 will have to pay the same amount, whether it is to the Rehabilitator or to American. The assertion that Syndicate 271's reinsurers may demand the release of their letters of credit contemplates several future actions that may, or may not, occur. Further, Syndicate 271 argues from the flawed premise that it will become the direct writer of American under an assumption certificate.  However, American's

---

[70] Mr. Langen could not provide the Court any precise information about how the parties would express their intention to establish a cut-through on a slip wording.

direct access to reinsurance payments from Syndicate 271 does not require the issuance of an assumption reinsurance agreement; it merely requires a redirection in the flow of funds.

## II.   LEGAL ANALYSIS.

### A.   Consent Is Not a Ground for Terminating a Rehabilitation.

The Rehabilitator contends that Legion and Villanova have consented to a termination of their rehabilitation. Section 518(a) of Article V, 40 P.S. §221.18(a), does not provide that an insurer may consent to a termination of a rehabilitation. However, an insurer *that is not in rehabilitation* may consent to a liquidation; the applicable statutory provision states:

> An order of the Commonwealth Court to liquidate the business of an insurer shall be issued only after a hearing before the court or *pursuant to a written consent of the insurer*.

Section 520(b) of Article V, 40 P.S. §221.20(b) (emphasis added). The questions are two: (1) whether the Court can make the factual finding that Legion and Villanova consented in writing to their liquidation, and (2) whether "written consent of the insurer" is a valid basis to terminate a rehabilitation and convert it to a liquidation under Section 518(a).

### 1.   The Rehabilitator cannot consent to her own petition for liquidation.

The consent of Legion and Villanova was not expressed by their board of directors but, rather, by the Rehabilitator.[71] Stated otherwise, in her

---

[71] The actual consent was executed by William S. Taylor, Deputy Insurance Commissioner, who avers that he has authority to act for the Rehabilitator. He also waived Legion's and Villanova's right to a hearing on their liquidation.

{PAGE }

(49)

liquidation petition the Rehabilitator purports to act on behalf of the moving party and on behalf of the defendants, Legion and Villanova.

On April 1, 2002, several days after her appointment as Rehabilitator, the Insurance Commissioner amended the Bylaws of Legion and Villanova. Asserting to act "with the full power of the Board of Directors," but without calling a meeting of the directors who continued to serve, [72] she consented to her amendment of the Bylaws. Specifically, she added the following language to Article V, Section 8 of the Bylaws of each insurer:

> If a rehabilitator of the Company ("Rehabilitator") has been appointed pursuant to an Order of the Commonwealth Court of Pennsylvania, such Rehabilitator shall have, *in addition to such other authority and power as the Rehabilitator may have under applicable law* and any order of the Commonwealth Court of Pennsylvania, the same authority and power as the Board of Directors shall have under these Bylaws and the Pennsylvania Consolidated Statutes. Pursuant to Title 40, Section 221.16 of the Pennsylvania Consolidated Statutes[73] *the Rehabilitator shall have all the powers of the directors, officers and managers* of the Company, whose authority shall be suspended, except as may be redelegated by the Rehabilitator.

LIQ Ex. 14, 15 (emphasis added). It is by authority of this amendment to the Bylaws that the Rehabilitator asserts the power to consent to the liquidation of Legion and Villanova.

---

[72] After the rehabilitation orders were entered on March 28, 2002, individual directors began to resign. LIQ Ex. 13. The resignations began on April 8, 2002, and continued through the summer. Most of the resignations were submitted effective August 23, 2002, several days before the liquidation petitions were filed. However, one individual, Robert Mulderig, remains on the board of directors of Legion and Villanova, and he testified at the hearing that he opposed the liquidation of either insurer. N.T. 11/14 at 116.

[73] The statute dealing with insolvent insurer is not codified. "Section 221.16" refers to the unofficial codification produced by West Publishing Company.



A creature of statute, such as the Insurance Commissioner acting as Rehabilitator, can only exercise those powers which have been conferred by the Legislature in clear and unmistakable language. *Aetna Cas. & Sur. Ins. Co. v. Insurance Dep't*, 536 Pa. 105, 118, 638 A.2d 194, 200 (1994), quoting *Human Relations Comm'n v. Transit Cas. Ins. Co.*, 478 Pa. 430, 438, 387 A.2d 58, 62 (1978). In this instance, the Rehabilitator's purported power to amend the Bylaws of Legion and Villanova derives from Section 516(b) of Article V, which states as follows:

> *The rehabilitator may take such action as he deems necessary or expedient to correct the condition or conditions which constituted the grounds for the order of the court to rehabilitate the insurer.* He shall have all the powers of the directors, officers and managers, whose authority shall be suspended, except as they are redelegated by the rehabilitator. *He shall have full power to direct and manage*, to hire and discharge employes subject to any contract rights they may have, *and to deal with the property and business of the insurer.*

40 P.S. §221.16(b) (emphasis added). The Rehabilitator has "full power to direct and manage" and to "deal with the property and business of the insurer" but to one end: to achieve a successful rehabilitation. However, Section 516(b) did not confer the power upon a rehabilitator to amend an insurer's bylaws[74] to assert *all* rights of its board of directors, even the right to consent to liquidation.

The purpose of Section 516(b) of Article V is to clarify that during the course of a rehabilitation, the commissioner, not the board, has responsibility for the management of the insurer's business. Otherwise, the rehabilitation can

---

[74] Indeed, Section 516(b) does not authorize a Rehabilitator to amend an insurer's bylaws for any purpose. Arguably, authority under bylaws is redundant of a rehabilitator's statutory authority to manage the insurer's business during rehabilitation.

{PAGE }

51

devolve into a contest between the commissioner and the insurer's management. As noted by the Supreme Court of Washington,

> [The proceeding] thrust the Commissioner into a contentious and litigious partnership with the company officers and virtually precipitated the trial court, as the arbiter, into the role of rehabilitator.

*Kueckelhan v. Federal Old Line Ins. Co.*, 444 P.2d 667, 674 (1968) (wherein conflicts developed between the commissioner and management as a result of their dual and divided administration of an insurer in rehabilitation). Section 516(b) prevents such an outcome; it directs that in any dispute on management of the business, the insurance commissioner trumps the board of directors.

However, a rehabilitator does not trump the board of directors in every respect. Her powers supersede the board *only* with respect to "such action" that is needed "to correct" the insurer's condition. Section 516(b) of Article V, 40 P.S. §221.16(b). Here, it is beyond dispute that Legion and Villanova have serious cash flow problems. Nevertheless, both insurers continue to report a policyholder surplus in excess of liabilities, which indicates that long-term they will have sufficient assets to pay all obligations.[75] The liquidation and corporate dissolution of Legion and Villanova are not actions that correct their cash flow problems unless one adopts a Kevorkian view that the death of a corporation is its "correction."

There is additional support in Article V to support the conclusion that the Rehabilitator may not act on behalf of the board of directors in this proceeding. Section 518(a) of Article V specifically authorizes use of insurer (in rehabilitation)

---

[75] As of June 30, 2002, Legion had a statutory surplus as regards policyholders of $289 million, and Villanova had a surplus of $37 million.



funds to contest its liquidation.[76] Such a contest would never be possible if, as asserted here, a rehabilitator can speak for the insurer in this life or death decision. Further, Section 520(b) of Article V does not authorize a rehabilitator to consent to a liquidation; it only authorizes the "insurer" to consent.   40 P.S. §221.20(b). "Insurer"[77] is a defined term, and it does not include "rehabilitator."   40 P.S. §221.3.

In short, Article V does not authorize a rehabilitator to consent to an insurer's liquidation.  The question, then, is whether this lack of express statutory authority was overcome by the Rehabilitator's amendment to the Bylaws of Legion and Villanova.

The amendment to the Bylaws confers on the Rehabilitator "the same authority" as the board of directors and suspends their authority to act.   It also states that her authority is "*in addition to such other authority* and power as the Rehabilitator may have *under applicable law* and any other order of the Commonwealth Court of Pennsylvania."   LIQ Ex. 14, 15 (emphasis added).

---

[76] Section 518(a) of Article V states in relevant part:

> The Commonwealth Court shall permit *the directors to take such actions as are reasonably necessary to defend against the petition and may order payment from the estate of the insurer of such costs* and other expenses of defense as justice may require.

40 P.S. §221.18(a) (emphasis added).

[77] Section 503 of Article V defines "insurer" as follows:

> **"Insurer"** means any person who is doing, has done, purports to do, or is licensed to do an insurance business, and is or has been subject to the authority of, or to liquidation, rehabilitation, reorganization or conservation by any insurance commissioner.  For purposes of this article, any other persons included under Section 502 shall be deemed to be insurers.

40 P.S. §221.3.  Section 502 of Article V, 40 P.S. §221.2, lists the various types of insurers subject to Article V.  An "insurer" is not, by any reading of this definition, synonymous with "rehabilitator" or "liquidation."



Because the amendment of the Bylaws did not involve the board of directors, its validity, as a matter of corporate governance, is questionable.  Nevertheless, it is certainly invalid under regulatory law.   The Legislature did not give the Rehabilitator all the powers of Legion and Villanova's boards, including the power to consent to a liquidation.  It only gave her the right to exercise the board's powers only where needed to effect a rehabilitation.  As a creature of statute, she may only exercise powers conferred by statute.  *Aetna Cas. & Sur. Ins. Co.*, 536 Pa. at 118, 638 A.2d at 200.  A rehabilitator may not, by changing an insurer's bylaws, expand her powers beyond present "applicable law."

Were the Court to accept the Bylaw amendments as valid, then the Insurance Commissioner at any time, on her decision alone, can convert a rehabilitation into liquidation; this is not consistent with Article V.  Even if consent were a permissible ground for such action, a premise we do not accept,[78] there is no consent here.  Legion and Villanova, by their board of directors, did not consent to their liquidation.

>   **2.     Section 518(a) governs, exclusively, the procedure and grounds for the liquidation of an <u>insurer in rehabilitation.</u>**

Once the course of rehabilitation has been chosen by the Insurance Commissioner, it must be pursued unless and until the Commissioner satisfies this Court that the rehabilitation should be terminated under Section 518(a) of Article V and a liquidation order entered.  In that case, a petition for liquidation brought under Section 518(a) "shall have the same effect as a petition under Section 520."

---

[78] We do not accept this premise because consent is not one of the grounds for terminating a rehabilitation listed in the applicable statutory provision, *i.e.*, Section 518(a), 40 P.S. §221.18(a).



40 P.S. §221.18(a).   In other words, a petition under Section 518(a) is an alternative to a petition under Section 520.   It was error for the Rehabilitator to base her petition on both Section 518(a) and Section 520, which she did, presumably, to find the statutory hook on which to hang her "consent."

Article V establishes precise standards for a conversion of a rehabilitation to a liquidation.   These standards cannot be avoided even if the insurer, by its board of directors, consents to the conversion.   Article V protects the interests of the creditors and policyholders in a decision to terminate a rehabilitation,[79] which is a decision of utmost importance to them.   The interest of policyholders in a rehabilitation has long been recognized.   *See, e.g., Foster v. Mutual Fire, Marine & Inland Ins. Co.*, 531 Pa. 598, 614 A.2d 1086 (1992) (wherein a committee of policyholders was permitted intervention in a rehabilitation).   The rights of policyholders to have the grounds for a conversion of a rehabilitation into a liquidation established in a court of law cannot be abrogated by the board of directors any more than they can be abrogated by a rehabilitator.   Consent of the insurer may be a means to a rehabilitation or to a liquidation at the outset, but it is not a means to a conversion of a rehabilitation into a liquidation.

In sum, "written consent of the insurer" is not a basis to order the liquidation of Legion and Villanova.   The rehabilitation of these insurers may not be terminated unless and until the Court has evidence of record on which to make the factual findings that continued rehabilitation will substantially increase the risk of loss to policyholders, creditors and the public, or it is futile.   These standards, set forth in Section 518(a) of Article V, are mandatory and may not be avoided

---

[79] There is an analogue in the federal Bankruptcy Code that requires a hearing before a Chapter 11 bankruptcy can be converted to a Chapter 7 bankruptcy.   11 U.S.C. §1112(b).

55

even where the insurer, as opposed to the rehabilitator, consents to a termination of a rehabilitation.

**B.     The Rehabilitator Has the Burden of Proof in a Petition to Convert a Rehabilitation into a Liquidation.**

In any petition to liquidate filed under Section 518(a) of Article V, the rehabilitator has the burden of proof.  As the moving party, it is the rehabilitator's burden to prove insolvency as of the date the petition for liquidation is filed. *Commonwealth Ins. Dep't. v. Safeguard Mut. Ins. Co.*, 336 A.2d 674 (Pa. Cmwlth. 1975).   The rehabilitator's next burden is to demonstrate that continued rehabilitation would "substantially increase the risk of loss to creditors, policy and certificate holders, or the public, or would be futile."   Section 518(a), 40 P.S. §221.18(a).

Liquidation is a remedy of last resort. *See, e.g., Grode v. Mutual Fire, Marine & Inland Ins. Co.*, 572 A.2d 798, 803 (Pa. Cmwlth. 1990) ("[T]he benefits of rehabilitation -- its flexibility and avoidance of inherent delays -- are preferable to the static and cumbersome procedures of statutory liquidation."); *Mutual Fire*, 531 Pa. at 614, 614 A.2d at 1094.  This principle is followed in most jurisdictions that have enacted an insurer insolvency statute similar to Article V.[80]  On the other

---

[80] *See, e.g., Carpenter v. Pacific Mut. Life Ins. Co. of Cal.*, 74 P.2d 761, 775 (Cal. 1937) ("The public has a grave and important interest in preserving the business [of the insolvent insurer] if that is possible.  Liquidation is the last resort."); *In re Executive Life Ins. Co.*, 38 Cal. Rptr. 2d 453, 459 (Cal. Ct. App. 1995) ("[W]hile the Commissioner . . . has the power either to rehabilitate the insolvent insurer or to liquidate it, liquidation is a last resort.") (citations omitted); *Kueckelhan v. Federal Old Line Ins. Co.*, 418 P.2d 443, 453 (Wash. 1966), *superseded by rule as stated in State v. WWJ Corp.*, 980 P.2d 1257 (Wash. 1999), ("[I]t should be remembered that the process of insurer rehabilitation is preferred to that of liquidation. . . ."); *State ex rel. Pope v. Xantus Healthplan of Tenn., Inc.*, No. M2000-00120-COA-R1O-CV, 2000 WL 630858, at *11.   (Tenn. Ct. App. May 17, 2000) ("Rehabilitation is preferred over

**(Footnote continued on next page . . . )**

{PAGE }

hand, as aptly observed by the Rehabilitator, something more than blind hope is needed to continue a rehabilitation and avoid a liquidation. *Minor v. Stephens*, 898 S.W.2d 71 (Ky. 1995).

Here, the Rehabilitator asserts that she should be allowed to take this step of last resort unless the Court finds that she has abused her discretion. In support, she refers the Court to several cases from other jurisdictions holding that it is the prerogative of the commissioner to choose whether to liquidate or to rehabilitate an insurer inasmuch as the grounds for each are identical.[81] *See, e.g.,* *State ex rel. Sizemore v. United Physicians Ins. Risk Retention Group*, 56 S.W.3d 557 (Tenn. Ct. App. 2001). At least one case, *Minor v. Stephens*, would apply this standard where, as here, a petition to terminate a rehabilitation and convert it to a liquidation was under consideration. Interestingly, however, the *Minor* court relied on our Supreme Court's holding in *Mutual Fire*, 531 Pa. 598, 614 A.2d 1086.

We come back, then, as we have repeatedly in this case, to the scope and meaning of our Supreme Court's holding in *Mutual Fire*. In particular, we consider the Supreme Court's statement that "it is not the function of the courts to reassess the determinations of fact and public policy made by the Rehabilitator." *Id.* at 609, 614 A.2d at 1091.

---

**(continued . . . )**

liquidation because of the public interest in insurance."); *cf. Mueller v. Beamalloy, Inc.*, 994 S.W.2d 855, 859 (Tex. App. 1999) (stating that under Texas Business Corporation Act, liquidation only allowed as a "last resort" when less harsh remedies such as rehabilitation are inadequate).

[81] Section 519 of Article V states:

> Any ground on which an order of rehabilitation may be based, as specified in section 514, whether or not there has been a prior order of rehabilitation of the insurer shall be grounds for liquidation.

40 P.S. §221.19.

57

*Mutual Fire* established a three-part test for determining whether this Court has properly approved, disapproved or modified a plan of rehabilitation proposed by the Rehabilitator. *Id.* at 610-611, 614 A.2d at 1092. It does not stand for the broad proposition that every action taken or opposed by a rehabilitator in the course of an Article V rehabilitation proceeding should be given a high degree of deference. Unlike the Federal Bankruptcy Code,[82] which only permits the bankruptcy court to approve or disapprove a plan of reorganization, Article V allows this Court to approve, disapprove or *modify* a plan of rehabilitation. In *Mutual Fire*, our Supreme Court held that this modification power was to be used sparingly and only to correct abuses of discretion.

The legislature conferred broad discretion upon a rehabilitator to devise a plan that will correct the problems of an insurance company placed into rehabilitation. It is not, however, unfettered discretion. "[C]onferring too much discretion on an individual or an institution creates the potential for harm attributable to abuse of discretion. Many administrative law doctrines are a response to that well-known problem." RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE §17.1 at 1227-1228 (4th ed. 2002). Here, the legislature did not establish a scheme whereby the Insurance Commissioner could operate an insolvent insurer unless and until one of her actions prompted a person who was aggrieved to seek judicial review. It could have, but it did not. Treatise authority addresses the balance of authority between the courts and agencies as follows:

> In many administrative schemes, the ultimate power of decision remains with the agency and the courts only monitor the agency's performance. In other schemes, the courts have the power of decision and the agency's decision forms the basis

---
[82] 11 U.S.C. §105.

> upon which the courts exercise that power. Each administrative
> scheme strikes a balance in the allocation of authority between
> total judicial dominance and total administrative dominance.

CHARLES H. KOCH, JR., ADMINISTRATIVE LAW AND PRACTICE §9.2 at 2-3 (2d ed.

1997). Article V is an example of the second paradigm: the Court has the power

of decision. However, the statute strikes a balance between judicial dominance

and administrative dominance.

      This balance was acknowledged in *Mutual Fire*. Our Supreme Court

found the rationale of a decision of the Washington Supreme Court in *Kueckelhan*

*v. Federal Old Line Ins. Co.*, 444 P.2d 667 (Wash. 1968), "very persuasive" for the

reason that the insurer insolvency statutes in both states were so similar.

*Kueckelhan* analyzes the division of authority between the courts and the Insurance

Commissioner as follows:

> *Our statutory provisions, therefore, properly place the*
> *responsibility on both the Insurance Commissioner and the*
> *courts, the Commissioner being required to follow the statutory*
> *mandates and to use reasonable discretion in the rehabilitation*
> of a seized company, with abuses of discretion to be checked by
> the judiciary.
>
> In this capacity, the court is acting much in the same manner as
> it acts when overseeing a trust or probate; only in this instance,
> it is reviewing the Insurance Commissioner who is acting like a
> receiver or trustee and as an officer of the state. Moreover, the
> Insurance Commissioner is not acting as an agent of the courts.
> He holds his position as rehabilitator by force of legislative
> enactment, confirmed by court appointment.

*Id.* at 674 (emphasis added). This is an apt description of the allocation of

responsibility in Article V: the Insurance Commissioner is not this Court's agent,

but neither is she a free agent. She must follow the statutory mandates (as must the

Court) and use "reasonable" discretion.

59

In short, the holding in *Mutual Fire* is limited to the situation of this Court's review of a plan of rehabilitation.[83]  Deference is not appropriate where, as here, the Court must apply specific statutory standards to the evidence presented by the Rehabilitator, MRM and by the Policyholder Intervenors that oppose liquidation.  To apply deference to the job of factfinding would undermine this Court's responsibility[84] to act upon the Rehabilitator's petition in a fair and neutral manner.  Further, to apply the deference standard as proposed by the Rehabilitator would shift the burden of proof, improperly, to those opposing a petition to liquidate.

---

[83] In *Mutual Fire*, the Supreme Court appeared to adopt an appellate standard of deference to the Rehabilitator's plan of rehabilitation, citing *Norfolk & Western Railway Co. v. Pennsylvania Public Utility Commission*, 489 Pa. 109, 413 A.2d 1037 (1980), which was an appeal of a PUC adjudication.  It also relied on *Blumenstein v. Housing Auth. of Pittsburgh*, 379 Pa. 566, 109 A.2d 331 (1954), wherein the Court refused injunctive relief to taxpayers who sought to challenge the choice of properties for condemnation in an eminent domain proceeding.  The continued efficacy of this holding is questionable because it precedes enactment of the Local Agency Law, 2 Pa. C.S. §§551-555, 751-754.

Article V proceedings, however, are conducted in this Court's original jurisdiction where an appellate standard of review cannot work.  In proposing a plan of rehabilitation, the Commissioner does not act as an adjudicator, but as a state officer with a proposal that cannot be implemented except with court approval.  Whatever deference is to be afforded the Rehabilitator, this deference does not usurp the Court's authority to make factual findings in the course of an evidentiary proceeding.  Factual findings can only be based on what is of record.

[84] This is consistent with precedent from other jurisdictions.  *See, e.g., LaVecchia v. HIP of N.J., Inc.*, 734 A.2d 361, 364 (N.J. Super. Ct. Ch. Div. 1999) (holding that trial court must determine if entry of an order of liquidation is appropriate and rejecting Insurance Commissioner's contention that an order of liquidation should be entered absent a showing of abuse of discretion by the Commissioner in her determination to seek liquidation); *Florida Dep't of Ins. v. Cypress Ins. Co.*, 660 So. 2d 1177, 1182-1183 (Fla. Dist. Ct. App. 1995) (explaining that the Department must apply to the court for an order of liquidation and the court is not required to give deference to the Department's findings regarding the necessity of liquidation); *Angoff v. Casualty Indem. Exch.*, 963 S.W.2d 258, 263 (Mo. Ct. App. 1997) (same).

60

### C.   A Standard Liquidation Will Harm the Policyholder Intervenors.

This Court has stated that the "equitable purpose of rehabilitation and liquidation in insurance insolvency statutes is to protect *first of all* consumers of insurance." *Grode*, 572 at 801 n.5.  The Rehabilitator asserts that under Article V, "individual interests may need to be compromised in order to avoid greater harm to a broader spectrum of policyholders and the public." *Vickodil v. Commonwealth, Ins. Dep't*, 559 A.2d 1010, 1013 (Pa. Cmwlth. 1989).[85]  As noted by American, this does not mean that the needs of all policyholders are not worthy of consideration.

Here, the "compromise" suggested by the Rehabilitator would have all reinsurance proceeds become general assets of Legion and Villanova.  At some point, which all parties agree is many years away, those assets will be used to pay policyholder claims.  In the meantime, policyholder claims will be transferred to various state guaranty funds for payment.[86]  The Policyholder Intervenors object, noting that the standard course of liquidation will greatly harm their interests without advancing the needs of Legion and Villanova.  Specifically, they note the following:

- The reinsurance agreements in question were purchased by and for the benefit of the Policyholder Intervenors, not for Legion;

---

[85] In *Vickodil*, judgment creditors sued the Insurance Department and certain of its employees for acts committed in their official capacities as rehabilitator of the judgment debtor's insurer.  The acts allegedly prevented the judgment creditors from obtaining insurance proceeds prior to the judgment debtor's insurer's liquidation.  The *Vickodil* holding recites the object of the priorities of a liquidation and does not have particular relevance to a conversion of a rehabilitation to a liquidation.

[86] Eligibility for guaranty fund coverage is a significant issue for PPG because of the years where a risk retention group shared responsibility with Legion for coverage as well as the other Policyholder Intervenors whose net worth will bar them from guaranty fund protection.



- Guaranty fund coverage will be unavailable in the 31 jurisdictions that have adopted net worth limitations on eligibility;

- Guaranty fund coverage is limited to amounts that are dwarfed by the loss exposures of the Policyholder Intervenors;

- Guaranty funds will take over the adjustment of claims presently handled by the reinsurers or by the Policyholder Intervenors;

- It will be years before any policyholder claims will be paid by the liquidator;

- Policyholder Intervenors will be better suited than a liquidator to collect on their reinsurance, in part because of their on-going relationship with the reinsurers;[87]

- Guaranty fund expenses and reinsurance collection expenses will drain the estates of Legion and Villanova; and

- The contractual expectations of all parties, including Legion, will be destroyed in the putative "compromise" advanced by the Rehabilitator.

The Policyholder Intervenors seek direct access to their reinsurance, in either a continued rehabilitation or in a liquidation. The Rehabilitator objects, contending that unless a precisely worded cut-though endorsement that accords with the Reliance guidelines[88] can be produced, direct access is not available to the Policyholder Intervenors. In light of the statutory standard that a rehabilitation

---

[87] The Rehabilitator's witness, Mr. Mullin explained that a person with an on-going business relationship with the reinsurer has more "muscle," and, thus, is better able to collect under a reinsurance agreement. N.T. 3/20 at 512, 514.

[88] This Court adopted guidelines for allowing policyholders direct access to reinsurance in another receivership proceeding, i.e., the liquidation of Reliance Insurance Company (In Liquidation). *Koken v. Reliance Ins. Co.*, No. 269 M.D. 2001. Those guidelines, while instructive, are not binding in the Legion and Villanova insolvency.

{PAGE }



should not be terminated unless it will substantially increase the risk of loss to, *inter alia*, policyholders, it is appropriate to consider whether direct access should be permitted to the Policyholder Intervenors and others that may be similarly situated.

### 1. The general rule in liquidations is to deny policyholder claimants direct access to reinsurance.

In most liquidations, reinsurance proceeds become general assets of the estate. *Amicus curiae*, the Reinsurance Association, explains the basis of this general rule with its primer on reinsurance:

> Reinsurance is insurance coverage taken out by an insurance company on risks that it has originally insured. . . . The two main reasons cited for purchasing reinsurance are capacity and stability. By arranging for reinsurance a primary carrier can relieve itself from the full burden of a large loss. By accepting a share of the loss, reinsurance has the effect of adding to the financial capacity of the primary insurer and stabilizing the primary carrier's financial results.

Reinsurance Association Brief at 5. Where the direct insurer seeks safety in reinsurance in the above-described manner, generally the policyholder has no knowledge of either the existence or application of reinsurance proceeds to its claims. *Housing Auth. of Lebanon County v. Envirohousing, Inc.*, 442 F. Supp. 1193, 1196 (M.D. Pa. 1977).

The usual occasion for reinsurance has no application to Legion. The Policyholder Intervenors, not Legion, placed the reinsurance; Legion neither adjusted nor funded claims; and Legion did not seek to expand its underwriting capacity through reinsurance. Indeed, it sought to avoid any underwriting because its business plan called for generation of fees not underwriting profits.

The general rule identified by the Rehabilitator and the Reinsurance Association is just that, a general rule that applies in the traditional insurer/reinsurer context. The general rule makes little sense, however, where following it will turn upside down the contractual arrangements established by the Policyholder Intervenors for providing for their liability risks.[89] The question, then, is the exception to the general rule.

### 2. Direct access to reinsurance is a right established on a case-by-case basis.

The Rehabilitator asserts that the case law generally supports her contention that a direct insured is not entitled to receive direct payments from reinsurers.[90] However, this is not a point in dispute. Decisions also acknowledge that direct insureds can establish a right to access reinsurance and provide directions for establishing this right. Even cases that have found against the direct insureds in this effort have acknowledged that direct access can sometimes be allowed. This was the case in *Mellon v. Security Mut. Cas. Co.*, 5 Phila. 400 (1981), upon which the Rehabilitator relies.

In *Mellon*, a policyholder brought a lawsuit against the reinsurer of the insolvent insurer that had issued the direct policy. The policyholder contended that because the reinsurance agreement at issue provided for indemnity against the

---

[89] A liquidation will transform Legion from a fronting company into an orthodox insurer that will perform claims adjustment and claim-paying functions.

[90] Syndicate 271 agrees. *See* Syndicate 271 Brief at 3-4. The numerous cases cited by Syndicate 271 therein are distinguishable because they do not involve fronting arrangements or reinsurance agreements with an insolvency clause worded in the same way as the Insolvency Article in the reinsurance contract applicable to Legion and Syndicate 271.



reinsured's liability, rather than its loss, it created a direct right of action in the insured.[91] The court rejected that theory, stating that:

> the distinction between "indemnity of loss" and "indemnity of liability" is merely determinative of *when* the obligation to pay arises, *i.e.*, whether a condition precedent has been discharged; but this issue bears no direct relationship to the question of *who* may enforce that obligation.

---

[91] Under English law, there is a recognized distinction between indemnity of loss and indemnity of liability. The former requires the reinsurer to pay even though the ceding company has not yet paid. Mr. Arledge testified that the London reinsurers understood that this clause meant Legion did not have to issue payment on behalf of American prior to receiving monies from Syndicate 271. N.T. 3/20 at 334-335. Indeed, this has been the meaning ascribed to such a clause for over one hundred years. For example, in *In re Eddystone Marine Insurance Co.*, [1892] 2 Ch. 423, 1892 WL 9775 (Ch D), the court explained that "pay as may be paid" language is:

> satisfied without the necessity of holding that payment is a condition precedent. To say that the liability of the reinsurer, who has received the premium on the full amount reinsured, depends upon the degree of solvency or insolvency of the original insurer, involves an absurdity. The Eddystone Company are accordingly bound to indemnify the Western against all claims up to the full amount of the reinsurance, whether the Western have paid anything or not.

*Id.* at 426. This interpretation has been reiterated in many more recent decisions. *See, e.g., Home & Overseas Ins. Co. Ltd. v. Mentor Ins. Co. Ltd.*, [1989] 1 Lloyd's Rep. 473, 480, 1989 WL 649995 (CA) (rejecting reinsurer's contention that "pay as may be paid" language, in conjunction with other clauses, meant that the reinsurer was liable only after the insurer paid claims to their insureds; stating that it is "both unjust and discordant with commercial good sense that, by reason of the accident of a reinsured becoming insolvent, the reinsurer (who has accepted premiums) should go scot-free from liability under the reinsurance policy in respect of claims for which the reinsurers would unquestionably have been liable had the reinsured remained solvent"). *See also Charter Reinsurance Co. Ltd. v. Fagan*, [1996] 2 Lloyd's Rep. 113, 117, 1996 WL 1090698 (HL) (explaining that liability for sums "actually paid" meant that the reinsurer was obligated at the time the reinsured was found liable for payment not when payment was actually made); *id.* at 119-121 (citing several decisions from U.S. jurisdictions supporting this conclusion); GRAYDON S. STARING, LAW OF REINSURANCE §16:1[2] (1993) (discussing same and summarizing decisions similarly requiring payment by reinsurers prior to payments by the direct insurer).

This law, taken in combination with the conduct of the parties, specifically, the fact that Syndicate 271 has indemnified Legion's liability, supports the conclusion that Syndicate 271 has assumed Legion's direct obligations to American.



*Id.* at 412. The court, therefore, concluded that even assuming the reinsurance contract provided indemnity against liability without regard to the reinsurer's actual payment of claims, the policyholders were not thereby entitled to assert direct claims against the reinsurers.

The *Mellon* court relied heavily on the holding in *Fontenot v. Marquette Cas. Co.*, 247 So. 2d 572 (La. 1971), noting that:

> the *Fontenot* court concluded that "[r]einsurance not only affords no privity in contract to the insured, but it is sought by the *insurer* solely for its own protection, profit, and benefit."

*Mellon*, 5 Phila. at 405 (quoting *Fontenot*, 247 So. 2d at 575) (alteration in original). Nevertheless, the *Mellon* court acknowledged that since *Fontenot*, courts have permitted insureds direct access to reinsurance on several alternative grounds. After summarizing those alternatives, the *Mellon* court concluded as follows:

> I do not feel that the listed exceptions are exclusive. Rather, a determination of whether an original insured may sue a reinsurer directly must be made on a case-by-case basis, viewing the plain language of the agreement in light of the generally recognized functions and purposes of reinsurance. *Pennsylvania courts have demonstrated a willingness to review the relationship between such parties on a case-by-case basis and evolve exceptions to the general rule* where the agreement itself, or the relationships among the reinsurer, the reinsured and the original insured, extend beyond the realm of traditional reinsurance and evidence an intent to create third-party beneficiary status for the original insured.

*Id.* at 407-408 (emphasis added) (footnotes omitted).

Other jurisdictions have established exceptions to the general rule by examining the reinsurance relationship in its entirety. In *Great Atlantic Life Ins. Co. v. Harris*, 723 S.W.2d 329 (Tex. App. 1987), an insurance company used a fronting company, United Bankers Life Insurance Company (United Bankers), to

{PAGE }



write business in Texas, where it was not licensed. Like Legion, United Bankers "assumed no risk and performed virtually no administrative functions," while the "reinsurer" "posted the required reserves." *Id.* at 334. United Bankers received a fronting fee, a half point of the premium, but it did not accept any underwriting risk. Over objections, the Texas Court of Appeals held that the receiver of United Bankers should not be able to "collect funds to which [the front] would not be entitled if it were not in receivership." *Id.*[92]

In keeping with *Mellon* and *Great Atlantic*, this Court is obliged to examine the reinsurance arrangements in their entirety to discern the parties' rights and obligations. The traditional approach holds little instructional value for a situation where the insolvent insurer acted only as a pass-through and not as a true insurer.

### 3.    The Policyholder Intervenors can claim third-party beneficiary rights under the reinsurance agreements.

Policyholders may bring a direct action against the reinsurance company where the policyholder is a "third-party" beneficiary or intended beneficiary of the reinsurance contract. *Reid v. Ruffin*, 503 Pa. 458, 461, 469 A.2d 1030, 1032 (1983). Under Pennsylvania law, a third-party beneficiary relationship is established by reference to the standards of Section 302 of the Restatement (Second) of Contracts. *Scarpitti v. Weborg*, 530 Pa. 366, 370-371, 609 A.2d 147,

---

[92] *See also Allstate Ins. Co. v. Administratia Asigurarilor de Stat.*, 948 F. Supp. 285, 307-309 (S.D.N.Y. 1996) (notwithstanding absence of language "explicitly" establishing the reinsurer's direct liability, the court refused to grant summary judgment to reinsurer when nature of the parties' relationship was not "traditional" reinsurance).

149-150 (1992).   The Pennsylvania Supreme Court has summarized these requirements as follows:

> [A] party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself, *unless*, the circumstances are so compelling that *recognition of the beneficiary's right is appropriate to effectuate the intention of the parties*, and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Scarpitti*, 530 Pa. at 372-373, 609 A.2d at 150-151 (second emphasis added) (citations omitted).  Prior to our Supreme Court's adoption of the Restatement test, recovery by third-party beneficiaries was allowed only in narrow circumstances. *Guy v. Liederbach*, 501 Pa. 47, 58-59, 459 A.2d 744, 750-751 (1983) (overruling *Spires v. Hanover Fire Ins. Co.*, 364 Pa. 52, 70 A.2d 828 (1950)).

In *Guy*, our Supreme Court established a two-part test for determining third-party beneficiary status: (1) recognition of the beneficiary's right must be "appropriate to effectuate the intention of the parties," and (2) contract performance must "satisfy an obligation of the promisee to pay money to the beneficiary" or "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Id.* at 60, 459 A.2d at 751.

The Policyholder Intervenors all assert third-party beneficiary rights but on different factual grounds.  The rights of Pulte, Rural/Metro and PPG stem from facultative reinsurance agreements specific to their individual risks; they were issued facultative certificates.  American claims rights under a reinsurance agreement that is not strictly facultative, *i.e.*, a facultative obligatory treaty.  On the other hand, the contract, or wording, between Legion and Syndicate 271 contains

{PAGE }

language that expresses American's right to cut-through Legion to collect reinsurance directly from Syndicate 271.[93] In spite of the differences in their circumstances, all the Policyholder Intervenors can demonstrate third-party beneficiary status under the two-part *Guy* test.

First, it was the intention of the parties that the reinsurer assume all underwriting risk. Legion's only role was that of a fronting company, and the parties did not intend that Legion use the proceeds of the reinsurance for its general business purposes. The reinsurance proceeds were used exclusively and entirely for the payment of Policyholder Intervenor claims, which satisfies the second part of the *Guy* test. Payment by the reinsurance companies was through Legion but for the benefit of the Policyholder Intervenors. In short, each "reinsurer" functioned as the direct insurer for each of the Policyholder Intervenors.

In determining third-party beneficiary rights under a reinsurance contract, courts look at the extent of the reinsurer's involvement in the underlying insurance program. *See, e.g., Reid*, 503 Pa. at 461, 469 A.2d at 1032; *Venetsanos v. Zucker, Facher & Zucker*, 638 A.2d 1333, 1339-1340 (N.J. Super. Ct. App. Div. 1994) (discussing *Reid*). In *Reid*, the Pennsylvania Supreme Court noted that unless certain factors are present, the general rule is that an insured does not enjoy a right of direct action against the reinsurer. *Id.* at 463-464, 469 A.2d at 1033. In *Reid*, the requisite factors could not be found because the direct insurer retained most of the risk, with only 25% reinsured, and it controlled the settlement of claims.

---

[93] Even the Rehabilitator acknowledges that the Insolvency Article in the Legion/Syndicate 271 reinsurance contract expresses a cut-through right in American.

{PAGE }



In comparison, in *Venetsanos*, the New Jersey Superior Court, citing to *Reid*, determined that where a reinsurer (1) underwrote the insurance policy in question, (2) undertook 100% of the risk from an insolvent "fronting" insurer, (3) retained final authority to negotiate and settle all claims on behalf of the "fronting" insurer, and (4) reimbursed the fronting insurer for all payments made under the policy, the policyholder was a third-party beneficiary to the reinsurance contract and could proceed directly against the reinsurer upon the primary insurer's insolvency. *Id.* at 1339-1340. The *Venetsanos* court distinguished a fronting arrangement from a "more orthodox reinsurance situation." *Id.* at 1338. In determining that the policyholder held third-party beneficiary status, the court distinguished the *Reid* outcome by noting:

> Although the Pennsylvania Supreme Court recognized the several rules respecting an insured's right to direct action against a reinsurer, its rationale in *Reid* was specifically grounded in the absence of factors which are here present, and the presence of factors which are here absent.

*Id.* at 1340.

Here, as in *Venetsanos*, factors are present to support a finding that the Policyholder Intervenors were third-party beneficiaries of the reinsurance contracts between Legion and the appropriate reinsurer. Legion acted as a fronting company, and it bore no true underwriting risk. Legion did not underwrite the risk, but, rather, was content to allow the true risk bearer, the reinsurer, to conduct the necessary due diligence. Legion also did not participate in the claims handling process, or the funding of claims. In all cases, these were the responsibility of the reinsurers.

70

The Rehabilitator [94] and Syndicate 271 offer countering views. Syndicate 271 contends that third-party beneficiary rights only inure to Legion's "liquidator, receiver, conservator or statutory successor."  Syndicate 271 Brief at 31.  The Rehabilitator, on the other hand,  disagrees and asserts that the only third-party beneficiary is one named as "an alternate payee" under clause (a) of the Insolvency Article[95] as found, for example, in the Legion/Syndicate 271 wording. Rehabilitator Proposed Conclusion of Law ¶96 (COL ____).  Both Syndicate 271 and the Rehabilitator are wrong.

Syndicate 271's interpretation is flawed because it makes no sense to grant third-party beneficiary rights to Legion's "liquidator, receiver, conservator or statutory successor" because the receiver has all the contract rights of Legion. Under Article V, "the [s]tatutory [l]iquidator steps into the shoes of the insurer." *Foster v. Monsour Med. Found.*, 667 A.2d 18, 20 (Pa. Cmwlth. 1995). Accordingly, a statutory successor is not a third-party to the contract but, rather, a

---

[94] The Rehabilitator counters on the basis of *Mellon*, which is not dispositive, and *Allendale Mut. Ins. Co. v. Crist*, 731 F. Supp. 928 (W.D. Mo. 1989).  *Allendale* addressed an insolvency clause unlike that in the Legion/Syndicate 271 reinsurance contract.  More importantly, the reinsurance agreement had a third-party beneficiary clause that explicitly limited third-party beneficiaries to the "receiver, liquidator or statutory successor."  *Id.* at 931.  Other cases relied upon are also distinguishable.  *See Richland Valley Prods., Inc. v. St. Paul Fire & Marine Ins. Co.*, No. 94-C-727-S, 1995 WL 675598 (W.D. Wis. Mar. 8, 1995) (addressing a reinsurance agreement with different insolvency clause and without the *Allendale* limit on a third-party beneficiary rights); *American Cast Iron Pipe Co. v. Statesman Ins. Co.*, 343 F. Supp. 860 (D. Minn. 1972) (addressing a differently worded insolvency clause); *General Reinsurance Corp. v. Missouri Gen. Ins. Co.*, 458 F. Supp. 1, 3 n.3 (D. Mo. 1977) (stating that "[i]n no instance shall any insured of the Company or any claimant against an insured of the Company have any rights under this [reinsurance] Agreement").

[95] There are three logical possibilities for being a third-party beneficiary under the Insolvency Article:  (a) a "liquidator, receiver, conservator or statutory successor"; (b) "another payee" under clause (a); or (c) "the direct insureds" under clause (b).

71

party to the contract with rights that are "not superior to nor more extensive than those of the carrier whose affairs he is liquidating." *Commonwealth ex rel. Sheppard v. Central Penn Nat'l Bank*, 375 A.2d 874, 876 (Pa. Cmwlth. 1977) (quoting *Commonwealth ex rel. Kelly v. Commonwealth Mut. Ins. Co.*, 450 Pa. 177, 181, 299 A.2d 604, 606 (1973)).  Because the rights of the Rehabilitator, or the liquidator (in the event of Legion's liquidation), are identical to Legion's rights, it does not follow that the Policyholder Intervenors and their reinsurers intended to grant third-party beneficiary rights to Legion's statutory successor.  It would be redundant to recite what will happen by operation of law.[96]

The Rehabilitator's argument that only a named "another payee" may assert third-party beneficiary rights is not persuasive.  First, the Insolvency Article in the contract between Legion and Syndicate 271 has an "or" between clauses (a) and (b).[97]  Following the Rehabilitator's reasoning, if "another payee" under clause (a) is intended to have third-party beneficiary status, then the "direct insureds" -- like American -- must have that status under clause (b).   Second, when a reinsurance contract intends to exclude a third-party beneficiary, there is express language that accomplishes that intent.  *See* Rehabilitator COL ¶ 51.

In sum, under the *Guy* two-part test, the Policyholder Intervenors can demonstrate third-party beneficiary rights to reinsurance that they purchased for their benefit alone and not for the benefit of Legion.

---

[96] By way of analogy, a trustee under the federal bankruptcy code similarly stands in the shoes of a debtor. *See, e.g., Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 358 (3d Cir. 2001) (stating that "bankruptcy law mandates that the trustee step into the shoes of the debtor when asserting causes of action").

[97] See page 39, *supra*, for the complete text of the Insolvency Article.

72

4.    **Direct access would not give the Policyholder**
      **Intervenors an impermissible preference.**

The Rehabilitator asserts that direct payments from reinsurers to policyholders constitute impermissible preferences under Pennsylvania law. This contention lacks a foundation in the record.

During the hearings pertaining specifically to American's claims, the Rehabilitator's witness, Arthur Mullin, initially suggested that direct payments by reinsurers might constitute preferences but then conceded that payments in liquidation pursuant to contractual cut-through are permitted by Section 534 of Article V, 40 P.S. §221.34. N.T. 3/20 at 440-442. Mr. Mullin also conceded that the Rehabilitator had not yet conducted any analysis as to whether direct payments to American and the other Policyholder Intervenors would constitute "preferences" under any circumstances. N.T. 3/20 at 444, 445, 493, 509.

While other witnesses presented by the Rehabilitator also contended that direct payments might constitute impermissible preferences, they did not explain the legal basis for this opinion. For example, Thomas Stolp, reinsurance manager for the Pennsylvania Insurance Department, stated that direct payments would "creat[e] a preference by allowing one group to be paid a hundred percent at the detriment of the other creditors because we have eliminated those reinsurance proceeds from the pot[.]" N.T. 11/8 at 386. Similarly, Mr. DiMemmo, upon questioning by this Court, contended that, because "reinsurance is a general asset," no particular group of policyholders should be allowed one hundred percent repayment while others are not. N.T. 11/14 at 105.

Further, no attempt was made to correlate these observations with the fact that the claims of Legion's and Villanova's workers' compensation policyholders and health insurance policyholders will be paid 100% without a

73

pause. In any case, the Rehabilitator has asserted that, in time, all policyholder claims will be paid because all reinsurance proceeds owed will be collected. N.T. 11/14 at 108, 109, 115.

Finally, Mr. DiMemmo and Mr. Stolp did not explain how enforcement of a valid contractual right could constitute an improper preference under Pennsylvania law. Even accepting the Rehabilitator's claim that direct access is an "economic" preference, it is nevertheless a lawful preference under Article V. N.T. 3/20 at 518.

### 5.   Article V expressly authorizes direct access.

Section 534 of Article V authorizes direct access to reinsurance proceeds in certain circumstances. It states as follows:

> The amount recoverable by the liquidator from reinsurers shall not be reduced as a result of delinquency proceedings, regardless of any provision in the reinsurance contract or other agreement. Payment made directly to an insured or other creditor shall not diminish the reinsurer's obligation to the insurer's estate *except when the reinsurance contract provided for direct coverage of an individual named insured and the payment was made in discharge of that obligation.*

40 P.S. §221.34 (emphasis added). The Rehabilitator gives a very narrow meaning to the exception provision.[98] She would allow an exception to the general rule only

---

[98] Syndicate 271 agrees. It cites *Ainsworth v. General Reinsurance Corp.*, 751 F.2d 962 (8th Cir. 1985) for the proposition that direct payment of claims might constitute a preference. Syndicate 271 Brief at 47. *Ainsworth* addressed an insolvency clause without an equivalent to the Legion/Syndicate 271 Insolvency Article. *Id.* at 964. There was no contractual or statutory basis by which that reinsurer could make a settlement with the direct insureds. *Id.* at 965. Thus, the Eighth Circuit's concerns with improper preferences were articulated in the context of a very different agreement using very different language.



where the operative reinsurance agreement contains a cut-through endorsement stated in very precise terms.[99]

The record showed, however, that it is difficult to make any generalizations about cut-through endorsements and how they ought to appear. At the hearing, Syndicate 271 offered Mr. Langen's opinions on cut-through endorsements as "definitive." [100]   Mr. Langen's own article, however, acknowledged that the "[t]he clauses and endorsements herein are examples only and are not offered as holy writ.  Moreover, there are various clauses readily available in the industry to express the intent of the parties." Syndicate 271 Ex. 20 at 583.   More specifically, Mr. Langen acknowledged that cut-through endorsements themselves are "distinctive" and vary depending upon the parties' intent. *Id.* at 601; *see also id.* at 601-616 (explaining different variations of such clauses).   Notably, Mr. Langen's own article includes as an example of an "insolvency provision effecting cut through," a clause that is virtually identical to the one in the reinsurance contract between Legion and Syndicate 271. *Id.* at 613.

In any case, the Strain compilation was far from the "only textbook" on the subject of drafting reinsurance contracts at the time the parties embarked on

---

[99] The Rehabilitator offered two examples of cut-through endorsements that meet her standards. LIQ Exs. 107, 108.  These endorsements may be the appropriate means for a policyholder to establish direct access against treaty reinsurance, which is purchased by the ceding insurer for traditional business purposes of the direct writer, as explained by the Reinsurance Association.

[100] Syndicate 271 Exhibit 20, excerpts from ROBERT W. STRAIN, REINSURANCE CONTRACT WORDING (3rd ed. 1998) sets forth Mr. Langen's opinions.  Syndicate 271 claimed the article was the "definitive text" and, in fact, "the only textbook on the subject" of drafting reinsurance contract wording. N.T. 4/3 at 196-197.

75

them. *See, e.g.,* GRAYDON S. STARING, LAW OF REINSURANCE (1993);[101] LEE R. RUSS & THOMAS F. SEGALLA, I COUCH ON INSURANCE (3d ed. 1997). As does Mr. Langen, these textbooks acknowledge that cut-through clauses differ markedly depending upon the jurisdiction and the intent of the parties.[102] In addition, industry documents contain different variants of cut-through and insolvency clauses. *See* LIQ. Ex. 127; Syndicate 271 Ex. 50; AA Ex. 89.

Section 534 of Article V does not require a cut-through endorsement in the form of holy writ; it does not even use the term "cut-through." Even if the statute had used those words, its meaning would be less than clear in light of the fact that there is more than one way to effect a cut-through. A facultative reinsurance agreement provides for "direct coverage of an individual named insured." Section 534 of Article V, 40 P.S. §221.34. No other inference is possible where the reinsurer, not Legion, bears 100% of the underwriting risk, and the reinsurer was chosen by the policyholder. This was the case with all the Policyholder Intervenors. The Policyholder Intervenors, through their consultants and agents, chose their reinsurers as the intended source of their coverage. The fronting company was the last party to the transaction; its identity was not even known until after the reinsurance was placed and all material terms decided by the Policyholder Intervenors and their reinsurers.

Notably, Section 534 refers to diminishment of the estate. Here, Legion's estate will be saved diminishment by allowing Policyholder Intervenors direct access. This step will relieve Legion of the expenses of claims adjustment,

---

[101] American offers other sources not available to the Court: DR. KLAUS GERATHEWOHL, et al., REINSURANCE PRINCIPLES AND PRACTICE (1980); R.L. CARTER, REINSURANCE (1979); K. THOMPSON, REINSURANCE (4th ed. 1966).

[102] *See, e.g.,* STARING §16:2[2].

76

reinsurance billing and collections.  At the same time, Legion will not have the liability for substantial claims.

### 6. Article V authorizes reformation and novation where appropriate to avoid prejudice to policyholders.

The Policyholder Intervenors note that to the extent their existing reinsurance agreements are imprecise on the point of direct access, this Court has the authority in a rehabilitation to order their reformation.[103]  The Court agrees.

Case law teaches that it is the Court's task to ensure that the Rehabilitator's actions are consistent with equitable principles and serve the interests of policyholders.  *See, e.g., Mutual Fire*, 531 Pa. 598, 614 A.2d 1086.  Syndicate 271 contends that "[n]o Rehabilitation Plan has been submitted to the Court that provides, or could be modified to provide, for reformation of the contract."  Syndicate 271 COL ¶ 119.  However, the Court could modify its Rehabilitation Order to that end.  Further, the Court has authority to order the filing of a rehabilitation plan to allow direct access to reinsurance where it would prevent great harm to some policyholders without adversely affecting the overall estates of Legion and Villanova.

---

[103] Syndicate 271 contends that this Court has no power to grant such relief.  Syndicate 271 Brief at 38-40.  Syndicate 271 primarily cites to the provisions in Article V, *i.e.*, 40 P.S. §§221.5, 221.16, 221.41, and contends that because none of these provisions contain *explicit* acknowledgement of the court's reformation powers, the law must be construed as forbidding such an interpretation.  Notably, Legion makes no such argument.  Section 505, 40 P.S. §221.5, authorizes the Court to restrain action "... that might lessen the value of the insurer's assets or prejudice the rights of policyholders, creditors, or shareholders, or the administration of the proceeding."

{PAGE }

77

Syndicate 271 refers to *Colonial Penn Ins. Co. v. American Centennial Ins. Co.*, 1992 WL 350838 (S.D.N.Y. Nov. 17, 1992). There, the court found that, given the facts at issue,[104] abrogating a cut-through right does not *necessarily* constitute an improper impairment of contract and that it was necessary, given the facts, to compromise the rights of some policyholders for the benefit of others. *Id.* However, this holding does not stand for the principle that this Court should abrogate rights of direct access. As has been noted, in this discussion, rights of direct access must be analyzed in the context of a particular receivership. Generalities do not assist in this analysis.

Syndicate 271 suggests that because this Court *may* decide in a liquidation to abrogate certain contractual provisions, including cut-through rights, it should not permit, as long as Legion and Villanova are in rehabilitation, direct access to American (or any of the Policyholder Intervenors). Syndicate 271 Brief at 41-42. This argument is based on a number of faulty premises, most notably the fact that the Court *may* disregard contractual provisions in a liquidation does not mean that the Court is required to do so. Indeed, this Court can recognize the right of the Policyholder Intervenors even if it grants the Rehabilitator's petition for liquidation.

Accordingly, this Court may reform the Agreement to reflect the parties' intent if necessary and appropriate to avoid prejudice to policyholder rights.

---

[104] The facts are quite different between those in the *Mutual Fire* rehabilitation and the present proceeding.

{PAGE }

### 7.    Direct access does not impair reinsurer contractual rights.

Syndicate 271, as an alien friend with substantial assets in the U.S., claims the constitutional rights that can be claimed by a domestic corporation.  It asserts that a judgment allowing American direct access to the Syndicate 271 reinsurance proceeds will impair Syndicate 271's contract rights.  It notes, correctly, that impairment of contract is prohibited by the United States[105] and Pennsylvania[106] Constitutions.  However, there are several flaws in the argument of Syndicate 271.

The Contracts Clause provides that: "no State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."  It does not speak to all "state action;" it speaks only to the legislative act of passing laws.  It has been explained by the United States Supreme Court as follows:

> It has been settled by a long line of decisions, that the provisions of §10, Article I, of the Federal Constitution, protecting the obligation of contracts against state action, is directed only against impairment by legislation and not by judgments of courts. . . .

*Barrows v. Jackson*, 346 U.S. 249, 260 (1953 (quoting *Tidal Oil Co. v. Flanagan*, 263 U.S. 444, 451 (1924)).  This principle has been established for more than a hundred years.  *See, e.g., New Orleans Waterworks Co. v. Louisiana Sugar Refining Co.*, 125 U.S. 18, 30 (1888).

---

[105] U.S. CONST., art. I, §10.
[106] Pa. CONST., art. I, §17.  The test for unconstitutional impairment of contract is the same under both constitutions.  *See Parsonese v. Midland Nat'l Ins. Co.*, 550 Pa. 423, 706 A.2d 814, 818-819 (1998).



Syndicate 271 does not explain how Article V impairs its contract rights. Notably, it is American, not Syndicate 271, that is in the position to assert impairment. Legion is in breach of its contractual obligation to pay claims, and the rehabilitation has deprived American of the ability to sue Legion for non-payment of its claims.

Even if Syndicate 271's challenges were presented to legislation, *i.e.*, Article V, it would need to show substantial impairment not outweighed by a legitimate and significant public purpose. *Energy Reserves Group, Inc. v. Kansas Power & Light*, 459 U.S. 400, 411-412 (1983). It cannot. Syndicate 271 has enjoyed a long respite from making any payments. The fact that Syndicate 271 will have to resume payments to American in amounts no greater than to Legion does not demonstrate impairment. Further, the possibility of lost collateral asserted by Syndicate 271 is a plangent too speculative to support a claim of impairment.

The Court agrees with American that the issue of whether Article V impairs insurance and reinsurance contracts has not been properly raised and need not be decided.

D.    **Continued Rehabilitation May Substantially Increase the Risk of Loss of Policyholders in an Orthodox Insurance Relationship with Legion and Villanova.**

The Rehabilitator's overriding goal has been to continue the payment of workers' compensation benefits and health insurance benefits while she sought to develop a plan that would allow the resumption of payment to other categories of claimants. However, funding of even those categories of claimants became problematic when numerous states refused to return statutory deposits to the Rehabilitator, and she was unable to make significant progress on collection of the

80

$310 million in past due and owing reinsurance recoveries. Liquidations will result in the transfer of all claims files to guaranty funds that will become responsible not only for workers' compensation and health insurance claims but also for the claims that have been in stasis since the inception of the rehabilitation.

Most of Legion's and Villanova's claims will fall under the limits of guaranty fund coverage, but guaranty funds are not a panacea. In Pennsylvania, the taxpayers ultimately bear the burden because the assessments upon insurers that contribute to guaranty funds are offset against the premium tax. *See, e.g.*, 72 P.S. §7902.1.[107] Further, guaranty fund limits and eligibility requirements will leave many policyholders with no remedy but to file a proof of claim against the estate which cannot be paid by the liquidator for many years.

Witnesses who appeared on behalf of guaranty fund trade associations testified that a finding of insolvency must be made and an order of liquidation entered before claims can be turned over to the guaranty funds. These positions appear grounded in custom and practice, not in statutory law. The Pennsylvania Workers' Compensation Security Fund is triggered by insolvency of the insurer. Section 3 of the Workers' Compensation Security Fund Act (Act), Act of July 1, 1937, P.L. 2532, 77 P.S. §1053. An insurer is "insolvent" if either a factual determination of insolvency is made *or* a "receiver or liquidator" is appointed. Section 2 of the Act, 77 P.S. §1052. The Pennsylvania statute does not require the appointment of a liquidator; the appointment of a "receiver," or rehabilitator, is sufficient. Further, a formal delinquency proceeding is not even required as a precondition to coverage so long as insolvency is established.

---

[107] To the extent other states follow this rule, state governments will bear the burden of guaranty fund payments at a time they are already facing tremendous revenue shortfalls.



The language of the Pennsylvania statute is not unlike the language of other state guaranty fund laws.[108]  Nevertheless, according to Mr. Wallis, the state funds interpret "receiver or liquidator" to mean only a liquidator, and they require a finding of insolvency specifically for the purpose of triggering guaranty funds. N.T. 11/8 at 452, 469.  This construction is not consonant with the actual language of the statutes, and it renders the word "receiver" mere surplusage, a result to be avoided in any statutory construction exercise.

The Court is persuaded that access to guaranty fund coverage is needed and that access will not occur in the absence of a liquidation.  This result does not seem commanded by the actual language of the statutes but, rather, by the reality of how these state funds interpret their statutory mission.  This Court is powerless to assist policyholders with claims covered by guaranty funds located in states other than Pennsylvania.  Accordingly, the Court is persuaded that not to order liquidation will only increase the risk of loss to policyholders.

### E.    The Alternate Section 518(a) Standard of Futility Cannot Be Applied to Legion and Villanova.

The Insurance Department obtained the consent of Legion and Villanova to their rehabilitation.[109]  If the Insurance Department obtains consent to a rehabilitation, it has a responsibility to move directly on a plan that will correct

---

[108] The definition of "insolvent insurer" for purposes of the Massachusetts Insurers Insolvency Fund requires only a finding of insolvency.  Mass. Gen. Laws ch. 175D, §1(4) (2002).  The California Insurance Guarantee Association Act requires an order of liquidation or receivership with a finding of insolvency.  Cal. Ins. Code §1033.1(b) (West 2003).

[109] The discussions between the parties are not, at this point, relevant.  However, it appears that both parties believed that a rehabilitation would be possible given the quality of the management and the quality of reinsurers.  Both Mr. Stolp and Mr. Mulderig testified credibly on the initial intention to rehabilitate, not liquidate, Legion and Villanova.

{PAGE }

(82)

the insurer's problems. Here, a plan for the rehabilitation for Legion and Villanova was never filed with the Court, and evidence of a plan's development was not presented at the hearing.

A rehabilitation is not to be used as a period of conservatorship while the Insurance Department reviews the options. Article V provides other options that should be used where the Insurance Department is not certain whether to pursue a rehabilitation or a liquidation. For example, the Insurance Department can issue an administrative order. A suspension order prohibits a financially troubled insurer from writing new business, and it places the Insurance Department in the position of deciding the extent to which claim payments should continue. Section 510(d) of Article V, 40 P.S. §221.10(b).[110] During the suspension period, there are restraints on legal process against the suspended insurer. *Id.* Further, the

---

[110] It states in relevant part as follows:

> (d) Any suspension order made by the commissioner under the provisions of subsection (a) shall prohibit issuance of policies, transfers of property, and payment of moneys, without prior written approval of the commissioner.... *From the date of such suspension on the ground that the insurer is insolvent*, or is in such condition that its further transaction of business will be hazardous financially to its policyholders, creditors, or the public, *no action at law or equity shall be commenced or prosecuted nor shall any judgment be entered* against nor shall any execution or attachment be issued or prosecuted against the suspended insurer, or against its property, in any court of this Commonwealth: Provided, that if such suspension order be vacated by the Commonwealth Court for the reason that the suspended insurer is no longer insolvent, or in such condition that its further transaction of business will be hazardous to its policyholders or to its creditors or to the public, these restraints upon legal process regarding the insurer shall thereafter cease to be operative.

40 P.S. §221.10(d) (emphasis added).

83

Insurance Department may seek whatever court orders needed to enforce the summary order. Section 510(g) of Article V, 40 P.S. §221.10(g).[111]

In short, a period of conservation may be the appropriate response to a financially-troubled insurer. However, a conservatorship should not be effected by court-ordered rehabilitation but, rather, by a summary administrative order issued by the Insurance Department pursuant to Section 510 of Article V, 40 P.S. §221.10.

An order of rehabilitation assumes the development and submission of a plan of rehabilitation. The Insurance Department should submit at least a preliminary plan promptly upon entry of a rehabilitation order for the review and comment by affected persons. The first plan document need not be elaborate; it may suggest only the general contours of a work-out. For example, in the case of Legion, the plan could have proposed to give direct access to all policyholders willing to forego claims against the estate of Legion and against guaranty funds,[112] an option that might have been attractive to commercial policyholders in light of Legion's overall small retention of underwriting risk, *i.e.*, 10%. Only with the filing of a plan, even in the most preliminary form, is it possible to track progress and establish the plan's viability or its futility.

This is not to say that futility can be established only against a proposed plan of rehabilitation. There will be cases where the rehabilitator

---

[111] It states in relevant part as follows:

> (g) The commissioner may apply for and any court of general jurisdiction may grant, such restraining orders, preliminary and permanent injunctions, and other orders as may be deemed necessary and proper to enforce a summary order.

40 P.S. §221.10(g).

[112] The example is offered hypothetically and in the abstract.



discovers that the insurer's finances are in total disarray, loss reserves against claim liabilities are drastically understated and investments chimerical. Evidence of this type would also establish futility.

Section 518(a) of Article V establishes futility as an alternative to substantial increase in risk of loss to policyholders, creditors and the public. Accordingly, the Court's inability to apply the futility standard here, where no plan has been presented, is of no moment. While evidence was presented to support a finding that Legion and Villanova could be turned around, that evidence is now stale.[113]

## III.  CONCLUSIONS OF LAW.

1.  The Court's original jurisdiction over this liquidation proceeding arises under Article V of The Insurance Department Act of 1921, *supra*, 40 P.S. §221.1 *et seq.*, and 42 Pa. C.S. §761(a)(3).

2.  The Rehabilitator is not entitled to deference in a proceeding brought under Section 518(a) of Article V, 40 P.S. §221.18(a), to terminate the rehabilitation of Legion and Villanova and convert it to a liquidation.

3.  Under Section 518(a) of Article V, 40 P.S. §221.18(a), consent is not a ground to convert a rehabilitation to liquidation, whether that consent is given by the insurer's board of directors or by the Rehabilitator on behalf of the insurer.

---

[113] Not to permit liquidation, where the Rehabilitator is reluctant to forge a plan of rehabilitation, will cause harm to the policyholders, creditors and the public. It is on this Section 518(a) standard that grounds are established for the termination of the rehabilitation of Legion and Villanova.



4.     Legion and Villanova are insolvent because they cannot pay their "obligations when they are due." Section 503 of Article V, 40 P.S. §221.3. This inability to pay obligations is a ground for rehabilitation under Section 514 of Article V, 40 P.S. §221.14 and for liquidation under Section 519 of Article V, 40 P.S. §221.19.

5.     The Rehabilitator has satisfied her burden under Section 518(a) of Article V, 40 P.S. §221.18(a), of proving reasonable cause to believe that further attempts to rehabilitate Legion and Villanova will substantially increase the risk of loss to policy and certificate holders.

6.     Legion has no right to the proceeds of the reinsurance agreements that cover the liability claims of Pulte Homes, Inc., Psychiatrists' Purchasing Group, Inc., Rural/Metro Corporation and American Airlines, Inc.

7.     Direct access to reinsurance in the case of the above-named Policyholder Intervenors will give effect to the reasonable expectations of policyholders; will not adversely affect the Legion estate; and will not constitute preferences.  Each of the above-named Policyholder Intervenors has a contractual right, as a third-party beneficiary, to payment by the reinsurer on its losses.

8.     Syndicate 271 has assumed Legion's direct obligations to American under the Insolvency Article of the Legion/Syndicate 271 reinsurance contract, which document expresses the parties' intent.  The Final Placement Slips were not intended to operate as slip wordings.

## IV.   **CONCLUSION**.

Article V identifies policyholders, not their claimants, as the persons whose interests guide an insurer's formal delinquency proceeding.   There is

{PAGE }



certainly a strong public interest in continuing claims to injured workers, and a liquidation will facilitate that end. However, the interests of claimants are separate and distinct from the interests of policyholders. Here, the purchasers of employer liability insurance, *i.e.*, workers' compensation insurance, will receive more favorable treatment than purchasers of other types of liability insurance.[114]

Further, Article V does not state that some policyholders are to be given greater consideration than others. The Rehabilitator suggests that "sophisticated" policyholders are less deserving than others and, thus, prime candidates for having their contractual expectations compromised. Article V does not so instruct, and "sophistication" is an inexact standard at best, as can be seen in the case of Legion and Villanova. By continuing to pay the claims of injured workers, the Rehabilitator has assisted purchasers of workers' compensation insurance. Stated otherwise, she has come to the aid of "sophisticated" policyholders, *i.e.*, large, well-financed corporations, that may be better able to fund claims during a rehabilitation than are Legion and Villanova.

The "equitable purpose of rehabilitation and liquidation in insolvency statutes is to protect first of all consumers of insurance." *Grode*, 572 A.2d at 801. To that end, the goal should be to enforce a policyholder's reasonable expectation of coverage, a principle accepted in Pennsylvania. *Tonkovic v. State Farm Mut. Ins. Co.*, 513 Pa. 445, 456, 521 A.2d 920, 926 (1987) (reasonable expectations of coverage are the "touchstone of any inquiry into an insurance policy"). Contracts should be construed with reference to the circumstances for the agreement and the objectives to be realized. *Wiegand v. Wiegand*, 349 Pa. 517, 520-521, 37 A.2d

---

[114] Insurance is a vehicle for indemnifying a policyholder. Its purchase does not eliminate liability, whether in tort or for the providing of statutory benefits to injured workers.



498, 495 (1944).  When two or more contractual documents are executed at the same time and involve the same transaction, they should be construed as a whole, even when the parties are not the same.  *Black v. T.M. Landis, Inc.*, 280 Pa. Super. 621, 625, 421 A.2d 1105, 1107 (1980).

Article V does not require, or even authorize, the abandonment of these principles.  Direct access will satisfy all these principles.  The relevant factors presented by the Policyholder Intervenors are as follows: (1) the absence of any underwriting risk by Legion or Villanova; (2) the absence of claims adjustment responsibility or activity by Legion or Villanova; and (3) the reinsurance was placed by the policyholder, not Legion or Villanova, for the policyholder's benefit. Notably, the Policyholder Intervenors are willing to waive claims against guaranty funds.

Legion and Villanova functioned as fronting companies; they have combined surplus as regards policyholders in excess of $326 million; and they have secured quality reinsurance.  In light of these factors, their rehabilitation should have been viable.  It is regrettable that guaranty funds have adopted a rigid and formulaic approach that allows for coverage only in the event of liquidation, not rehabilitation.[115]  It is equally unfortunate that so many states refused, or were

---

[115] It is at least theoretically possible for guaranty funds to participate in a rehabilitation of insurer by making loans.  The stated purpose of Article XVIII of The Insurance Department Act of 1921 (Act), added by section 1 of the Act of December 12, 1994, P.L. 1005, *as amended*, 40 P.S. §§991.1801-991.1820, is to avoid financial loss to policyholders and to assist in the "prevention" of insurer insolvency.  Section 1801(1) and (2) of the Act, 40 P.S. §991.1801(1) and (2).  The Pennsylvania Property and Casualty Insurance Guaranty Association is generally authorized to perform acts "proper to effectuate the purposes of this article.  Section 1803(c)(8) of the Act, 40 P.S. §991.1803(c)(8).  *Cf.* Section 1706(a)(3) of the Act, 40 P.S. §991.1706(a)(3), which expressly authorizes the Pennsylvania Life and Health Insurance Guaranty Association to make loans to an impaired insurer.

unable, to relinquish control of statutory deposits.  Reinsurers could have shown leadership in the challenge of this rehabilitation effort, but it appears not in their short-term interests to so act.  These factors, in concert, require that the step of last resort, *i.e.*, liquidation, be taken.

In reaching this conclusion, it is important to note what issues are not herein decided.  For another day is the question raised by the Reinsurance Association, *i.e.*, that the Court should not assert jurisdiction over reinsurance disputes but should permit them to be decided in arbitration, which will delay the day of reckoning for reinsurers.  Similarly, the record is inadequate to determine whether funds established for the payment of PPG claims and American "small" claims are general assets of Legion or are held in trust.  Finally, this Court lacks jurisdiction to decide the collateral issue raised by Rural/Metro with respect to its large deductible reimbursement policy issued in Bermuda.

The specifics of a liquidation order, including its effective date, will not be entered until the Rehabilitator proposes an order that includes, *inter alia*, a new bar date and new effective date.  The proposed order must also address a procedure for allowing direct access to those policyholders in situations similar to those of the Policyholder Intervenors.

In accordance with this Opinion, the Court enters the attached Order.

_____
MARY HANNAH LEAVITT, Judge



IN THE COMMONWEALTH COURT OF PENNSYLVANIA

M. Diane Koken, Insurance Commissioner,  :
Commonwealth of Pennsylvania,                      :
                    Plaintiff                 :
                                      :
                v.                 :    No. 183 M.D. 2002
                                        :
Legion Insurance Company,                         :
                Defendant               :

RE:   Petition for Liquidation of Legion Insurance Company (In Rehabilitation)

## ORDER

AND NOW, this 26th day of June, 2003, it is hereby ORDERED as follows:

1.    The Rehabilitator's petition to terminate the rehabilitation of Legion Insurance Company (In Rehabilitation) is GRANTED, but the Rehabilitation Order of March 28, 2002, shall remain in effect until entry of the Order of Liquidation.

2.    The requests of Pulte Home, Inc., Psychiatrists' Purchasing Group, Inc., Rural/Metro Corporation and American Airlines, Inc. for direct access to the reinsurance agreements to which they have demonstrated third-party beneficiary status, as set forth in the attached Opinion, are GRANTED.

3.    The Rehabilitator shall prepare and submit to the Court for approval: a procedure whereby policyholders of Legion Insurance Company (In Rehabilitation), who can demonstrate third-party beneficiary rights under a reinsurance agreement in accordance with the principles set forth in the attached Opinion, may directly access those reinsurance agreements.



4.     The Rehabilitator shall prepare and submit to the Court for approval an order for the liquidation of Legion Insurance Company (In Rehabilitation) that includes: a new effective date for the liquidation order; a new bar date for the filing of proofs of claim with the liquidator; and other provisions that will address the current status and financial condition of Legion Insurance Company (In Rehabilitation).

5.     The Rehabilitator's proposed order for the liquidation of Legion Insurance Company (In Rehabilitation) shall be filed with the Court on or before July 14, 2003.


_____
MARY HANNAH LEAVITT, Judge

